# EXHIBIT A

Slip Copy, 2010 WL 2640137 (M.D.Fla.)
**(Cite as: 2010 WL 2640137 (M.D.Fla.))**

H

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court, M.D. Florida,
Tampa Division.
ADVANCED CARTRIDGE TECHNOLOGIES,
LLC, Plaintiff,
v.
LEXMARK INTERNATIONAL, INC., Defendant.
**No. 8:10-cv-486-T-23TGW.**

June 30, 2010.

Brian R. Gilchrist, Jeffrey Scott Boyles, Allen, Dyer, Doppelt, Milbrath & Gilchrist, PA, Michael E. Marder, Greenspoon Marder, PA, Orlando, FL, for Plaintiff.

Audra Eidem Heinze, Binal J. Patel, Timothy C. Meece, V. Bryan Medlock, Jr., Banner & Witcoff, Ltd., Chicago, IL, Christopher B. Roth, Banner & Witcoff, Ltd., Washington, DC, Daniel F. Molony, David S. Johnson, Shook, Hardy & Bacon, LLP, Tampa, FL, for Defendant.

### ORDER

STEVEN D. MERRYDAY, District Judge.

**\*1** The plaintiff sues Lexmark International, Inc., for patent infringement and "false patent marking" actionable under 35 U.S.C. § 292. Moving (Doc. 17) to dismiss the false marking claim, the defendant argues that the complaint (1) fails to comply with the pleading requirements of Rules 8 and 9(b), Federal Rules of Civil Procedure; (2) fails to allege an injury sufficient to confer standing; and (3) asserts a claim barred by the statute of limitations. The plaintiff responds (Doc. 22) in opposition.

The false marking statute provides that "[w]hoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word 'patent' or any word or number importing that the same is patented for the purpose of deceiving the public ... [s]hall be fined not more than $500 for every such offense." 35 U.S.C. § 292(a). The statute permits any person to sue to enforce the prohibition, "in which event one-half [of the fine] shall go to the person suing and the other to the use of the United States." 35 USC § 292(b). To state a claim for false marking, the plaintiff must allege that the defendant "(1) mark[ed] an unpatented article (2) [with] intent to deceive the public. *See The Forest Group, Inc. v. Bon Tool Co.,* 590 F.3d 1295, 1300 (Fed.Cir.2009).

Intent to deceive is a state of mind arising when a party acts with sufficient knowledge that what it is saying is not so and consequently that the recipient of its saying will be misled into thinking that the statement is true. '[T]he fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent.'

*Clontech Labs., Inc. v. Invitrogen Corp.,* 406 F.3d 1347, 1352 (Fed.Cir.2005). "The false marking statute is a fraud-based claim, which is subject to the pleading requirements of" Rule 9(b), Federal Rules of Civil Procedure. *Juniper Networks v. Shipley,* 2009 WL 1381873, at 4 (N.D.Cal. May 14, 2009) (citing *Berson v. Applied Signal Tech., Inc.,* 527 F.3d 982, 987 (9th Cir.2008) ("[p]laintiffs must 'state with particularity facts giving rise to a strong inference' that defendants acted with the intent to deceive ...."). *But see Third Party Verification, Inc. v. Signaturelink, Inc.,* 492 F.Supp.2d 1314, 1327 (M.D.Fla.2007) (Conway, J.) (noting that "no case law ... require[s] the Rule 9 level of pleading to claims for false marking.").

The complaint alleges that the defendant "marks patent numbers on toner cartridge products for ima-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2640137 (M.D.Fla.)
**(Cite as: 2010 WL 2640137 (M.D.Fla.))**

ging devices" and that the defendant "knows, or reasonably should know, that marking the Cartridge Products with patents that do not cover the Cartridge Products, or patents that are invalid or expired, will deceive the public." (Doc. 1, ¶¶ 30, 32) Providing only sparse factual detail, the complaint utterly fails to "state with particularity the circumstances constituting fraud." Rule 9(b), Federal Rules of Civil Procedure.

**\*2** The defendant also argues for dismissal of the false marking claim because the plaintiff "fails to allege an injury-in-fact sufficient to confer standing." However, the complaint alleges that the defendant's false marking is "likely to discourage and/or inhibit competition for the manufacture and sale of toner cartridges to the detriment of Plaintiff, and [to] allow Defendant to demand excessive prices for Cartridge Products offered to the public." (Doc. 1, ¶ 37) Alleging an injury specific to the plaintiff, the complaint adequately alleges standing.

Finally, the defendant argues that the plaintiff's false marking claim is barred by 28 U.S.C. § 2642, which requires the plaintiff to sue within five years after the claim "first accrued." The defendant argues that the plaintiff "must assert a violation that first occurred since February 22, 2005 (five years prior to the commencement of this action). To the extent Lexmark first marked its cartridges products with patent numbers prior to February 22, 2005, any false marking claims directed to that conduct is barred in its entirety." (Doc. 17 at 16-17) However, the false marking statute's "plain language requires the penalty to be imposed on a per article basis. The statute prohibits false marking of 'any unpatented article,' and it imposes a fine for 'every such offense.' " *Forest Group,* 590 F.3d at 1301. Accordingly, the relevant date remains the date the defendant marked each article (not, as the defendant suggests, the date the defendant "first marked its cartridges with patent numbers").

The defendant's motion (Doc. 17) to dismiss is **GRANTED IN PART** and **DENIED IN PART.** The motion is **GRANTED** to the extent that count

two is **DISMISSED** for failure to state with particularity the circumstances constituting the defendant's alleged fraud. The motion is otherwise **DENIED.** On or before **Friday, July 9, 2010,** the plaintiff may submit an amended complaint that complies with the pertinent pleading standard.

ORDERED.

M.D.Fla.,2010.
Advanced Cartridge Technologies, LLC v. Lexmark Intern., Inc.
Slip Copy, 2010 WL 2640137 (M.D.Fla.)

END OF DOCUMENT

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Alabama, Southern Division.
CENTRAL ADMIXTURE PHARMACY SER-
VICES, INC., and Gerald Buckberg, Plaintiffs,
v.
ADVANCED CARDIAC SOLUTIONS, P.C., and
Charles Wall, Defendants.
**No. CV-00-2430-VEH.**

Jan. 13, 2006.
Opinion Denying Reconsideration Feb. 27, 2006.

David Dalke, Brett J. Williamson, Nathaniel L.
Dilger, O'Melveny & Myers, Irvine, CA, John W.
Smith T, Michael S. Denniston, Thomas G.
Peterson, Bradley Arant Rose & White, Birming-
ham, AL, for Plaintiffs.

Brendan E. Squire, Robert J. Veal, Smith Gambrell
& Russell LLP, Atlanta, GA, Howard P. Walthall,
Jr., Burr & Forman LLP, Birmingham, AL, for De-
fendants.

(CORRECTED) MEMORANDUM OF OPINION

HOPKINS, J.

**\*1** Before the court are four motions for summary
judgment, filed by the plaintiffs, Central Admixture
Pharmacy Services, Inc. ("CAPS"), and Gerald
Buckberg; and two motions for summary judgment
and one motion for judgment on the pleadings, filed
by the defendants, Advanced Cardiac Solutions,
P.C. ("ACS"), and Charles Wall.

The instant cause is a civil action for the infringe-
ment of U.S. Patent Number 4,988,515 (the " '515
patent"). The plaintiffs are, Dr. Gerald Buckberg,
the inventor and alleged owner of the patent, and
CAPS, the exclusive licensee of the patented inven-

tion. In their complaint, the plaintiffs assert a cause
of action under federal patent law, 35 U.S.C. §§
281, et seq., against the defendants ACS and
Charles Wall for infringement of the '515 patent by
producing, commercially marketing, and selling
directly infringing products, and by inducing others
to infringe the patent by producing infringing
products.

In their Third Amended Answer and Counterclaim,
the defendants assert several defenses to the
plaintiffs' patent infringement claim as well as three
counterclaims of their own. In Counterclaim I, the
defendants seek a declaration that the '515 patent is
unenforceable and, alternatively, that the defend-
ants did not infringe the patent. In Counterclaim II,
the defendants assert a cause of action under 35
U.S.C.A. § 292 for false marking. In Counterclaim
III, the defendants assert a cause of action for false
advertising under the Lanham Act, 15 U.S.C.A. §
1125(a)(1)(b).

In the instant motions filed by the defendants, the
defendants seek judgment on the plaintiffs' claim of
infringement on three separate grounds. In the first
motion (doc. 219), the defendants seek judgment on
the pleadings on the ground that the plaintiffs do
not have title to the patent. In the second motion
(doc. 233), the defendants move for summary judg-
ment based upon the defense that the plaintiffs en-
gaged in inequitable conduct in the procurement of
the patent. In the third motion (doc. 235), the de-
fendants seek partial summary judgment on the
ground that the plaintiffs have failed to adduce any
evidence that the defendants infringed the '515 pat-
ent prior to the issuance of the Certificate of Cor-
rection.

In the instant motions for summary judgment filed
by the plaintiffs, the plaintiffs seek judgment on
their claim of infringement, on the defendants' three
counterclaims, and on an unpled counterclaim for
violations of the Sherman Anti-Trust Act. In the
plaintiffs' first motion (doc. 220), they seek sum-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)

**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

mary judgment on their claim of infringement and against the defendants' counterclaim for a declaration of no infringement. In the plaintiffs' second motion (223), they seek summary judgment on the defendants' defense that the '515 patent is invalid. In the plaintiffs' third motion (doc. 226), the plaintiffs seek summary judgment on the defendants' counterclaim of false marking and false advertising under Lanham Act. In the plaintiffs' fourth motion (doc. 229), they seek summary judgment on the defendants' affirmative defense of inequitable conduct, patent misuse, and on an unpled counterclaim under the Sherman Anti-Trust Act.

**\*2** These motions were opposed, fully briefed, and were taken under submission by the court on July 26, 2005.

### SUMMARY OF DISPOSITION

For the reasons below, the court rules as follows:

1. The defendants' motion for judgment on the pleadings for lack of ownership of the '515 patent (doc. 219) is DENIED;

2. The plaintiffs' motion for summary judgment as to the defendants' claim of inequitable conduct and patent misuse (doc. 229) is GRANTED FN1 and the defendants' motion for summary judgment on inequitable conduct (doc. 233) is DENIED;

> FN1. Because the plaintiffs' motion for summary judgment on the defendants' unpled counterclaim of antitrust violation (doc. 229) is DENIED AS MOOT, the plaintiffs' fourth motion for summary judgment (doc. 229) is GRANTED IN PART as to defendants' defenses of inequitable conduct and patent misuse and DENIED IN PART as to the defendants' unpled antitrust counterclaim. The defendants failed to plead a counterclaim for violations of the federal antitrust laws, and the claim

simply is not before the court.

3. The plaintiffs' motion for summary judgment as to the defendants' claim of that the '515 patent is invalid on grounds of obviousness (doc. 223) is GRANTED;

4. The plaintiffs' motion for summary judgment on its claim of infringement (doc. 220) is DENIED IN PART and GRANTED IN PART as follows: summary judgment is granted as to whether the defendants willfully infringed the '515 patent provided that the certificate of correction is found to be valid; summary judgment is denied as to whether the certificate of correction is valid;

5. The defendants' partial motion for summary judgment of no infringement prior to the issuance of the certificate of correction (doc. 235) is DENIED;

6. The plaintiffs' motion for summary judgment on the second counterclaim of false marking and third counterclaim of false advertising (doc. 226) is GRANTED.

### PROCEDURAL BACKGROUND

The plaintiff CAPS commenced this action on August 31, 2000, by filing a complaint with this court asserting a cause of action for patent infringement under federal patent law. Fact discovery in this case initially closed on August 17, 2001.

On April 30, 2002, the court conducted a *Markman* hearing to construe the claims of the '515 patent. On May 2, 2002, the court issued its *Markman* order construing the claims of the patent. On November 21, 2003, the plaintiffs filed their motions for summary judgment. On December 8, 2003, the court extended the deadline for filing dispositive motions until March 23, 2004. On March 23, 2004, the date of the dispositive motion deadline, the defendants filed two motions for summary judgment, as well as a motion to dismiss and a motion regard-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

ing claim construction. On September 1, 2004, the defendants filed an additional motion for summary judgment on the previously unraised grounds of inequitable conduct and common law fraud, along with a "supplemental" motion for summary judgment on the ground of patent invalidity.

On November 29, 2004, the court entered an order denying the defendants' motion to dismiss for lack of standing. However, the court agreed with the defendants' argument that CAPS, the exclusive licensee of the patented technology, was required to join the inventor, Dr. Gerald Buckberg, as a plaintiff to the action to comply with statutory, as opposed to constitutional, standing requirements. On December 15, 2004, Dr. Buckberg was joined as a plaintiff in the action. On January 7, 2005, the court gave the defendants 60 days to conduct discovery on Dr. Buckberg.

**\*3** Due to the additional discovery and the passage of time, on March 3, 2005, the court denied all of the parties' previously filed summary judgment motions. On May 5, 2005, the court required that new motions for summary judgment be filed by June 6, 2005. The parties filed six new motions for summary judgment on the date of the deadline. In addition, on May 23, 2005, the defendants also filed a motion for judgment on the pleadings. On July 26, 2005, the court took those summary judgment motions and the motion for judgment on the pleadings under submission. They are now before the court.

### THE TECHNOLOGY

The invention at the heart of this dispute is called a cardioplegic solution. Cardioplegic solutions are chemical solutions used during open-heart and other kinds of stop-heart surgical procedures. One type of cardioplegic solution is used to stop the heart and reduce its energy demands. While the heart is stopped, the patient is sustained on a cardiopulmonary by-pass machine, which maintains the circulation of oxygenated blood through the body. Meanwhile, another cardioplegic solution is used to pro-

tect the heart from muscle damage, called ischemia, while the heart is stopped. At the conclusion of the operation, a different cardioplegic solution is infused to start the heart beating again and to prepare the heart for the return of normal blood flow, a process called reperfusion.

### THE '515 PATENT

The invention covered by the '515 patent is described as a "cardioplegic solution." Commercially, the invention is known as a "Buckberg Solution" (hereinafter the "Invention" or the "Buckberg Solution") and is named for the inventor, the plaintiff Dr. Buckberg. The patent involves two varieties of cardioplegic solutions: high potassium solutions, which are used initially to stop the heart's beating at the beginning a stop-heart surgical operation, and low potassium solutions, which are used to protect the heart from muscle damage during the surgery. These solutions are called "blood cardioplegic" solutions because the solutions are mixed with the patient's blood before they are infused into the patient's heart.

The '515 invention consists of an amino acid enriched cardioplegic solution with (1) a calcium ion concentration of between 50-300 umol; (2) a concentration of metabolizable substrate between about 400-1000 mg%; and (3) an osmolality of between about 400-500 mOsmol/kg.[FN2] Because blood usually has a calcium concentration of 1000 umol, a calcium content of 50-300 umol is considered hypocalcemic. Although the patent allows for several varieties of metabolizable substrates, the metabolizable substrate used most often appears to be glucose. A solution having a concentration of glucose between about 400-1000 mg% would fall within the '515 patent's second criterion. Osmolality refers to the number of particles of solute per kilogram of water in the solution and is denoted by the abbreviation mOsmol/kg.[FN3] Because blood usually has an osmolality of approximately 280-300 mOsmol/kg, the levels of osmolality in described by the '515 patent (between about 400-500 mOsmol/kg) are

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

considered moderately hyperosmotic.

> FN2. The '515 patent originally provided for the invention to have an *osmolarity* of between about 400-500 mOsmol. On January 30, 2001, the United States Patent and Trademark Office issued a certificate of correction changing every instance of osmolarity in the '515 patent to osmolality. Although the question of the certificate of correction's validity is centrally disputed in this action, for purposes of providing the background of the dispute, the court refers to the '515 patent as altered by the certificate of correction.

> FN3. Osmolarity, by contrast, refers to the number of particles of solute per liter of solution and is denoted by the abbreviation mOsmol/L.

**\*4** In addition, because the Buckberg Solution is an amino acid enriched solution, it contains 10-30 mmol of the amino acid aspartate and 10-30 mmol of the amino acid glutamate. The solution must have a pH of between 7.5 and 7.7. The Buckberg Solution generally contains blood, but the '515 patent covers solutions involving a "carrier" or "cardioplegic compatible diluent" other than blood as well. However, for the purposes of this action, the only relevant carrier or diluent involved is blood.

The '515 patent has three independent claims: claims 1, 7, and 13. Claim 1 has seven dependent claims (Claims 2-6, 18) and patents specific types of cardioplegic solutions. Claim 7 has five dependent claims (Claims 8-12) and patents methods for treating hearts with cardioplegic solutions. Claim 13 has four dependent claims (Claims 14-17) and patents concentrated aqueous solutions that need to be diluted to become cardioplegic solutions. As mentioned above, for purposes of this action, the concentrated aqueous solution referred to in Claim 13 will be diluted with blood to become a cardioplegic solution.

Under all three of the '515 patent's independent claims, the solution, the treatment, and the aqueous solution adapted to be diluted must contain (1) a calcium ion concentration of between 50-300 umol; (2) a concentration of metabolizable substrate between about 400-1000 mg%; and (3) an osmolality of between about 400-500 mOsmol/kg.

I.

Ownership of the '515 Patent

The defendants moved for judgment on the pleadings on the ground that the plaintiffs do not own the '515 patent. The facts relevant to this motion are set out below.

A. *Facts*

Dr. Buckberg created the Buckberg Solution at some point between 1979 and 1985. During this period, Dr. Buckberg was an employee of the University of California. He developed the solution while conducting research pursuant to National Institutes of Health ("NIH") research grant number HL-16292. On August 2, 1985, Dr. Buckberg conveyed his interest in the Buckberg Solution to the University of California.

On August 21, 1985, Dr. Buckberg applied for a patent on the Buckberg Solution. In the patent application, Dr. Buckberg named himself as the inventor. On December 13, 1985, the Regents of the University of California granted the United States a nonexclusive, nontransferable, irrevocable, royalty-free license to use the Buckberg Solution. (Def.Ex. E.)

On March 11, 1987, Dr. Buckberg requested a waiver of patent rights from the NIH. On September 23, 1987, the Assistant Secretary for Health, Dr. Robert E. Windom, issued a waiver of patent rights with respect to the Buckberg Solution. The waiver provided that Buckberg was "free to retain and ad-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

minister the patent rights to the invention in accordance with the requirements of 37 C.F.R. § 401 .9" and that "the inventor shall grant to the government of the United States a nonexclusive, irrevocable, royalty-free license to use the invention for government purposes." (Def.Ex. G.)

**\*5** In response to the defendants' requests for admissions, Dr. Buckberg admitted that he "did not execute a license to the United States Government in the invention covered by U.S. Patent 4,988,515 at any time between 1987 and 1991." (Def.Ex. I.)

On January 29, 1991, the PTO issued patent '515, which covered the Buckberg Solution. (Def.Ex. C.) The '515 patent lists Dr. Buckberg as the inventor and the Regents of the University of California as the assignees. (*Id.*) The '515 patent further provides that "the invention was made with Government support under Grant No. HL 16292 awarded by the National Institutes of Health. The Government has certain rights in this invention." (*Id.*) On June 24, 1991, the Regents of the University of California assigned their rights to the patent to Dr. Buckberg. (Pla.Ex. FFF.)

**B. *Legal Standard***

Judgment on the pleadings is proper when no issues of material fact exist and the movant is entitled to judgment as a matter of law. *See Ortega v. Christian,* 85 F.3d 1521, 1524-25 (11th Cir.1996).[FN4]

> **FN4.** Because the defendants' motion is based almost entirely upon documents not included within the pleadings, the defendants' motion for the most part is a motion for summary judgment. To the extent that the defendants base their arguments on documents outside the pleadings, the court will evaluate the motion under the standard governing summary judgment set out *infra.*

**C. *Analysis***

The defendants' motion for judgment as a matter of law is based on the argument that Dr. Buckberg failed to perfect his title to the invention due to his failure to comply with the Bayh-Dole Act, 35 U.S.C.A. §§ 200-12, the related agency regulations, and the requirements in the NIH's waiver of patent rights that Buckberg execute a license in favor of the United States.[FN5] (*See* Def. Ex. G.) With respect to the Bayh-Dole Act, the defendants argue that the Act required Dr. Buckberg to grant the United States a paid-up, irrevocable license to use the Buckberg Solution, and that, because Buckberg failed to do so, he lacks title to the '515 patent.

> **FN5.** The defendants also move for judgment on the pleadings on the ground that the plaintiffs failed to specifically allege that Dr. Buckberg owns the '515 patent. Not only is this argument frivolous, but the defendants are estopped from making it. Earlier in the litigation, the defendants moved for dismissal on the basis that Dr. Buckberg, the patent owner, had not been joined as a plaintiff to the action. In course of advancing that argument, the defendants unequivocally asserted that "The patent is owned by Gerald Buckberg." (*See* Defs.' Mot. to Dismiss, doc. 79, at 3.) Having induced the court to order the joinder of Dr. Buckberg on the basis of that argument, the defendants now are estopped from complaining about the inadequacy of the plaintiffs' pleading with regard to Dr. Buckberg's ownership of the '515 patent.

The Bayh-Dole Act, 35 U.S.C.A. §§ 200-12, governs the patent rights of inventions made with federal assistance. For the act to apply, a party must be a contractor who enters into funding agreements with federal agencies and who reduces to practice an invention, called a subject invention, in the performance of the work under the funding agreement. Here, there is no dispute that the University of California is both a contractor and a nonprofit organization, within the meaning of sections 201(c) and (i)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

of the Act, and that the Buckberg Solution is a subject invention that was reduced to practice during the performance of work under a funding agreement with a federal agency. The Act therefore applies. The analysis moves to the questions of whether the Act was violated, and if so, what the consequence of the violation must be.

Section 202(c)(1) requires a contractor to disclose within a reasonable time any subject invention to the federal agency that issued the funding agreement. *See* 35 U.S.C.A. § 202(c)(1). Federal regulations define a reasonable time as within two months of the date the invention was created. *See* 48 C.F.R. § (c)(1). After the invention is disclosed to the federal agency, the Act requires the contractor to "make a written election within two years after disclosure to the federal agency ... whether the contractor will retain title to a subject invention." 35 U.S.C.A. § 202(c)(2). If the contractor elects to retain title, section 202(c)(5) provides that "the Federal agency shall have a nonexclusive, nontransferable, irrevocable, paid-up license to practice or have practice for or on behalf of the United States any subject invention throughout the world." Federal regulations further require a contractor to "agree to execute or to have executed and promptly deliver to the Federal Agency all instruments necessary to (I) establish or confirm the rights the government has throughout the world in those subject inventions to which the Contractor elects to retain title...." 48 C.F.R. § 52.277(f)(1)(I). The regulations further require the contractor to "include ... within a patent issuing thereon covering the subject invention, the following statement, 'The invention was made with Government support under (identify the contract) awarded by (identify the Federal agency). The Government has certain rights in the invention.' ' *Id.* § 52.277(f)(4).

**\*6** There is no dispute here that the University of California complied with each of these requirements. The University timely disclosed the Buckberg Solution to the NIH. On December 13, 1985, it executed a confirmation of the NIH's paid-up, irre-

vocable license to the invention. (*See* Def. Ex. E.) The '515 patent contains the statement required by regulation section 52.277(f)(4).

However, in 1987, the University of California decided to forgo its rights to the Buckberg Solution. At that point, Dr. Buckberg requested, pursuant to section 202(d) of the Bayh-Dole Act, to obtain the NIH's permission to seek patent rights in his own name. Section 202(d) provides: "If the contractor does not elect to retain title to a subject invention in cases subject to this section, the Federal agency may consider and after consultation with the contractor grant requests for retention of rights by the inventor subject to the provisions of this Act and regulations promulgated hereunder." 35 U.S.C.A. § 202(d). Among the regulations promulgated under the Act is 37 C.F.R. § 401.9, which provides that "[a]gencies which allow employee/inventor of the contractor to retain rights to a subject invention made under a funding agreement with a small business or nonprofit organization, as authorized by 35 U.S.C.A. § 202(d), will impose upon the inventor at least those conditions that would apply to a small business contractor under paragraphs (d)(1) and (3); (f)(4); (h); and (j) of the clause at § 401.14(a)." 37 C.F.R. § 401.9.

On September 23, 1987, the NIH assented to Dr. Buckberg's request to retain title to what would become the Buckberg Solution. However, the NIH's assent stated that "the inventor shall grant to the Government of the United States a nonexclusive, irrevocable, royalty-free license to the invention for government purposes." The defendants have submitted to the court Dr. Buckberg's admission that he did not execute a such license. Although Rule 37(b) permits a party to move to withdraw or amend an admission, the plaintiffs failed to file such a motion prior to the close of discovery. Consequently, even though Dr. Buckberg has provided, in opposition to this instant motion, a declaration that he did execute a license to the government, under Federal Rule 37(b), the court is obligated to treat Dr. Buckberg's admission as "conclusively es-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

tablish[ing]" that he did not execute any such license.

The defendants, therefore, have shown that Dr. Buckberg has failed to comply with the Bayh-Dole Act. The question, therefore, moves to what the Act prescribes as consequence of Dr. Buckberg's noncompliance.

The defendants argue that Dr. Buckberg's noncompliance entails that Dr. Buckberg never obtained title to the '515 patent. The problem with the defendants' argument, however, is that this consequence is nowhere mentioned in the Act. Rather, the only consequence mentioned in the Act for failing to comply with its requirements is that the federal government will retain the right to receive title to the invention. For instance, if a contractor entirely fails to disclose the existence of an invention to the relevant federal agency, the Act provides that "the Federal Government *may* receive title to any subject invention not disclosed to it within such time." 35 U.S.C.A. § 202(c)(1) (emphasis added). Similarly, if a party fails to make a timely written election of its intent to retain title to the subject invention, the Act provides that "the Federal Government *may* receive title to any subject invention in which the contractor does not elect to retain rights or fails to elect within such time." 35 U.S.C.A. § 202(c)(2) (emphasis added). The Federal Circuit has confirmed that the phrase "the Federal Government may receive title" means that the federal government has discretion to determine whether to take title to the invention. *See Campbell Plastics Eng'g & Mfg., Inc. v. Brownlee,* 389 F.3d 1243, 1250 (Fed.Cir.2004) ("We agree with the [Armed Services] Board [of Contract Appeals] that FAR 52.227.11(d) vests discretion in the government in determining whether to invoke forfeiture when an invention has not been correctly disclosed to it.").

**\*7** In support of their argument that the Act divests Buckberg of title, the defendants rely on *TM Patents, L.P. v. IBM Corp.,* 121 F.Supp.2d 349, 368-69 (S.D.N.Y.2000). However, the court will not follow *TM Patents* because it is at odds with

*Campbell Plastics.* Whereas *Campbell Plastics* states that a violation of the Bayh-Dole Act gives the Federal Government discretion to take title to a subject invention, *see* 389 F.3d at 1250 *TM Patents* states that the forfeiture is automatic. *See* 121 F.Supp.2d. at 368-69 ("Failure to comply with the conditions of § 202 results in the Government acquiring title."). On this question of patent law, this court is obligated to follow the Federal Circuit's authority as against the Southern District of New York. FN6

> FN6. Furthermore, the *TM Patents* decision is not persuasive because its legal conclusions are not supported by the authorities upon which the decision relies. In support of the proposition that the Bayh-Dole Act operates an automatic forfeiture on the patent rights of parties who do not fully comply with the Act, the *TM Patents* court relies on the following quotation from *Thermalon Industry, Ltd. v. United States,* 34 Fed. Cl. 411, 414 (Fed.Cl.1995): "NSF [a government entity] acquires title to a patent, rather than a license, *inter alia,* in the event the grantee fails to disclose within a reasonable time that the patented invention resulted from the grant." Although the *TM Patents* court relies on this quotation as an authoritative interpretation of the Bayh-Dole Act, the quotation is no such thing. Instead, the quotation is part of a recitation of the provisions of a contract between the National Science Foundation (NSF) and Thermalon Industries. The *Thermalon* court was not even attempting to construe the Bayh-Dole Act, much less give an authoritative interpretation of it. Indeed, the *Thermalon* case was a breach of contract action for damages having nothing to do with patent rights. Thus, the *TM Patents* opinion is contrary to the language of the Act, contrary to the binding authority of the Federal Circuit, and unsupported by the authority to which it cites.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

Based on the language of the statute and its interpretation by the Federal Circuit, the court determines that Dr. Buckberg's failure to comply with the Bayh-Dole Act leaves the patent subject to the Federal Government's discretionary right to take title to the '515 patent. In addition to the fact that this outcome is supported by the statutory language and applicable case law, the court finds that this conclusion furthers the purpose of the Bayh-Dole Act by interpreting the law to preserve the government's rights to inventions created through government funding and also by declining to interpret the law to provide additional defenses to alleged patent infringers.

Because the defendants have failed to present any evidence that the NIH has taken title to the '515 patent, the court finds that the defendants are not entitled to judgment on the ground that Dr. Buckberg is not the owner of the patent. Accordingly, the defendants' motion for judgment on the pleadings for lack of ownership of the '515 patent is due to be DENIED.

## II.

### The Validity of the '515 Patent

The plaintiffs move for summary judgment as to the defendants' counterclaim and affirmative defenses that the '515 patent is invalid.

### A. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023

(11th Cir.2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. Id. at 324.

**\*8** All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir.1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Chapman, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249.

On a motion for summary judgment, the burden of proof that applies is the "evidentiary standard of proof that would pertain at a trial on the merits." Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 962 (Fed.Cir.2001). Because patents are entitled at law to a presumption of validity, see 35 U.S.C.A. § 282, a moving party seeking to have a patent held not invalid at summary judgment must show that the nonmoving party, who bears the burden of proof at trial, failed to produce clear and convincing evidence of invalidity so that no reasonable jury could invalidate the patent. Id. Additionally, when a party attacks a patent based upon prior art that was considered by the PTO, "he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

from their work with the level of skill in the art and whose duty it is to issue only valid patents." *Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1359 (Fed.Cir.1984).

**B. Facts**

As described above, the Buckberg Solution consists of an amino acid enriched cardioplegic solution having (1) a calcium ion concentration of between 50-300 umol; (2) a concentration of metabolizable substrate between about 400-1000 mg%; and (3) an osmolality of between about 400-500 mOsmol/kg. At these levels, the solution combines the characteristics of being hypocalcemic, hyperglycemic, and hyperosmotic, and it possesses these characteristics within the precise ranges claimed in the patent.

The prior art in the area of cardioplegia that form the basis of the defendants' claims of invalidity are as follows. In 1978, Dr. David Follette, *et al.,* published in the journal *Surgical Forum* an article describing a cardioplegic solution that was hypocalcemic (.5 mEq/L calcium).[FN7] The solution described by Dr. Follette was not amino acid enhanced. In 1979, Dr. Buckberg published an article entitled "A Proposed 'Solution' to the Cardioplegic Controversy" in which he disclosed a solution that was hypocalcemic (500 umol calcium) and moderately hyperosmotic (>400 mOsmol/L).

> FN7. The defendants' expert, Dr. Robert Riggs, reports that .5 mEq/L converts to 250 umol calcium.

In 1980, in what the parties refer to as the "Dyson Reference," Drs. Buckberg and Charles Dyson described their "standard cardioplegic solution" as being hyperosmotic (360 mOsmol/L) and hypocalcemic with a metabolizable substrate, in this case dextrose, of over 2000 mg%. The Dyson Reference was later updated and, in 1982, it was published as Chapter 22 of the *Textbook on Clinical Cardioplegia* (the "Chapter 22 Reference"). Neither the Dyson Reference nor the Chapter 22 Reference describe solutions that are amino acid enhanced.

**\*9** In 1981, Dr. David Follette, *et al.,* published an article where the authors described a cardioplegic solution that was hypocalcemic and hyperosmotic, but at various levels of calcium concentration and levels of osmolarity. The article endorses as "ideal" a calcium concentration of 500 umol and an osmotic pressure of 351 +/-5 mOsmol/L. However, the article did not disclose any amount of glucose or other metabolizable substrate in the solution, nor was it amino acid enriched.

In 1982, Dr. Phillip Menasche, *et al.,* published an article wherein the authors disclosed a cardioplegic solution that was hypercalcemic (2500 umol calcium), moderately hyperosmotic (395 mOsmol/L), and hyperglycemic (10 gm/L glucose).[FN8] Menasche based his solution on a 1981 article by Dr. Follette, although Menasche's solution also was amino acid enriched and contained glucose. The Menasche article described a clinical trial testing a procedure called retrograde coronary sinus profusion as a means of delivering cardioplegia.

> FN8. The defendants' expert, Dr. Riggs, states that 10 gm/L of glucose would produce a glucose concentration of approximately 1000 mg%. (*See* Riggs Decl. (doc. 239, Defs.Ex. 2) ¶ 11.)

In 1983, Dr. Kito published an article describing a cardioplegic solution that was hyperglycemic with a glucose range of 2500-3500 mg%. In 1983, Dr. Rosenkrantz described a cardioplegic solution that was hypocalcemic (500 umol calcium) and moderately hyperosmotic (360 mOsmol/L) but that did not disclose any glucose concentration or recommend amino acid enrichment. In 1984, Dr. Hashimoto disclosed a cardioplegic solution containing 2000 mg% of glucose.[FN9]

> FN9. Dr. Riggs, the defendants' expert, lists additional references as relevant prior art, but there is no dispute that the remaining references, including the Menasche

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

1984, the Irasawa 1983, and the Bercot 1979 References disclose cardioplegic solutions that differ in material respects from the Buckberg Solution. Reflecting this, in their brief opposing summary judgment, the defendants make no arguments based upon these additional references.

The application that led to the '515 patent was filed on August 21, 1985. On November 20, 2003, the defendants filed a Request for *Ex Parte* Reexamination of the '515 Patent with the PTO. All of the references cited in the Information Disclosure Statements submitted during the reexamination proceedings were considered by the Examiner. On February 10, 2005, a Notice of Intent to Issue Ex Parte Reexamination Certificate was issued by the Examiner. The Examiner stated that "[n]one of the references, either taken individually or taken as a whole, suggest the cardioplegia solution within the limitations claimed." (*See* Notice of Intent to Issue Reexamination Cert., Pla. Ex. JJ.)

C. *Analysis*

The defendants assert a counterclaim for a declaration that the '515 patent is invalid and raise invalidity as an affirmative defense. The defendants' claims of invalidity are based upon anticipation under section 102 of the patent law, the public use bar under section 102 of the patent law, indefiniteness under section 115 of the patent law, and obviousness under section 103 of the patent law.

1. *Anticipation Under § 102*

"Anticipation under 35 U.S.C.A. § 102 means lack of novelty, and is a question of fact." *Beckson Marine, Inc. v. NFM, Inc.,* 292 F.3d 718, 725 (Fed.Cir.2002). To prevail on their claim that the '515 patent is void because it was anticipated, the defendants must show, by clear and convincing evidence, "that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a

person of ordinary skill in the art could practice the invention without undue experimentation." *Advanced Display Sys., Inc. v. Kent State Univ.,* 212 F.3d 1272, 1282 (Fed.Cir.2000).

**\*10** The defendants predicate their claim of lack of novelty on an article authored by Phillip Menasche, *et al.,* published in 1982 in the *Society of Thoracic Surgeons* journal. However, this reference plainly fails to support the defendants' claim of anticipation on two grounds.[FN10] First, the solution described in the Menasche 1982 Reference discloses a calcium concentration of 2500 umol, which far exceeds the Buckberg Solution's claimed range of 50-300 umol. In fact, the Menasche solution is significantly *hyper* calcemic rather than *hypo* calcemic. Although the defendants argue that a person skilled in the art could add sufficient chelating agent to reduce the calcium concentration to the ranges claimed in the '515 patent, there is nothing in the text of the article to motivate a reader to do so. To the contrary, because the article recommends formulating a solution that is strongly hypercalcemic to begin with, it would be contradictory to view the article as disclosing or teaching or in any way encouraging the formulating of a strongly hypocalcemic solution.

> FN10. The plaintiffs object to the defendants' reliance on this reference because it was not disclosed until three years after the close of the original discovery deadline. Ordinarily, this argument would prevail and the untimely disclosed evidence would be disregarded. *See Sosa v. Airprint Sys., Inc.,* 133 F.3d 1417, 1418 (11th Cir.1998). However, because the court reopened discovery in this action and permitted the parties to file new motions for summary judgment based upon evidence produced in the most recent round of discovery, the court can see no principled ground for viewing this evidence as untimely, nor can the court perceive that the plaintiffs will suffer any prejudice by the court's consid-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

eration of the reference given their opportunity to conduct additional discovery on the reference.

Accordingly, the defendants have failed to provide clear and convincing evidence creating an issue of fact as to whether the '515 patent is invalid for having been anticipated. The plaintiffs are entitled to summary judgment on this ground.

### 2. *Public Use Under § 102*

Section 102 of the patent law provides that a person "shall be entitled to a patent unless ... (b) the invention was ... in public use or on sale in this country, more than one year prior to the date of the application in the United States." 35 U.S.C.A. § 102(b). As with any other challenge to the validity of a patent, the burden of proof to prove public use of the patented invention more than a year prior to the filing of the patent application is on the party attacking the patent. *See TP Labs. v. Professional Positioners, Inc.,* 724 F.2d 965, 971 (Fed.Cir.1984). Furthermore, it is well-established that "if a use is experimental, though not secret, 'public use' is negated." *Id.*

The defendants base their claim of public use on an article that Dr. Buckberg published in 1986 in *The Journal of Thoracic and Cardiovascular Surgery.* The article reports that, from May 1984 to April 1985, patients were clinically treated at UCLA and Long Beach Memorial Hospital for acute coronary occlusion with a cardioplegic solution within the ranges within the '515 patent. Although Dr. Buckberg testified that he did not remember whether he began treating the patients with the cardioplegic solution before or after August 21, 1984, the defendants ask the court to infer, on the basis of the article, that some use of the cardioplegia occurred prior to this date.

The defendants' reliance on the 1986 article falls short of clear and convincing evidence from which a jury could find that the '515 patent is invalid due

to public use. It is well-established that experimental use of an invention does not constitute public use under section 102(b). The fact that Dr. Buckberg published his findings in a scientific journal strongly supports the conclusion that the use was experimental. This conclusion is further supported by the fact that Dr. Buckberg relied on the data obtained from the clinical trials to support his application for a patent on the Buckberg Solution. (*See* '515 patent, at 2.) The defendants offer no evidence contradicting the plain appearance that Dr. Buckberg's clinical use of the invention was experimental.

**\*11** Accordingly, the plaintiffs are entitled to summary judgment on the defendants' claims that the '515 patent is invalid due to public use under section 102 of the patent law.[FN11]

> FN11. The plaintiffs submitted, along with their reply brief, a declaration from Dr. Buckberg indicating that the clinical treatment was secret, and therefore not public. However, the court struck that declaration, along with several other pieces of evidence, because they were untimely submitted under the Northern District of Alabama's Uniform Guidelines Regarding Summary Judgment. (*See* Order, dated July 26, 2005, doc. 266.)

### 3. *Obviousness Under § 103*

Section 103 of the patent law requires provides that "[a] patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C.A. § 103(a). Obviousness is an issue of law based upon four factual inquiries, to wit: "(a) the scope and content of the prior art; (b) the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

differences between the prior art and the claims at issue; (c) the level of ordinary skill in the art; (d) the objective evidence of nonobviousness." *Custom Accessories, Inc. v. Jeffrey-Allen Indus., Inc.,* 807 F.2d 955, 958 (Fed.Cir.1986). Furthermore, "when determining the patentability of a claimed invention which combines two known elements, the question is whether there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination." *Ecolochem, Inc. v. S. Cal. Edison Co.,* 227 F.3d 1361, 1371 (Fed.Cir.2000). However, one must not "use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention." *Id.* "[T]he court requires the challenger to show a motivation to combine the references that creates the case of obviousness." *Beckson Marine, Inc. v. NFM, Inc.,* 292 F.3d 718, 727-28 (Fed.Cir.2002) (brackets omitted).

The defendants base their claim of obviousness on the opinion of Dr. Riggs, on the twelve references cited in his expert reports, on the Dyson/Chapter 22 Reference, and on the Menasche 1982 Reference. With the exception of the Menasche 1982 Reference that the court discussed above, there appears to be no dispute that no single Reference embodies all of the '515 patent's claims. FN12 Consequently, the defendants rely on an argument that the prior art reveals a motivation to combine the elements present in the prior art in a way that obviously would lead to the formulation of the Buckberg Solution.

> FN12. *See* Holman Decl. (Pla.Ex. VV) ¶¶ 38-64. Furthermore, as the court ruled above, the Menasche 1982 Reference has a calcium concentration that plainly exceeds the range claimed in the '515 patent, and the defendants have produced no clear and convincing evidence that it contains a glucose concentration within the claimed ranges.

The defendants make this argument with a series of legal obstacles arrayed against them. In addition to

the patent possessing a statutory presumption of validity, the finding of the PTO Examiner as expressed in the Reexamination Certificate itself is evidence of the invention's lack of obviousness, and the court is obligated to afford the Examiner's conclusion some deference. *See Am. Hoist & Derrick Co.,* 725 F.2d at 1359. Furthermore, the plaintiffs have adduced substantial objective evidence of the invention's nonobviousness. Regarding the invention's commercial success, the defendants not only admit that its success is substantial, but they acknowledge that virtually no substitute products exist: "CAPS has an extremely strong position in the outsourcing of cardioplegia and faces competition from only one or two major companies and a handful of regional providers such as ACS. CAPS has no competitors in the outsourcing of amino acid enriched cardioplegia except ACS, but for ACS, no other substitute product exists." (Defs. Opp. to Pla.3d Mot. for Summ. J at ¶ (B)(1)).

**\*12** Moreover, Charles Wall admitted that he copied Dr. Buckberg's solution to formulate ACS' cardioplegia products. (Wall Dep. at 29-30, 48.) Additionally, several prominent cardiovascular surgeons have filed declarations supporting the nonobviousness of the Buckberg Solution in the prior art. Included among these surgeons is Dr. Follette, who authored many of the references relied upon by the defendants to support their claim of obviousness. ( *See* Def. Ex. X.)

Thus, to prevail against this evidence, defendants require extremely powerful evidence of a motivation to combine to establish that the Buckberg Solution was obvious in light of the prior art. Such evidence simply is lacking. FN13 Although it is possible to cherry-pick from the prior art the elements that Dr. Buckberg synthesized in the Buckberg Solution, each reference cited by the defendants teaches away from the invention to the same degree that it teach towards it.

> FN13. Although the defendants submit the opinion of Dr. Riggs that one can derive a motivation to combine from the prior art,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

Dr. Riggs's opinion does not prevent the granting of summary judgment because obviousness is a question of law, not one of fact. *See Custom Accessories, Inc., 807 F.2d at 958.* Thus, Dr. Riggs's opinion, to the extent that it attempts to establish that the Buckberg Solution was obvious in light of the prior art, amounts to an opinion on an ultimate question of law.

Furthermore, Dr. Riggs's opinion is flawed because it attempts to demonstrate a motivation to combine by focusing only on Dr. Buckberg's prior publications, and using the development in Dr. Buckberg's writing to predict what Dr. Buckberg's ideal solution would have been in 1985. This approach is flawed because Dr. Riggs's motivation for focusing exclusively on Dr. Buckberg's writing is his hindsight knowledge that Dr. Buckberg ultimately would synthesize the cardioplegia patented by the '515 patent. The law is clear that using hindsight to retrace the creation of an invention is an improper form of analysis to support a claim of obviousness. *See Beckson Marine, Inc., 292 F.3d at 727-28.*

The reason for this is that the prior art leading up the Buckberg Solution reveals no discernable trend in the levels disclosed in cardioplegia. For instance, the Menasche 1982, the Menasche 1984, and the Bercot 1979 References all teach hypercalcemia (1250-2500 umol calcium) in cardioplegia. However, other references published during the same period-such as Follette 1978, Follette 1981, the Rosenkrantz 1983, and the Dyson/Chapter 22 References-counsel the opposite, *i.e.,* hypocalcemia. Many references during this period contain no teaching on glucose, *see, e.g.,* Menasche 1984, Irisawa 1983, Follette 1981, Rosenkrantz 1983, Buckberg 1979, and Bercot 1979. Those that do contain teachings on glucose-*e.g.,* Kito 1983,

Hashimoto 1984, Follette 1977, and Dyson/Chapter 22-teach hyperglycemia at ranges far in excess of the ranges claimed in the '515 patent.

Reading the prior art references proffered by the defendants, the writing was not on the wall. One could only produce the Buckberg Solution if one had the special insight to know precisely which lines of the prior art to reject and which to accept. FN14 As attested to by the nineteen surgeons who provided declarations to support the nonobviousness of Dr. Buckberg's invention during the application for a patent, Dr. Buckberg alone possessed the rare insight necessary to separate the fruitful lines of development from the futile. There is no clear and convincing evidence to the contrary.

FN14. As discussed above, the Menasche 1982 cardioplegic solution is the one disclosed in the prior art that is most similar to the Buckberg Solution. However, the Menasche 1982 Reference addresses a separate topic. The article lists the formula of the cardioplegic solution only once in a table and it discloses the constituent elements of cardioplegia only briefly and incompletely in the text. The article makes no references of any particular benefits arising from the particular formulation used and it makes no attempt to encourage readers to use a similar solution. The article provides no guidance whatever as to which of the cardioplegia's elements should be pursued and which should be rejected. Consequently, the article fails to provide any motivation to reject its teaching on hypercalcemia, while accepting its teaching as to moderate hyperosmolality and hyperglycemia.

Given the mass of objective evidence as to nonobviousness, and in light of the substantial legal presumptions in favor of validity, and the failure of the defendants to demonstrate any expressly stated or inherent motivation to combine the prior art to produce the invention, the plaintiffs are entitled as a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

matter of law to a judgment that the '515 patent is not invalid for obviousness. Accordingly, the plaintiffs are entitled to summary judgment as to the defendants' claim that the patent is void for obviousness under section 103.

### D. Indefiniteness

**\*13** The defendants argue that the '515 patent is void for indefiniteness. A patent is unenforceably indefinite when one skilled in the art would not understand the bounds of the claim when read in light of the specification. *See Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1385 (Fed.Cir.1986). If the "claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more." *Id.* An assertion of indefiniteness must be proved by clear and convincing evidence. *See Northern Telecom, Inc. v. Datapoint Corp.,* 908 F.2d 931, 941 (Fed.Cir.1990). Close questions of indefiniteness are "properly resolved in favor of the patentee." *Exxon Research & Eng'g Co. v. United States,* 265 F.3d 1371, 1380 (Fed.Cir.2001).

The defendants argue that the '515 patent is indefinite for two reasons. First, they argue that the phrase "adapted to be diluted" is indefinite. Second, they argue that the word "maintaining," as used in the patent's claims, is indefinite.

The defendants' indefiniteness challenges fail, however, because they lack any evidentiary support. Critically, all the experts who have offered their opinions in this action have been able to construe the claims of the '515 patent. Furthermore, the defendant, Charles Wall, attests that he understood the claims of the '515 patent well enough to design ACS' products to avoid infringement. Thus, all the evidence supports the conclusion that the claims of the '515 patent are not unenforceably indefinite, and there is no probative evidence to the contrary.

Accordingly, the plaintiffs are entitled to summary judgment on the defendants' affirmative defense

and counterclaim that the patent is unenforceably indefinite.

### E. Conclusion

The plaintiffs' motion for summary judgment as to the defendants' affirmative defense and counterclaim that the '515 patent is invalid is due to be GRANTED.

### III.

### Inequitable Conduct

Both parties move for summary judgment on the defendants' claim of inequitable conduct in the procurement of the '515 patent.

### A. Sufficiency of Defendants' Pleadings

Federal Rule of Civil Procedure 9(b) states that claims alleging fraud must be pled with particularity. Fed.R.Civ.P. 9(b). Inequitable conduct, while a broader concept than fraud, must also be pled with particularity. *Ferguson Beauregard/Logic Controls v. Mega Sys.,* 350 F.3d 1327, 1344 (Fed.Cir.2003). Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b).

"Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with intent to deceive." *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.,* 204 F.3d 1368, 1373 (Fed.Cir.2000) (quotation and citation omitted). To satisfy the particularity requirement of Rule 9(b), ACS must plead "(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person respons-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

ible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1380-81 (11th Cir.1997).[FN15] Mere conclusory allegations of fraud are insufficient. *Id.* Allegations of inequitable conduct must give CAPS notice of the particular misconduct alleged so that it can defend against the charge. ACS must offer specific facts that CAPS can either deny or controvert. *See Weatherford Int'l, Inc. v. Casetech Int'l, Inc.,* No. Civ.A.H.-0305383, 2005 WL 1745457, at *1 (S.D.Tex. July 25, 2005). In holding that inequitable conduct must comply with Rule 9(b), the Federal Circuit has ruled that it would not "infer facts to support a claim that must be pled with particularity." *Ferguson Beauregard/Logic Controls,* 350 F.3d at 1344.

> FN15. The Federal Circuit applies the law of the regional circuit where the case arises as to procedural issues not unique to patent law, such as those under Rule 9(b). *See Ferguson Beauregard/Logic Controls,* 350 F.3d at 1344.

**\*14** In their Third Amended Answer and Counterclaim, the defendants asserted the following allegations in relation to inequitable conduct:

Affirmative Defenses

...

11. Each claim of the '515 patent is void and unenforceable by virtue of the failure of patentee to advise the Patent Office of prior art which was material to the examination of the application.

...

Counterclaims

...

9. Upon information and belief, during pro-

secution of the '515 Patent, the patentee failed to disclose all of the relevant prior art known to it, and thereby failed to satisfy its duty of disclosure to the United States Patent and Trademark Office. Additionally, by manipulation of various measurements and units, the patentee sought to mislead the Patent and Trademark Office regarding the relationship between the claimed invention and the prior art. The '515 Patent is unenforceable as a result of this failure to disclose and/or inequitable conduct during the prosecution of the patent.

...

19. The '515 Patent is invalid and unenforceable.

Third Amended Answer and Counterclaim, Affirmative Defenses, ¶ 11; Counterclaims, ¶¶ 9, 19.

These allegations fail to state a defense or claim of inequitable conduct with particularity. The allegations do not provide the specific details required by Rule 9(b), such as the precise statements, documents, or misrepresentations made; the time, place, and person responsible for the statement; or the content and manner in which these statements misled the PTO. *See Brooks,* 116 F.3d at 1380-81. The allegations fail to provide CAPS with specific facts to deny or controvert. Instead, the allegations merely restate the elements of an inequitable conduct defense. They are prototypical conclusory allegations.

Accordingly, the defendants have failed to plead an inequitable conduct defense with particularity as required by the Federal Circuit's case law.[FN16] The plaintiffs are therefore entitled to judgment as a matter of law on the defendants' counterclaims and defenses of inequitable conduct.

> FN16. The defendants rely upon *Great American Indemnity Co. v. Brown,* 307 F.2d 307, 308 (5th Cir.1962), for the proposition that objections under Rule 9(b)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)

**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

are waived if the objections are not presented via a Rule 12 motion. *Great American Indemnity Co.* is distinguishable, however, because it addresses the issue of pleading special damages and arises on an appeal after the entry of judgment. The case does not, and cannot, stand for the proposition that a party waives its 9(b) arguments if it moves for judgment on an inadequately pled defense for the first time at the summary judgment stage.

Furthermore, the court stands by its prior rulings that the defendants failed to show good cause for amending its pleadings to make additional allegations of inequitable conduct after the deadline for amending pleadings had passed.

Lastly, the defendants are mistaken to rely on the court's Order, dated May 5, 2005 (doc. 214), as ruling that the defendants adequately pled a defense of inequitable conduct. That Order merely ruled that defendants' discovery was relevant under Rule 26(b)(1) to allegations made in the defendants' Third Amended Answer and Counterclaim. The Order did not, however, review, analyze, or in any way rule upon the sufficiency of the defendants' allegations of inequitable conduct under Rule 9(b).

B. *Alternative Ruling on the Merits*

Even if the defendants had adequately pled their claims of inequitable conduct, the court nevertheless would grant the plaintiffs' motion for summary judgment on the claims on their merits.

"Inequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with intent to deceive." *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.,* 204 F.3d 1368, 1373 (Fed.Cir.2000). ACS's

unpled claims of inequitable conduct include an assertion that CAPS failed to disclose to the PTO the Dyson/Chapter 22 Reference, and that CAPS misrepresented the data contained in Figure 4 of the patent.

ACS's claim based upon the Dyson/Chapter 22 Reference fails because ACS has adduced no evidence, much less clear and convincing evidence, showing that the Dyson/Chapter 22 Reference was material or that it was omitted with the intent to deceive. First, the Dyson/Chapter 22 Reference discloses no prior art that was not already before the Examiner. Although the Dyson/Chapter 22 Reference discloses a calcium concentration of 150 umol that is within the range claimed by the '515 patent, the Follette 1978 Reference does so as well. Furthermore, the Dyson/Chapter 22 Reference teaches a glucose concentration (approximately 2160 mg%) that far exceeds the concentration of the '515 patent, although it mirrors glucose concentrations disclosed in the prior art references that were before the patent examiner, such as the Kito 1983, Hashimoto 1984, and Follette 1977 References. Thus, the Dyson/Chapter 22 Reference is merely cumulative and not material. *See Regents of the Univ. of Cal. v. Eli Lilly & Co.,* 119 F.3d 1559, 1574-75 (Fed.Cir.1997) (no inequitable conduct where the uncited reference teaches no more than what a reasonable Examiner would consider to be taught by the prior art already before the PTO).

**\*15** Second, ACS presents no evidence that Dr. Buckberg intentionally withheld the references to deceive the Examiner as to the state of the prior art. The only evidence of Dr. Buckberg's intent indicates that the materials were omitted for innocent reasons, *i.e.,* because the subject of the Dyson/Chapter 22 Reference was not the formula of the cardioplegia, but rather was the delivery system used to administer the cardioplegia. (*See* Buckberg Decl., Pla. Ex. WW, ¶ 22; Holman Decl., Pla. Ex. VV, ¶ 56.)

Because there is no evidence of either materiality or intent to deceive, the plaintiffs are entitled to judg-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

ment as to the defendants' unpled defense and counterclaim of inequitable conduct based upon the Dyson/Chapter 22 Reference.

The defendants' second basis for their inequitable conduct claim is Figure 4 of the '515 patent. The defendants allege that Figure 4 purports to record the results of the use of a cardioplegic solution with an osmolarity of 400-500, when in reality the solution had a osmolarity of 360-380 mOsmol.[FN17] This claim fails, however, because the defendants present no evidence, other than attorney speculation, that Figure 4 misstates anything, nor have defendants produced any evidence to indicate that, if a misstatement was present, it was made intentionally. To the contrary, it is undisputed that the article upon which the defendants rely to show that Figure 4 is incorrect was submitted to the Examiner. (*See* Def. Ex. P.) This is strong evidence that Dr. Buckberg did not intend to deceive the Examiner and the defendants have failed to rebut it. Accordingly, the plaintiffs are entitled to summary judgment as to the defendants' counterclaim and defense of inequitable conduct based upon the alleged misrepresentation contained in Figure 4.

> FN17. Defendants base their argument of misrepresentation on the assertions (1) that the research leading to the '515 patent is the same as the research reported in Article IX of the Journal of Thoracic and Cardiovascular Surgery, and (2) that Article IX reports the data differently from how the data is reported in the '515 patent. (*See* Def. Ex. Z (Bradley S. Allen, M.D., *et al.*, *Studies of Controlled Reperfusion After Ischemia: IX. Reperfusate Composition: Benefits of Marked Hypocalcemia and diltiazem on Regional Recovery*, J. OF THORAC. CARDIOVASC SURG. . v. 92, at 564-572 (1986)). Apparently making them for the first time in their summary judgment briefs, defendants fail to present any evidence to support either assertion.

*C. Conclusion*

The plaintiffs' motion for summary judgment as to the defendants' counterclaim and affirmative defense of inequitable conduct is due to be GRANTED.

IV.

Validity of the Certificate of Correction

Along with their motion on inequitable conduct, the defendants argue that the certificate of correction is invalid. The defendants base their argument on *Superior Fireplace Co. v. Majestic Prods. Co.,* 270 F.3d 1358, 1375 (Fed.Cir.2001), which holds that a certificate of correction that corrects "mistakes of minor character" may not correct a mistake that broadens a patent's claims. Because the court already has held that the certificate of correction issued on the '515 patent corrected "a mistake of minor character," (Order, dated May 2, 2002, doc. 64, at 1), the defendants argue that the certificate is invalid because the certificate accomplished a broadening of the scope of the patent. Furthermore, the defendants submit additional evidence that they argue demonstrates that the COC expanded the claims of the '515 patent. However, the court already has ruled that "the defendants may present the question of the COC's validity to the jury." (*Id.*)

**\*16** To the extent that the defendants' argument constitutes a request for the court to revisit this ruling, the court declines the request. The defendants' evidence tends to show that osmolarity and osmolality are not identical measures. (*See, e.g.,* Riggs Decl. (doc. 239, Defs.Ex. 2).) However, there continues to be a question of fact as to whether "an increased level of between about 400-500 mOsmol/kg" is broader than "an increased level of between about 400-500 mOsmol/L." Accordingly, the defendants' motion for summary judgment on the validity of the certificate of correction is due to be DENIED.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

V.

Infringement

The defendants move for summary judgment on the plaintiffs' claims of infringement prior to the issuance of the certificate of correction ("COC"). The plaintiffs move for summary judgment on the claims of infringement after the issuance of the COC. Each motion is addressed in turn.

A. *Legal Standard*

Evaluating claims of infringement involves two steps, "(1) claim construction to determine the scope and meaning of the claims asserted to be infringed, followed by (2) a determination of whether the properly construed claim encompasses the accused [device or] method." *See Robotic Vision Sys., Inc. v. View Eng'g, Inc.,* 189 F.3d 1370, 1373 (Fed.Cir.1999). Because the plaintiffs' claims of infringement are before the court on summary judgment, the summary judgment standard laid out above applies.

B. *Claim Construction*

The '515 patent has three independent claims: claims 1, 7, and 13. Each independent claim describes treatment for the human heart for the purpose of preventing and reversing muscle damage due to ischemia. Claim 1 describes the patented treatment as "an amino acid enriched cardioplegic solution for use in treating human hearts"; whereas claim 7 describes the treatment more generically as "a method for treating human hearts"; while claim 13 describes the treatment as "[a] composition of matter for introduction into human hearts". All three independent claims require: (1) a calcium concentration of "between about 50-300 umol," (2) a metabolizable substrate concentration of "between about 400-1000 mg%," and (3) an osmolality or osmolarity of "between about 400-500

mOsmol." '515 patent at 8-10.

Following the *Markman* hearing, the court issued orders on May 2, 2002, and again on September 4, 2003, construing the scope and meaning of the claim contained in the '515 patent. In the September 2003 Order, the court determined that the word "about" was to be given "its common sense meaning as a term of approximation, including numbers both below and above the ranges specified in the '515 patent." *Markman* Order, dated Sept. 4, 2003. The court further ruled that the limitation "between about 400-500" encompasses "a range of osmolarity or osmolality from 385-515." *Id.*[FN18]

> FN18. Although the court issued its construction of the patent's claims in its Orders of May 2, 2002, and September 4, 2003, the defendants now urge the court to amend its construction by construing the term "maintaining" as used in the '515 patent's claims 7 through 12. The defendants assert that the court should construe the term "maintaining" to mean that the '515 patent is not infringed unless a solution is within the claimed ranges throughout the treatment being administered to a patient. The defendants make this argument too late as the court already has issued its claim construction of the '515 patent. In the interest of finality, the issue of construction shall not be revisited or endlessly litigated. In addition, even if the asserted construction of the term "maintaining" were considered, the court would reject it. It is undisputed that it is impossible to measure the levels of cardioplegic solutions after they have been administered to the patient. Thus, adopting the defendants' proposed construction would render the '515 patent uninfringeable due to the impossibility of measuring infringement. There is no merit to a claim construction that yields such an absurd result.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

*1. Application of the COC*

The defendants move for summary judgment on the plaintiffs' claims of infringement of the patent prior to the issuance of COC. The defendants make this motion in the alternative. Their primary position is that the COC does not apply to this suit because the suit was filed prior to the issuance of the COC. The defendants advance the instant motion for summary judgment only if the court rejects that argument and rules that the COC applies to this action as well as to all causes of action that accrued after the issuance of the COC. Accordingly, it would be premature for the court to rule on the defendants' instant motion without first determining the threshold question of whether the COC applies to this suit at all. Because the issue has been fully briefed by the parties, and because the resolution of this issue is necessary to determine the infringement questions pending before the court, the court will address whether the COC applies to this action.

**\*17** The parties agree that the Federal Circuit's opinion in *Southwest Software, Inc. v. Harlequin Inc.,* 226 F.3d 1280 (Fed.Cir.2000), provides the definitive authority as to the application of the COC. However, the parties quarrel over the meaning and effect of the Federal Circuit's holding in that case. At issue is whether the Federal Circuit held that a COC applies only to *causes of action* arising after the issuance of the COC or whether the COC applies only to *lawsuits* filed after the COC's issuance. The confusion as to how to interpret the Federal Circuit's opinion arises from the fact that the *Southwest* opinion uses the terms "lawsuit" and "cause of action" interchangeably throughout the opinion. Thus, the defendants quote the passages in *Southwest Software* containing the phrase "lawsuit," *see, e.g., id.* at 1294 ("We hold that the certificate of correction that added the Program Printout Appendix is not to be given effect in this pre-certificate lawsuit."), while CAPS cites to the sentences where the phrase "cause of action" is used. *See, e.g., id.* at 1294 ("The certificate of correction is only effective for causes of action arising

after it was issued.").

The plaintiffs observe that the reason the Federal Circuit could use the terms "cause of action" and "lawsuit" interchangeably in *Southwest Software* is that, under the particular facts of that case, the terms had the same effect. The defendant in *Southwest Software* ceased its allegedly infringing activity upon the filing of the lawsuit. *See id.* at 1287. Because the relevant certificate of correction in that case issued while the suit was pending, the plaintiff's lawsuit was filed, and all of the plaintiff's causes of action arose, prior to the COC's issuance. In contrast to the instant action, the Federal Circuit in *Southwest Software* did not confront a situation where some of the plaintiffs' causes of action arose prior to the issuance of the COC and some arose after its issuance. Because of these particular facts, *Southwest Software* must be interpreted with care.

Pursuant to such a careful reading, the court finds that the *Southwest Software* opinion supports the interpretation that a COC applies to *causes of action* arising after the COC's issuance, even if the lawsuit is filed prior to the COC's issuance. The Federal Circuit explained its holding as motivated, in part, by the court's desire to avoid the "illogical and unworkable result" that a patent holder might be able "to sue an alleged infringer for activities that occurred before the issuance of the certificate of correction" where the patent appeared invalid prior to the issuance of the COC but was rendered valid as a result of the COC. In such a case, the Federal Circuit opined that, prior to the issuance of the certificate, "reasonable competitors would be justified" in competing with the invention. *See id.* at 1295-1296.

This portion of the Federal Circuit's discussion is dispositive because the Federal Circuit's "illogical and unworkable result" would not be avoided if a COC applied to lawsuits filed after the issuance of a COC where the lawsuit sought to recover on causes of action accruing prior to the issuance of the COC. The only interpretation that avoids the result decried by the Federal Circuit is the interpretation that a COC applies only to causes of action

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

arising after the issuance of the COC, regardless of when the lawsuit seeking to recover on those causes of action is filed.

**\*18** Also supporting this interpretation of the *Southwest Software* opinion is the Federal Circuit's following caveat: "Finally, we point out that, for any cause of action arising after April 1, 1997, the date the certificate of correction issued, the certificate will be treated as part of the original patent. Therefore, any invalidity arising from the absence of the Program Printout Appendix only affects causes of action arising before the certificate issued. Put another way, if claim 1 is found to have been invalid without the Program Printout Appendix, the invalidity ceased on April 1, 1997, when the PTO issued the certificate of correction." *Id.* at 1297. This caveat simply is incompatible with the defendants' interpretation that a COC applies only to lawsuits filed after its issuance. Were the defendants' interpretation correct, the caveat would have no application since the lawsuit in *Southwest Software* obviously had commenced prior to the COC's issuance. The only interpretation that gives this dictum meaning is that the Federal Circuit was advising the district court that the plaintiff could proceed on any claims arising after the COC's issuance.

Honoring that instruction, this court will permit the plaintiffs here to do the same. For any causes of action for infringement of the '515 patent accruing after the issuance of the certificate of correction, the COC shall apply, provided, of course, that the certificate ultimately is held valid. For causes of action accruing prior to the issuance of the COC, the COC shall have no application.

## C. *Facts*

In support of the claims of infringement, the plaintiffs present evidence from two experts. The first expert is Dr. Stanley B. Digerness. Dr. Digerness tested fourteen samples of the defendants' products that defendants provided during discovery.

The defendants admit that they commercially produce solutions 1-12.

Dr. Digerness obtained blood samples from the cardiopulmonary bypass reservoir of five randomly selected patients. Dr. Holman provided an additional sample. After diluting each of the defendants' 14 sample crystalloid solutions with the collection blood samples, Dr. Digerness measured the calcium ion concentrations, metabolizable substrate concentration, osmolality, and pH of each sample.

Dr. Digerness found that, when mixed 1 to 4 with blood, all fourteen of the defendants' samples had calcium concentrations ranging from 90-199 umol; glucose concentrations ranging from 639-934 mg%; and amino acid concentrations ranging from 24.2 to 26.5 mmol/L, in an even proportion between glutamate and aspartate. Dr. Digerness also found that samples 1, 7, 9, 11, 12, 13, and 14 had a pH ranging from 7.353 to 7.603.

Dr. Digerness found that samples 1, 7, 9, 11, 12, 13, and 14 had osmolalities ranging from 368 to 442 mOsmol/kg, with twenty-two of the forty-six data points at 385 mOsmol/kg or greater. Sample 1 had osmolalities of 385, 391, and 398 when mixed with blood from patients 3, 1, and 2, respectively; and 394 when mixed with Dr. Holman's blood sample. Sample 7 had an osmolality of 385 and 393 when mixed with blood from patients 3 and 2, respectively. Sample 9 had an osmolality of 389 and 390 when mixed with blood from patients 2 and 4, respectively. Samples 11 and 12 had osmolalities of 392 when mixed with blood from patient 2. Sample 13 had an osmolality of 388 when mixed with blood from patient 2. Sample 14 had an osmolality of 386 when mixed with blood from patient 2. When mixed with the blood of the other patients, however, these samples had osmolalities of less than 385. Furthermore, Dr. Digerness found that samples 2, 3, 4, 5, 6, 8, and 10 had osmolalities of less than 385 mOsmol/kg.

**\*19** The plaintiffs' second expert is Dr. Hal Peterson. Dr. Peterson did not test solutions pre-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

pared by ACS. Instead, Dr. Peterson tested two solutions prepared by the plaintiff CAPS (CS-1 and CS-2) that Dr. Peterson attests is "chemically identical" to solutions sold by ACS to the University Hospital of New Orleans and Riverview Hospital. Dr. Peterson found that, when mixed with human blood in a 1:4 ratio, these samples, CS-1 and CS-2, had osmolalities ranging from 392 to 443 mOsmol/kg. Dr. Peterson attests that CS-1 and CS-2 are "chemically identical" to defendants' sample solutions 11 and 12.

The defendants present evidence from their expert, Dr. David R. Wade. Using the test results produced by Dr. Digerness, Dr. Wade calculated the osmolarity of the 14 cardioplegic solutions tested by the plaintiffs' experts. Dr. Wade calculated that each of the fourteen solutions had osmolarities of between 349 and 377 mOsmol/L.

D. *Infringement Prior to the Issuance of the COC*

Prior to the issuance of the COC on January 30, 2001, the '515 patent covered cardioplegic solutions with osmolarities of about 400-500 mOsmol/L. The court has interpreted the claim of between about 400-500 mOsmol/L to apply to all solutions having osmolarities within the range of 385-515 mOsmol/L. The testimony of Dr. Wade is undisputed that none of the defendants' 14 tested solutions came within the claims range of 385-515 mOsmol/L. Osmolarity is a necessary element of the '515 patent under all three of its independent claims. Consequently, there is no evidence of direct infringement of the patent as it read prior to the issuance of the COC.

The plaintiffs argue that questions of fact exist regarding whether the defendants nevertheless are liable for infringement under the doctrine of equivalents. Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claims may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused patented in-

vention." *Warner Jenkinson Co., Inc. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 21, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

The defendants argue that plaintiffs are barred from invoking the doctrine of equivalents due to prosecution history estoppel. It is true that prosecution history estoppel, if applicable, would prevent the plaintiffs from taking advantage of the doctrine of equivalents.[FN19] However, there is no question that amendment-based prosecution history estoppel requires, at minimum, that the patentee have made a narrowing amendment to his or her claims during the patent review process. *See Abbott Labs. v. Dey, L.P.,* 287 F.3d at 1103 ("[T]here can be no amendment-based estoppel with respect to this claim limitation [that was not amended during the prosecution of the patent]."). Rather, the only amendment that the defendants can point to is the addition of the language "at an increased level" in claims 1 through 6. Thus, the defendants can make no argument that the doctrine of equivalents does not apply to claims 7 through 17.[FN20]

> FN19. Prosecution history estoppel can be amendment-based or it can be argument-based. *See Abbott Labs. v. Dey, L.P.,* 287 F.3d 1097, 1103 (Fed.Cir.2002). Here, all of defendants' prosecution history estoppel arguments are amendment-based.

> FN20. The defendants, in their briefs, argue for amendment-based estoppel only. That is, they do *not* argue that argument-based prosecution history estoppel applies. *See,* doc. 235 at pp. 26-23.

**\*20** In addition, the language that the defendants rely upon in no way limits the scope of claims 1 through 6. The defendants argue that the language "at an increased level" means that the doctrine of equivalents can only be applied to levels higher than the patent's claimed ranges of 400-500 mOsmol, but may not be applied to anything below that range. The court ascribes no such meaning to this phrase. Instead, the court interprets "at an increased

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

level" to indicate merely that the cardioplegic solution must be hyperosmolar as compared to the normal osmolarities found in human blood. As human blood normally has an osmolarity of between 280 and 300 mOsmol, the '515 patent's requirement that the solution be hyperosmolar cannot be interpreted to limit the patent only to ranges above 400 mOsmol.

Indeed, the court rejected this very argument by the defendants during the claim construction phase of this action. At that time, the defendants argued that the language "at an increased level" required the court to limit the claimed range of between about 400 to 500 mOsmol as covering only ranges above, but nothing below, 400 mOsmol. The court rejected that argument and ruled that the patent's claim of "about 400-500 mOsmol" included "numbers both below and above the ranges specified in the '515 patent." (*Markman* Order, dated Sept. 4, 2003.) Accordingly, prosecution history estoppel is not applicable here, and the plaintiffs are not barred from arguing for the application of the doctrine of equivalents.

The essential inquiry under the doctrine is, "Does the accused or process contain elements identical or equivalent to each claimed element of the patented invention?" *Warner Jenkinson Co., 520 U.S. at 40.* This analysis may be determined under the "triple identity" test-which focuses on the "*function* served by a particular claim element, the *way* that element serves that function, and the *result* thus obtained by that element-or it may be evaluated by inquiring whether the allegedly infringing device or process possess only 'insubstantial differences.' " *Id.* (emphases added). In *Warner Jenkinson Co.,* the Supreme Court observed that the triple identity test is better suited for mechanical devices than for other products or processes. Thus, the more suitable framework here is to inquire whether the defendants' products contain only "insubstantial differences" from the plaintiffs' products. Under either framework, "[t]he determination of equivalence should be applied as an objective inquiry on an ele-

ment-by-element basis." *Id.* "[E]quivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co. (Graver II), 339 U.S. 605, 609, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).*

"A finding of equivalence is a determination of fact." *Graver Tanks & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 65, 609 (1950).* "[E]quivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case." *Johnson & Johnson Assocs. Inc. v. R.E. Serv. Co. Inc., 285 F.3d 1046, 1053 (Fed.Cir.2002).*

**\*21** The facts before the Supreme Court in *Warner Jenkinson Co.* are similar to those here. There, the patent at issue covered an ultrafiltration process that operated at a "pH from approximately 6 .0 to 9.0." *See Warner Jenkinson Co., 520 U.S. at 22.* The alleged infringer used an ultrafiltration process having a pH of 5.0. *Id.* The Supreme Court held in that case that, as long as prosecution history estoppel did not apply, the doctrine of equivalents could be applied. Based upon this holding and the Supreme Court's view that a jury reasonably could find a pH of 5.0 equivalent to a pH of 6.0-9.0, the court sees no reason why an osmolarity of between 349 and 377 mOsmol/L might not be considered equivalent to an osmolarity of between 385 and 515 mOsmol/L.

Furthermore, although the Supreme Court ruled that intent is irrelevant to the application of the doctrine of equivalents, the plaintiffs have submitted evidence that the defendants developed their solutions by copying the plaintiffs' solutions precisely except that they lowered the osmolarity of the solutions to just under the ranges claimed by the '515 patent. ( *See* Memo of Charles Wall, dated June 2, 1998, Pla. Ex. L; Letter by Robert Veal, dated Aug. 14, 1998, Pla. Ex. G.) This evidence is sufficient to invoke the doctrine of equivalents, which is designed to ensnare exactly "the unscrupulous copyist [who] make[s] unimportant and insubstantial changes and substitutions in the patent which, though adding

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law." *Graver Tanks & Mfg.,* 339 U.S. at 605. If a jury determined that, as a factual matter, an osmolarity of 349-377 mOsmol/L constitutes an insubstantial difference from an osmolarity of 385-515 mOsmol/L, the jury reasonably could find that the defendants infringed the '515 patent as it read prior to the issuance of the COC.

In response, the defendants have submitted the statements of Charles Wall, who asserts that Buckberg misread the prior art by failing to appreciate that the optimal osmolarity for cardioplegia is significantly below the '515 patent's claimed ranges of 400-500 mOsmol/L. (*See* Wall Decl. ¶ 9.) Based upon this assertion, Wall claims that the alterations of his solutions are not equivalents but instead constitute substantial improvements on the cardioplegia. (*Id.*)

This conflicting evidence creates a question of fact to be resolved at trial. Therefore, because prosecution history estoppel cannot apply in this case, the plaintiffs may proceed on their infringement claims based upon the '515 patent as it read prior to the issuance of the COC. Even though the defendants' solutions did not literally infringe the '515 patent prior to the issuance of the COC, the plaintiffs may adduce proof that the osmolarity of the defendants' solutions of between 349 to 377 mOsmol/L is equivalent to the claimed range of between 385 and 515 mOsmol/L. Accordingly, the defendants' motion for summary judgment on the plaintiffs' claims of infringement of the patent as it read prior to the issuance of the COC are due to be, and hereby are, DENIED.[FN21]

> FN21. Because summary judgment as to infringement is denied, it necessarily follows that the plaintiffs' motion for summary judgment as to whether the infringement was willful also is DENIED.

E. *Infringement Following the Issuance of the COC*

*22 The plaintiffs have moved for summary judgment on their claims of infringement of the '515 patent as amended by the COC. The tests performed by Drs. Holman and Digerness indicate that the defendants' solutions 1, 7, 9, 11, 12, 13, and 14 come within the claimed ranges of the patent as to every element.

Plaintiffs' evidence shows that solutions 1, 7, 9, 11, 13, and 14 had a calcium concentration between 90-199 umol. This is within the '515 patent's claimed range of 50-300 umol, and the defendants have presented no evidence to the contrary. Plaintiffs' evidence shows that solutions 1, 7, 9, 11, 13, and 14 had a glucose concentration of between 639 and 934 mg%. This is within the '515 patent's claimed range of 400-1000 mg%, and the defendants have presented no evidence to the contrary. Plaintiffs' evidence shows that solutions 1, 7, 9, 11, 13, and 14 had an amino acid concentration of between 24.2 and 26.5 mmol/L in even proportions of glutamate and aspartate. This is within the '515 patent's claimed range 10-30 mmol/L of aspartate and between 10-30 mmol/L of glutamate, and the defendants have presented no evidence to the contrary. Plaintiffs' evidence shows that solutions 1, 7, 9, 11, 13, and 14 had a pH of between 7.353 and 7.603. This comes within the claimed pH range of 7.5 and 7.7 pH, and the defendants have presented no evidence to the contrary. Plaintiffs' evidence shows that solutions 1, 7, 9, 11, 13, and 14 had an osmolality of between 385 and 398 mOsmol/kg. This is within the '515 patent's claimed range 385 to 515 mOsmol/kg, and the defendants have presented no evidence to the contrary.

Thus, the undisputed evidence shows that the defendants directly infringe the '515 patent as to claims 13 through 17. As to these claims, the defendants' infringement is direct because the defendants manufacture and sell crystalloid cardioplegic solutions which are adapted to be diluted with blood at a 1 to 4 ratio. (*See* '515 patent claims 13-17; Holman Decl. at ¶ 2.) With respect to claims 1 through 12 and 18, the defendants' infringement

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 24

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

is contributory because they sell their cardioplegia products with the intent that the customers will mix them with blood at a 1 to 4 ratio, thereby bringing the solution within the scope of '515 patent's claims.[FN22]

> FN22. To be contributorily liable for infringement, it must be shown that (1) the defendants sold solutions comprising a material part of the patented invention; (2) the defendants knew the solutions sold were especially made for use in practicing the patented invention; and (3) the solutions sold were not a staple article or commodity of commerce suitable for substantial non-infringing use. *See* 35 U.S.C.A. § 271(c). Here, the memorandum written by Charles Wall, dated June 2, 1998 (Pla.Ex. L), shows that the defendants intended their customers to mix ACS's solutions with blood at a 1 to 4 ratio, which would produce cardioplegic solutions used for the treatment of human hearts within the claimed ranges of the '515 patent.

The undisputed evidence shows, therefore, that the defendants are liable for direct and contributory infringement of the '515 patent as amended by the COC. However, because the court already has ruled that the defendants may present evidence at trial challenging the validity of the COC, the court cannot grant summary judgment on infringement at this time. Instead, the Court will grant summary judgment to the plaintiffs only in part and deny it in part. The plaintiffs' motion for summary judgment is GRANTED IN PART as to the issue of whether the defendants are liable for infringement of the '515 patent as amended by the COC, provided that the COC is valid. The motion is DENIED IN PART insofar as the validity of the COC is a question of fact to be determined at trial.

**\*23** Similarly, the court will grant in part and deny in part the plaintiffs' motion for summary judgment on their claim that the defendants willfully infringed the '515 patent. The plaintiffs claim that the

defendants' infringement of the patent was willful and seek to recover the treble damages authorized by statute for willful infringement. *See* 35 U.S.C.A. § 284.

The undisputed evidence indicates that the defendants directly copied the plaintiffs' patented solutions in developing their products. (Wall Dep. at 29-30, 48; Memo of Charles Wall, dated June 2, 1998.) This is strong evidence of willful infringement. *See Stryker Corp. v. Intermedics Orthopedics, Inc., 96 F.3d 1409, 1414 (Fed.Cir.1996).* The only evidence rebutting a finding of willfulness is the opinion letter that the defendants obtained from their counsel, Robert Veal. Ordinarily, an opinion letter from counsel will insulate an infringer from a charge of willful infringement if the opinion of counsel is both favorable and competent. *See Johns Hopkins Univ. v. CellPro, Inc., 152 F.3d 1342, 1363 (Fed.Cir.1998).*

Here, however, defendants' counsel, Robert Veal, advised the defendants only as to the '515 patent as it read prior to the issuance of the COC.[FN23] The defendants have submitted no evidence that they obtained a competent opinion from counsel that would insulate them from liability for infringement of the corrected patent. Accordingly, there is no dispute of fact as to the willfulness of the defendants' infringement of the '515 patent following the issuance of the COC. The court therefore will, and hereby does, GRANT IN PART summary judgment as to the willfulness of the defendants' infringement of the '515 patent following the issuance of the COC, provided that at trial the COC is found to be valid. The plaintiffs' motion for summary judgment on its claim that the defendants' infringement of the patent was willful is in all other respects DENIED.

> FN23. In his opinion letter, Veal advised the defendants to keep the ranges of the constituent elements of their solutions "significantly out of the specified ranges" of the '515 patent. Veal opined that an osmolarity of 360 mOsmol/L would qualify as significantly outside of the '515 patent's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

claimed range. The plaintiffs argue that the defendants failed to adhere to Veal's advice because the undisputed evidence here indicates that the defendants' products contained osmolarities of as high as 377 mOsmol/L. Because the court denied summary judgment on the plaintiffs' claims of infringement prior to the issuance of the COC, the court does not need to resolve at this time whether Veal's letter constitutes a defense to willful infringement of the '515 patent prior to the issuance of the COC.

### VI.

### Counterclaims

The plaintiffs move for summary judgment on the defendants' counterclaims of (1) false marking under the False Marking Statute, 35 U.S.C. § 292(a) ( "Section 292") and (2) false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). Each motion is addressed in turn.

### A. *Facts*

In support of the counterclaims of false marking and false advertising, the defendants offer expert reports from Dr. Stanley B. Digerness and Dr. Hal Peterson. These expert reports are discussed at length *supra.* The defendants rely specifically on the results in each report for the osmolarities of samples of the Buckberg Solution tested. As described above, the Buckberg Solution consists of an amino acid enriched cardioplegic solution having (1) a calcium ion concentration of between 50-300 umol; (2) a concentration of metabolizable substrate between 400-1000 mg%; and (3) an osmolality of between about 400-500 mOsmol.[FN24] It is not disputed that the plaintiffs mark all amino enriched cardioplegic solutions as being covered by the '515 patent.

FN24. In the *Markman* Order dated May 2, 2002, the court ruled that an osmolality of "between about 400-500 mOsmol" encompasses osmolalities "from 385-515."

### B. *False Marking*

**\*24** Count II of the defendants' counterclaim alleges false marking under Section 292. Section 292 is a private attorney general statute that allows recovery of penal damages against anyone who fraudulently misrepresents that a product is subject to a patent. The damages awarded under Section 292 are shared equally with the government. See 35 U.S.C. § 292(b).

The threshold for establishing a successful Section 292 claim is extremely high. *Brose v. Sears, Roebuck, & Co.,* 455 F.2d 763, 768 (5th Cir.1972).[FN25] Both the language of Section 292 and the binding authority in this Circuit place on the defendants the burden to plead and produce facts demonstrating that the plaintiffs, in marking the solution with the '515 patent, had the specific intent to deceive the public into believing something that the plaintiffs knew to be false. *Id.* See also *Clontech Laboratories, Inc. v. Invitrogen Corp.,* 406 F.3d 1347, 1355 (Fed.Cir.2005) (intent is a key element under a Section 292 claim); *Arcadia Machine & Tool, Inc. v. Sturm,* 786 F.2d 1124, 1125 (Fed.Cir.1986) (mismarking must have been done for the purpose of deceiving the public); *Mayview Corp. v. Rodstein,* 620 F.2d 1347, 1359 (9th Cir.1980) (same). In order to demonstrate an intent to deceive, the defendants must show by a preponderance of the evidence that the plaintiffs "did not have an honest good faith belief in marking its products." *Clontech Laboratories, Inc. v. Invitrogen Corp.,* 406 F.3d 1347, 1355 (Fed.Cir.2005) (citing *Brose v. Sears, Roebuck, & Co.,* 455 F.2d 763, 768-769 (5th Cir.1972)).

FN25. The Eleventh Circuit, in *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11 th Cir.1981) (en banc), adopted as preced-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

ent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

The sole issue for this court to consider in analyzing the counterclaim for false marking is whether or not the defendants have established, through a preponderance of the evidence, that the plaintiffs manifested the intent to deceive when marking the cardioplegic solutions that tested outside the acceptable osmolality range under the '515 patent. Because the court finds that the defendants fail to meet its burden of offering evidence that demonstrates an intent to deceive on the part of the plaintiffs, the Section 292 claim fails.

The Eleventh Circuit has "adopted the formulation that an honest, though mistaken, mismarking of an article would not trigger liability under [Section 292]." *Clontech Laboratories, Inc. v. Invitrogen Corp.,* 406 F.3d 1347, 1352 (Fed.Cir.2005) (citing *Brose v. Sears, Roebuck and Co.,* 455 F.2d 763, 768-769 (5th Cir.1972)). Section 292 is not a statute of strict liability for mismarking. *Id.* "Intent to deceive is a state of mind arising when a party acts with sufficient knowledge that what it is saying is not so and consequently that the recipient of its saying will be misled into thinking that the statement is true." *Clontech* 406 F.3d 1347 at 1352 (citing *Seven Cases v. United States,* 239 U.S. 510, 517-517, 36 S.Ct. 190, 60 L.Ed. 411 (1916)).

Intent to deceive is proved when (1) the patent does not cover the marked article; and (2) the differences between the mismarked article and a properly marked article are "so plain that no one in good faith" could think otherwise. FN26 *Brose v. Sears, Roebuck and Co.,* 455 F.2d 763, 768 (5th Cir.1972).

> FN26. Claims brought under Section 292 as part of a strategic plan in pending patent litigation are not favored. *See Brose v. Sears, Roebuck and Co.,* 455 F.2d 763, 768 (5th Cir.1972) ("It is at this point that the law-perhaps out of distaste for blood money suits-compels a positive showing. For here not only are objective physical facts involved. Here are questions of motive, purpose and attitudes.").

**\*25** We can assume that if a device claimed to be covered by license of a cited patent is so obviously not revealed by it as the patentese world would view it, the use of such a legend would be mismarking. But where the device is within the specific field covered by the patent and uses materials and methods similar to the technical patent disclosures, the licensee's use in good faith reliance on the license is not to be transmuted into an evil purpose to deceive the public merely on proof and finding that for one or more or all of the reasons skilled patent advocates could think up, the embodiment in question does "not read on" or is not an "infringement" of the cited patent. But this presupposes that the private attorney general has established that the device is not within the patent. Only at that time does the good faith purpose or motive of the marker of a license to a cited patent come into question.
*Id.* at 768-769. The defendants fail to meet their burden of proof under the first element of the intent test in *Brose;* therefore the court need not consider the merits of the present case under the second element of the test.

It is undisputed that the plaintiffs mark all their amino enriched cardioplegic solutions with the '515 patent and that the acceptable osmolality range covered under the patent is between 385-515 mOsmol.

The defendants claim that they need not test the plaintiffs' marked solutions to determine that the solutions fall outside the range of the '515 patent because the plaintiffs' own tests demonstrate that fact. See *Defendants' Memorandum in Opposition to Plaintiffs' MSJ No. 3 False Marking and False Advertising* at 16. The defendants do not challenge that the Buckberg Solution marked by the plaintiffs contains a calcium ion concentration of between 50-300 umol and a concentration of metabolizable substrate between 400-1000 mg% as is required under the patent; rather, the defendants solely posit

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

that certain marked containers of solution fall out-side the '515 patent osmolality range of "about 400-500 mOsmol." An examination of the evidence is contrary to the defendants' position. None of the plaintiffs' tests show an osmolality range of the plaintiffs' amino enriched cardioplegic solution outside the patent range of "about 400-500 mOsmol."

The bulk of the defendants' argument and evidence that the plaintiffs' marked solutions fall outside of the '515 patent concern the osmolarity of the plaintiffs' marked solution. As arguments related to the osmolarity of the plaintiffs' solution have been expressly rejected by this court they will not be considered.[FN27]

> [FN27]. As previously discussed, the court's *Markman* Order dated May 2, 2002, held that claims involving the '515 patent must be analyzed using the term "osmolality" and not "osmolarity."

The defendants have not satisfied their burden under the first element of the test in *Brose*. In addition, the court notes that the defendants' counterclaim fails under the second element of a *Brose* analysis. The differences between a mismarked solution falling outside of the osmolality range of the '515 patent and a properly marked solution are so negligible that no one in good faith could find that the plain differences between the two solutions reveal an intent to deceive on the part of the plaintiffs. A variation in the osmolality range of a marked solution coupled with the lack of evidence establishing that the plaintiffs' marked solution does not contain a calcium ion concentration of between 50-300 umol or that the marked solution does not contain a concentration of metabolizable substrate between 400-1000 mg% as is required under the patent leads the court to hold that, even if there is a variation in the osmolality range of the marked solution outside of the '515 patent parameters, such a variation does not rise to the level of an intent to deceive under the second element of the test in *Brose*. Accordingly, the plaintiffs' motion for summary judgment on the defendants' claim of

false marking is due to be, and hereby is, GRANTED.

### C. *False Advertising*

**\*26** Count III of the defendants' counterclaim alleges that the plaintiffs' marking of its amino acid enriched solutions with the '515 patent comprises false advertising actionable under the Lanham Act.

"It is well-settled that no proof of intent or willfulness is required to establish a violation of the Lanham Act ... for false advertising." *Vector Products, Inc. v. Hartford Fire Ins. Co.,* 397 F.3d 1316, 1319 (11th Cir.2005). To succeed on a false advertising claim under the Lanham Act, a defendant must show that: (1) the plaintiff made false or misleading statements about its product in an advertisement; (2) the advertisement actually deceived, or had the tendency to deceive, the targeted audience; (3) the deception is material; (4) the plaintiffs' advertised product traveled in interstate commerce; and (5) the defendant has been or is likely to be injured as a result of the false or misleading advertisements." See *Hyman v. Nationwide Mut. Fire Ins. Co.,* 304 F.3d 1179, 1196 (11th Cir.2002). The failure of the defendants to satisfy their burden with respect to any one of the foregoing elements warrants summary judgment in favor of the plaintiffs. See *Laughlin Products, Inc. v. ETS, Inc.,* 257 F.Supp.2d 863 (N.D.Tex.2002) (the plaintiffs need "only show that [defendants] who bear the burden to prove, have adduced no evidence to support an essential element of the case.").

The defendants have not offered any facts and this court cannot locate any evidence in the record showing that: (1) the plaintiffs marked its amino enriched cardioplegic solutions as being patented; (2) the marking of the plaintiffs' solutions actually deceived or had the tendency to deceive the public; or (3) that any alleged deceptive marking would be material in that the marking somehow influenced customers' purchasing decisions. The parties concede that the marked solutions are sold and trans-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

ported as a part of interstate commerce. Because the first three elements of the test articulated in *Hyman* are not satisfied, the court will not provide analysis under the moot fifth element as to whether or not the defendants have suffered an injury as a result of hypothetical false advertising on the part of the plaintiffs.[FN28] Accordingly, the plaintiffs' motion for summary judgment on the defendants' claim of false advertising under the Lanham Act is due to be, and hereby is, GRANTED.

> FN28. The plaintiffs and defendants reference the court to *Zenith Elect. Corp. v. Exzec, Inc.,* 182 F.3d 1340, 1348 (Fed.Cir.1999), in order to add an additional element for analysis to the defendants' Lanham Act claim for false advertising that the plaintiffs' alleged marketplace activity in support of the '515 patent "must have been undertaken in bad faith." As neither party cited to Eleventh Circuit or U.S. Supreme Court precedent on this issue and the court, through its own examination, has not located a binding decision relating to the element of "bad faith" discussed in *Zenith,* the court is unwilling to venture beyond the Lanham Act precedent of this Circuit.

This opinion shall be carried out by a separate Order.

DONE and ORDERED.

*MEMORANDUM OPINION AND ORDER*[FN1] ON RECONSIDERATION

> FN1. The parties are put on notice that all motions, briefs, or other writings to be filed with the Court should be double spaced and written in 14 point font. The Court will strike any motions, briefs, or other writings that do not follow these specifications.

This matter comes before the Court on Defendants', Advanced Cardiac Solutions, P.C. and Charles Wall (hereinafter "ACS"), Motion for Reconsideration of the Court's (Corrected) Memorandum Opinion and Order on the parties' motions for summary judgment (doc. 274). After discussion of the standards governing a motion for reconsideration and a Rule 59(e) motion,[FN2] the Court concludes that ACS's motion is unsupported and due to be DENIED.

> FN2. While defendant's motion is titled a motion for reconsideration, the court also addresses the standard for a Rule 59(e) motion since plaintiff appears to believe that there is one at issue in this case.

**\*27** The parties additionally seek a final ruling by the Court as to the validity of the Certificate of Correctness (hereinafter "COC") as a matter of law. The Court holds that the COC is valid.

*Standard of Review*

A district court has plenary power over an interlocutory order and the power to reconsider, revise, alter, or amend it. *Toole v. Baxter Healthcare Corp.,* 235 F.3d 1307, 1315 (11th Cir.2000) (citations and internal quotations omitted). The standards for the grant or denial of relief in a motion to reconsider or in a Rule 59(e) motion to alter or amend are similar, but there are some differences, and each is set out below.

I. *Rule 59(e)*[FN3]

> FN3. Defendant's motion for reconsideration in the instant case cannot be construed as a Rule 59(e) or Rule 60(b) motion because it does not seek to alter or amend a final judgment. An order denying summary judgment, such as the one entered in this case, is not a final judgment. It is an interlocutory order.

"The purpose of a Rule 59(e) motion is not to raise

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)

**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

an argument that was previously available, but not pressed." *Stone v. Wall,* 135 F.3d 1438, 1442 (11th Cir.1998). A party may not "use a Rule 59(e) motion to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Michael Linet, Inc. v. Village of Wellington, Fla.,* 408 F.3d 757, 763 (11th Cir.2005). Essentially, a Rule 59(e) motion will not be granted when a party simply disagrees with the district court's decision but offers no new law or evidence. *See id.* However, there is some authority that Rule 59(e) motions may be granted for the following reasons: (1) to account for an intervening change in controlling law; (2) to address newly-discovered or previously-unavailable evidence; or (3) to correct a clear error or prevent manifest injustice. *Cover v. Wal-Mart Stores Inc.,* 148 F.R.D. 294 (M.D.Fla.1993).[FN4]

> FN4. District court decisions, even from this district, are not controlling authority.

The trial judge has discretion whether to alter or amend a judgment, and such a decision will not be overturned on appeal absent abuse of that discretion. *Am. Home Assur. Co. v. Glenn Estess & Assocs., Inc.,* 763 F.2d 1237, 1238-39 (11th Cir.1985). "In practice, because of the narrow purposes for which they are intended, Rule 59(e) motions typically are denied." 11 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2810.1 (1995).

## II. *Motion To Reconsider*

In the interests of finality and conservation of scarce judicial resources, reconsideration of an order is an extraordinary remedy and is employed sparingly. *See, e.g., Spellman v. Haley,* 2004 WL 866837, at *2 (M.D.Ala. Feb.22, 2004) ("litigants should not use motions to reconsider as a knee-jerk reaction to an adverse ruling"); *United States v. Bailey,* 288 F.Supp.2d 1261, 1267 (M.D.Fla.2003); *Pennsylvania Ins. Guar. Ass'n v. Trabosh,* 812

F.Supp. 522, 524 (E.D.Pa.1992). As a general rule, "[a] motion to reconsider is only available when a party presents the court with evidence of an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or manifest injustice." *Summit Medical Center of Alabama, Inc. v. Riley,* 284 F.Supp.2d 1350, 1355 (M.D.Ala.2003).

**\*28** It is well established that "[a]dditional facts and arguments that should have been raised in the first instance are not appropriate grounds for a motion for reconsideration." *See, e.g., Rossi v. Troy State University,* 330 F.Supp.2d 1240, 1249 (M.D.Ala.2002) (denying motion to reconsider where plaintiff failed to submit evidence in question prior to entry of order and failed to show good cause why he could not have done so). Furthermore, the Eleventh Circuit has explicitly stated that "a motion to reconsider should not be used by the parties to set forth new theories of law." *Mays v. U.S. Postal Service,* 122 F.3d 43, 46 (11th Cir.1997); *see also Russell Petroleum Corp. v. Environ Products, Inc.,* 333 F.Supp.2d 1228, 1234 (M.D.Ala.2004) (relying on *Mays* to deny motion to reconsider where movant advanced several new arguments); *Coppage v. U.S. Postal Service,* 129 F.Supp.2d 1378, 1379-81 (M.D.Ga.2001) (similar); *Richards v. United States,* 67 F.Supp.2d 1321, 1322 (M.D.Ala.1999) (same).

Notwithstanding these limitations, reconsideration is appropriate to correct manifest errors of law or fact. *See* Fed.R.Civ.P.60(b); *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.,* 90 F.3d 1264, 1269 (7th Cir.1996) ( "Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence."); *Summit Medical Center of Alabama, Inc. v. Riley,* 284 F.Supp.2d 1350, 1355 (M.D.Ala.2003) ("A motion to reconsider is only available when a party presents the court with evidence of an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or manifest injustice."). The grant or

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

denial of a motion to reconsider is left to the discretion of the district court. *See Chapman v. AI Transport,* 229 F.3d 1012, 1023-24 (11th Cir.2000).

*Analysis*

In its motion for reconsideration, ACS merely (1) asserts arguments previously raised and considered; or (2) raises arguments that could have been asserted previously and are improperly submitted in a motion for reconsideration. ACS offers arguments that the defense of prosecution history estoppel somehow limits the scope of asserted claims including the doctrine of equivalents. However, the Court has repeatedly examined, analyzed, and rejected these arguments; most recently in the January 13, 2006, Order on the parties' motions for summary judgment. These assertions will not be revisited by the Court in analyzing the instant motion.

The only novel argument that ACS brings to the Court's attention centers around the Federal Circuit's decision in *Johnson & Johnson Assocs. Inc. v. R.R. Serv. Co., Inc.,* 285 F.3d 1046 (Fed.Cir.2002). The rule in *Johnson & Johnson* dictates that disclosed but unclaimed alternatives found in the patent specification are deemed to have been dedicated to the public and cannot be recaptured under the doctrine of equivalents. ACS argues that "it is manifestly clear from the record that the formulas disclosed in the '515 patent are not claimed by the '515 patent ... [therefore] because the formulas were dedicated to the public, [ACS was] entitled to copy them prior to the certificate of correction." [Def. Memo. in Support of the Motion for Reconsideration, p. 17]. CAPS asserts that "the disclosed formulas are preferred embodiments of the claimed solutions and are therefore presumptively within the scope of the '515 patent claims." [Pla. Opposition to the Motion for Reconsideration, p.9]. ACS's argument is untimely and improperly brought.

**\*29** As the Court mentioned above, "a motion to reconsider should not be used by the parties to set forth new theories of law." *Mays v. U.S. Postal Ser-*

*vice,* 122 F.3d 43, 46 (11th Cir.1997). In addition, "a party who fails to present his strongest case in the first instance generally has no right to raise new theories or arguments in a motion to reconsider." *Publishers Resource v. Walker-Davis Pubs.,* 762 F.2d 557, 561 (7th Cir.1985). The holding in *Johnson & Johnson* does not offer new and controlling case law that was previously unavailable to ACS. Because ACS could have properly asserted this argument in its motion for summary judgment or, alternatively, in response to CAPS's motion for summary judgment, this argument is not properly brought in a motion for reconsideration and will not be analyzed by this Court.

Alternatively, the Court holds that the disclosed formulas are presumptively within the scope of the '515 patent claims and that ACS has failed to present substantial evidence to the contrary. *See Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1583 (Fed.Cir.1996) (interpretation of a patent claim that excludes the preferred embodiment is "rarely, if ever, correct and would require highly persuasive evidentiary support").

A motion to reconsider is only appropriate when (1) there is an intervening change in controlling law, (2) new evidence becomes available, or (3) there is a need to correct clear error or manifest injustice. None of those situations are present in the instant case. Accordingly, ACS's Motion for Reconsideration is hereby DENIED.

*The Certificate of Correction is Valid as a Matter of Law*

The parties to this action request that the Court decide the question of whether the correction effectuated by the COC broadened the scope of the '515 patent claims. FN5 This Court will rule on the validity of the COC based on the papers already presented. No fruitful purpose would be served through additional briefing as to the validity of the COC.

FN5. In its motion for reconsideration,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)
**(Cite as: 2006 WL 4448613 (N.D.Ala.))**

> ACS requests the Court to rule on the validity of the COC. When responding to the motion, CAPS agreed that the Court should decide this issue.

The issue regarding the validity of the COC has previously been decided by the Court in its *Markman* Order, which was issued following briefing by both parties and testimony from witnesses. The Court held that:

> [A]t this time [ACS] has failed to present clear and convincing evidence that the COC is invalid. The burden rests heavily on the party challenging the validity of the COC to present clear and convincing evidence that the COC is invalid. While [ACS] did present some evidence of invalidity, they did not present clear and convincing evidence that the COC did anything more than correct a mistake of minor character. [ACS] failed to present sufficient evidence to prove that the COC broadened the claim.

[*Markman* Order (doc. 64), p.1]. ACS challenges the validity of the COC and has failed to present any new evidence to cause the Court to revisit its holding in the *Markman* Order; therefore, this ruling is now made final. *See Superior Fireplace Co. v. Majestic Fireplace,* 270 F.3d 1358, 1367 (Fed.Cir.2001) (holding that the burden rests heavily on the party challenging the validity of the COC to present clear and convincing evidence that the COC is invalid). The Court specifically adopts its holding in the *Markman* Order issued May 2, 2002 (doc. 64), that the COC is valid as a matter of law and that the COC did not broaden the claim. FN6

> FN6. This holding will not change any of the Court's prior Orders.

**\*30** DONE and ORDERED this 27th day of February, 2006.

N.D.Ala.,2006.
Central Admixture Pharmacy Services, Inc. v. Advanced Cardiac Solutions, P.C.

Not Reported in F.Supp.2d, 2006 WL 4448613 (N.D.Ala.)

END OF DOCUMENT

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

H

United States District Court, S.D. New York.
D.O.C.C. INC., Plaintiff,
v.
SPINTECH INC., Defendant.
**No. 93 CIV. 4679 (RPP).**

Aug. 15, 1994.

Beth Kovitz, for Plaintiff.

Robert Neuner, Gary M. Butter, for Defendant.

ROBERT P. PATTERSON, Jr., District Judge.

*1 THE COURT: These are findings of fact and conclusions of law in D.O.C.C. v. Spintech Inc. I promised you a decision this morning. I had expected the parties in here at 10:00 o'clock, but my deputy tells me I didn't make that clear and he didn't understand me, so I set it down for 1:00 o'clock.

I have drafted in draft form findings of fact and conclusions of law which this opinion will constitute, subject to any editorial changes that may be required when I see the transcript.

In this action, plaintiff D.O.C.C. filed its complaint against defendant Spintech on July 12, 1993 alleging two causes of action. The first count alleges infringement of United States Patent No. 5,003,892, which I shall refer to hereinafter as the "892 patent," that patent was awarded to Jonathan Bricken on April 2nd, 1991, and is entitled "Process for Sterile Disposal of Syringes." The second count alleges intentional patent mismarking by Spintech of its TAPS medical waste processing product.

The 892 patent matured from an application serial number 507,133 filed April 10, 1990, as a division of application serial number 364,817 filed June 9, 1989 which was subsequently abandoned

(Defendant's Exhibit D.)

The 892 patent claims a simple process for heating as few as one syringe in a heat conductive container to: 1. melt the plastic portion of the syringe; 2. have the melted plastic encapsulate the needle of the syringe; and 3. render the molten mass sterile (Defendant's Exhibit D).

The independent claim of the 892 patent recites the following three steps:

1. Providing a heat conductive container adapted to contain at least one syringe to be prepared for sterile disposal therein;

2. Placing at least one syringe into the heat conductive container, and

3. Applying heat to the heat conductive container in an amount sufficient to melt the at least one syringe so that the plastic of the plastic portion can encapsulate the needle of the syringe to form a molten mass and render the molten mass sterile.

This process is supplemented by dependent claims, such as: prescribing a temperature range for heating the container, providing a lid for the container, providing a means for sealing the lid for the container, and providing a means for regulating the temperature and heating time in an oven.

In 1976, 13 years prior to the filing of the 892 patent, a patent was awarded to Philip A. Knight, Jr. disclosing the same process for melting plastic and sterilization and encapsulation that is claimed by Mr. Bricken, together with an afterburner for treating unwanted fumes (Defendant's Exhibit K).

Furthermore, a Swedish patent application available in 1981 disclosed the same heating process, only with the addition of plastic to make certain of encapsulation. That application did not claim that it would sterilize the syringe or needle.

Page 2

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

Also, since 1984, home care patients have utilized a process of disposing of used syringes whereby they were placed in coffee cans and placed in an oven at 400 or more degrees Fahrenheit for 45 minutes as a regular means of disposing of used syringes.

**\*2** On June 9, 1989, the same day that the 892 patent was first applied for, Dr. Ronald Spinello applied for a patent entitled "Apparatus and Method for Sterilizing, Destroying and Encapsulating Medical Implement Waste." Subsequently, that patent was issued by the Patent and Trademark Office (PTO). It was issued subsequent to the 892 patent as U.S. Patent No. 4,972,217, and it appears to be directed to the same subject matter as the 892 patent.

The claimed improvement made by Spintech's 217 patent on the subject patent is the use of amounts of additional plastic and temperature calibrated plastic to verify sterilization and permit encapsulation.

During the processing of the 892 patent, the Knight patent was not disclosed to the United States Patent Office by either Mr. Bricken or his attorney. Both Mr. Bricken and his attorney had learned of the Knight patent when, in a companion application, the examiner rejected patent apparatus claims for an instrument utilizing the process claims contained in the '892 patent. The patent examiner based his rejection on the prior art contained in the Knight patent.

Plaintiff's grounds for arguing patentability over the Knight patent are that the 892 process does not require the use of an afterburner, does not include any heat limitations whereas the Knight patent specifies a temperature range of 400 to 600 degrees Fahrenheit, and that the Knight patent does not include a lid to the heat conductive container which is placed in the heating space or oven.

Despite learning of the rejection of the apparatus claims made in their patent application neither Mr. Bricken nor his attorney notified the patent examiner then examining the application for the 892 pro-

cess patent that the Knight patent might be material to any determination.

Spintech is a start-up company which is attempting to market a processor which is an apparatus for sterilizing, destroying, and encapsulating medical waste, and which bears the patent numbers of Patent No. 4972,217, which was issued to Dr. Spinello, as well as a later patent, 5,078,924.

The TAPS system which plaintiff is charging with infringement is designed for small-scale disposal of medical waste, but is not limited to syringes, to which the 892 patent seems to be limited by its language. The literature accompanying the TAPS processor indicates that it is for the sterile disposal of glass syringes and tubes and other items as well as plastic syringes.

Spintech has been engaged in finding financing for the TAPS product development, and is in a position now where further funds are required, and has found that investors will not provide such funds in view of this lawsuit.

The Court concludes that the first count of patent infringement fails for the following reasons:

1. That the 892 patent is invalid under 35 USC 102 and 103, because the claimed invention was anticipated or rendered obvious by prior art;

2. The 892 patent is invalid under 35 USC 101 and 112 because the alleged invention, as stated in the claim, is inoperable and because no enabling disclosure is provided.

**\*3** 3. The 892 patent is unenforceable due to inequita conduct during the prosecution of the application leading to the 892 patent. And.

4. The 892 patent is not infringed by Spintech either directly or based on a contributory or induced infringement theory.

The second count for patent mismarking also fails under 35 USC 292. Spintech's alleged mismarking

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

was caused by a typographical error, wherein Spintech, U.S. Patent No. 5,078,924 was unintentionally listed as U.S. Patent No. 5,078,928 on a Spintech product brochure.

The other claim of mismarking which is the basis of the second count, that the TAPS unit does not contain the patentable features listed in either 5,078,924 or 4,972,217, fails because the TAPS instrument does rely on compression, contrary to the claims of the plaintiff that it does not. The compression is formed by a heavy lid of a type of plastic which melts in the final stages of the process, as opposed to the early stages, thereby causing the lid to fall and the force of gravity to compress the contents of the cylinder.

Now, I think at this point I will state some of the conclusions of law from which this opinion is based.

PATENT INVALIDITY.

A. Conclusions of law

Under 35 USC 282, a patent is presumed valid and the burden of establishing the invalidity of a patent rests on the party asserting such invalidity. However, the statutory presumption of validity is a procedural device and not substantive law. DMI Inc. v. Deere & Co., 802 F.2d 421, 427 (Fed.Cir.1986). The presumption of validity exists because the Patent and Trademark Office is assumed to have performed its job correctly, at least with respect to the information available to it. American Hoist & Derrick Company v. Sowa & Sons, Inc., 725 F.2d 1350, 1359-1360 (Fed.Cir.), cert denied, 469 U.S. 821 (1984).

Section 102 of Title 35 reads:

"Conditions for patentability; novelty and loss of right to patent.

"A person shall be entitled to a patent unless:

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for the patent in the United States."

The Court finds that Spintech has proved anticipation of the patent by clear and convincing evidence. To invalidate a claim in a patent by anticipation under section 102(b), all that is required is for a single prior device or practice that was disclosed in a printed publication or used publicly more than one year prior to the filing date to contain all the essential limitations of the claim. Kalman v. Kimberly-Clark Corp., 713 F.2d 760, 771 (Fed.Cir.1983), cert. denied, 465 U.S. 1026 (1984). The lid on the 892 patent and the afterburner on the Knight patent and the temperature limitations on the Knight patent do not appear to this Court to be essential to the process, or at least have not been shown by the plaintiff to be essential to the patented process for which the plaintiff is claiming a patent or has been issued a patent.

**\*4** In assessing invalidity under 102(b), a single prior device or practice need not expressly anticipate the claimed invention; it is enough that the prior art reference expressly or inherently possess each element of the claimed invention. Verdegaal Bros, Inc. v. Union Oil Co., 814 F.2d, 628, 631-32 (Fed.Cir.), cert. denied, 484 U.S. 827 (1987).

With means-plus function claims, to demonstrate anticipation the prior art reference need not be identical to the claimed invention. In re Bond, 910 F.2d 831, 833 (Fed.Cir.1990). The patent statute requires means-plus function limitations to be "construed to cover the corresponding structure, material, or acts described in the specification and equivalence thereof." Id.

And it is axiomatic that if a device or practice would infringe if used later than the issuance of a patent, that same device or practice anticipates the patent if used prior to the critical date. General Electric Company v. Hoechst Celanese Corp., 740

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

F.Supp. 305, 313 (D.Del.1990), Lewmar Marine Inc. v. Borient Inc., 827 F.2d, 744, 747 (Fed.Cir.1987), cert denied, 484 US 1007 (1988).

An examination of the Knight patent reflects that it would infringe the 892 patent if it had been obtained subsequently. And for purposes of infringement and anticipation, it is irrelevant if more elements exist in an infringing system, as long as all the claimed elements exist. See Northern Telecom, Inc. v. Datapoint Corp., 908 F.2d 931, 945 (Fed.Cir.) cert. denied, 498 U.s. 920 (1990).

Thus, defendant's burden in proving invalidity is more easily satisfied, because examiner Yuen, who examined the 892 patent, was never made aware of the Knight patent, and United States patent examiner Snay rejected the 892 process claims as "clearly anticipated" by the Knight patent in his determination. See American Hoist, supra.

Thus the presumption of validity of plaintiff's patent is overcome by the evidence in this case.

As with the Knight patent, the Alexon application was never brought to the attention of patent examiner Yuen and deference to the Patent and Trademark Office finding of allowability is not warranted in view of this failure.

The plaintiff's alleged inventive process as described in the 892 patent has been in the public domain for a number of years as evidenced by the Knight patent, the Alexon application, and the practice of home care patients found by the Court. The patent statute, 35 USC 102, requires that any such patent anticipated by prior use or publication for over a year be declared invalid.

In light of the prior art represented by the Knight patent, the Alexon application and prior practice by home care patients, Mr. Bricken's alleged inventive process would have been obvious under section 35 USC 103. That section provides in pertinent part:

"Conditions for patentability; nonobvious subject matter.

"A patent may not be obtained, though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which such subject matter pertains."

**\*5** The factual inquiry underlying the legal determination of obviousness involves assessing: 1. the scope and content of the prior art; 2. the differences between the most pertinent prior art and the claimed invention; and 3. the level of ordinary skill in the art. Modine Manufacturing Co. v. Allen Group, Inc., 917 F.2d 538 (Fed.Cir.1990), cert. denied, 500 U.S. 918/1991).

B. *Findings of Fact.*

Now, to apply these legal principles, the following findings of fact are made:

1. The alleged invention described in the 892 patent of heating syringes until they melt and are rendered sterile was in public use and described in printed publications for many years prior to the patent's filing date.

There is clear and unequivocal proof of anticipation under 35 U.S.C. 102(b): 1. U.S. Patent No. 3,958,936 (the "Knight patent") issued to Philip A. Knight Jr. twelve years prior to the 892 patent application; 2. the Swedish patent application by Carl Ingemar Alexon was published in 1981 (the "Alexon application"); and 3. public use in this country as described by the registered nurse, Ms. Swezey, as described earlier in this opinion, occurred from 1984 to 1988.

None of the three above-noted prior art references were before the patent examiner Yuen, the examiner who allowed plaintiff's 892 patent, while the plaintiff was prosecuting the application which resulted in that patent.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

The critical date for prior art is more than one year prior to the June 9th, 1989 filing date of patent application 364,817.

Plaintiff has limited the infringement contentions to claims 1 through 5 and 8 of the 892 patent.

Of the claims for which the plaintiff alleges infringement, claims 4, 5, and 8 include "means-plus function" language (Defendant's Exhibit D).

The Knight and Swedish prior art references discussed below disclose more complex technology with limited additional features than that contained in the 892 patent, which is totally flexible in its heat, time and volume elements, specifically, "sufficient to cause sterilization and encapsulation."

Claims 1-4 and 8 of the 892 patent are anticipated by U.S. Patent No. 3,958,936 to Philip A Knight Jr.

The Knight patent issued May 26, 1976, more than twelve years prior to the critical date of the 892 patent. Thus, it is prior art for purposes of rendering the 892 patent invalid.

The heating, melting, sterilizing and encapsulating feature of the 892 patent are all recognized by reference to the abstract of the Knight patent: "An appliance for sterilizing and melting plastic items such as found in hospitals or the like, for example, which appliance includes a chamber containing a foil casing within which the items are placed"-and I stress the "for example, which appliance"-"and means for heating the chamber for a temperature and time cycle sufficient to soften or melt the plastic items which, when cooled, will form a solid body of plastic material containing within it other non-melted disposable items such as might have been included with the plastic items."

**\*6** A review of the Knight patent demonstrates that each and every element of the claims the plaintiff seeks to enforce are disclosed, and the example of that is shown by the demonstrative Exhibit P, which includes the language from both patents, the 892 patent and the Knight patent.

Although the 892 patent describes a lid for the heat conductive container and the Knight patent does not, and although the Knight patent uses an afterburner to remove the odor of burning plastic, neither of these features appear to be essential to the process which is described in both patents.

Mr. Bricken filed a PCT International application with a disclosure which was the same as or virtually identical to the disclosure provided with the 892 patent, and process claims which are identical to claims 1 and 2 of the 892 patent.

The PCT application was filed in the United States receiving office, and was preliminarily examined by Examiner Snay, also assigned to the parent United States patent application from which the 892 patent was a divisional.

Claims 28 and 29 of the PCT application are identical to the claims 1 and 2 of the 892 patent.

On June 13, 1991 Examiner Snay rejected the process claims, stating that claims 28 and 29 were clearly anticipated by Knight Jr.

Patent Examiner Snay, in his review of plaintiff's PCT International application, reached the conclusion that the process claims of the 892 patent are anticipated by the Knight patent. And because the Court finds neither the lid nor afterburner and the temperature limitations significant or essential limitations on the processes described by the two patents, the Court agrees with Examiner Snay's conclusion.

Thereafter, D.O.C.C. and Mr. Bricken abandoned the PCT application, and Examiner Yuen, a different examiner who was responsible for allowing the 892 patent, was never made aware of the Knight patent by the plaintiff, Mr. Bricken or his attorney.

The Alexon patent application was published August 16, 1981, more than seven years prior to the critical date of the 892 patent. It, too, is prior art for the purposes of demonstrating invalidity of the 892 patent.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

As with the Knight patent, the Alexon application was never brought to the attention of patent examiner Yuen reviewing the 892 patent application.

The essential features of the Alexon application which anticipate the 892 patent are succinctly noted in the application summary:

"Method for destruction of injection syringes as injection containers of thermoplastics, intended for one time use.

"The injection syringes or injection containers are melted down in a vessel which remains intact after the meltdown, which gives a block of the plastics material with cannulae (needles) remaining on the injection syringes or injection containers enclosed therein."

A review of the Alexon application demonstrates that each element of claims 1 through 4 of the 892 patent is disclosed as shown by demonstrative Exhibit Q.

**\*7** The Alexon device does contemplate a closure on the receptacle in which the contents are heated, as in the 892 patent, and similar to the 892 patent has no afterburner to remove odors, but it does not make a claim for sterilization, even though a heat application at the temperatures described in the patent would sterilize. Accordingly, an application to sterilize would appear to be obvious in view of the temperatures utilized by the heating apparatus as described in the Alexon patent application.

The simple process claimed in the 892 patent of placing syringes in a heat conductive container, heating the container in order to melt the plastic, encapsulating the needles and rendering the resultant mass sterile, has been in public use since at least as early as 1984 by home care patients using syringes. Thus, the claimed process is again anticipated under section 102(b).

Disposal of used syringes by home care or hospital outpatients has been a significant problem due to fear of infection during waste storage, collection and disposal process.

Certain classes of patients, such as diabetics in need of daily insulin injections, may use more than 20 syringes a week.

Since at least 1984, it has been standard practice for registered nurses specializing in home care treatment of such patients to recommend to the patients a syringe disposal method that clearly anticipates the 892 patent process claims. The unrebutted testimony was that registered visiting nurses were instructed to tell their patients to use the following procedure: 1. Store used syringes in an empty coffee can; 2. When full, place the can in an oven at approximately 400 degrees Fahrenheit for approximately 45 minutes; and 3. Allow the materials to cool so the plastic can harden, and dispose of the can.

Although the use did not expressly state that its object was encapsulation or sterilization, it is recognized that registered nurses are professionals whose duties include recognizing sanitary and safety as well as medical treatment.

Given the prior art discussed above, the virtually identical purpose and function of the prior art and the 892 patent, and the simplicity of the alleged invention itself, the invention is deemed anticipated under section 102. The process to sterilize and encapsulate would have been certain to be obvious to one who utilized the prior art described in the Knight patent or the Alexon application, or a patient following the instructions of home care nurses and registered home care nurses in disposing of syringes. Thus, the claims of the 892 patent are invalid under section 103.

## INOPERABILITY OF THE 892 PATENT

A. Conclusions of Law

Now we come to the issue of the inoperability of the patent as claimed under the 892 patent.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

Under 35 USC Section 101, a claimed invention must be operable, that is, have utility, to be patentable.

Moreover, under title 35 USC Section 112, the patent specification must enable one skilled in the art to practice the claimed invention.

**\*8** Failure to satisfy these requirements renders a patent invalid. The Federal Circuit has stated:

"Because it is for the invention as claimed that enablement must exist, and because the impossible cannot be enabled, a claim containing a limitation impossible to meet may be held invalid under section 112. Moreover, when a claim requires a means for accomplishing an unattainable result, the claimed invention must be considered inoperative as claimed, and the claim must be held invalid under either section 101 or 112 of 35 USC." Raytheon Co. v. Roper Corp. 724 F.2d 951, 956 (Fed.Cir.1983), cert. denied, 469 U.S. 835 (1984).

The claims must first be interpreted to define the invention in order to test the invention for utility. Raytheon, 724 F.2d at 956.

Claim interpretation is an issue of law, but its resolution may depend on the claim language, the specification, the patent application history, the prior art, the nature of other claims, and expert testimony. SmithKline Diagnostics, Inc. v. Helena Labs Corp., 859 F.2d 878, 882 n. 7 (Fed.Cir.1988).

The Federal Circuit has noted that the "litigation induced pronouncement" of an inventor supposedly interpreting the meaning of claim language after the patent has issued should be given no weight. See Lear Siegler Inc. v. Aeroquip, 733 F.2d 881, 889 (Fed.Cir.1984).

"All limitations of a claim must be considered meaningful." Unique Concepts, Inc. v. Braun, 939 F.2d 1558, 1562 (Fed.Cir.1991).

Legal inoperability is measured by claim language. Raytheon, 724 F.2d at 956.

B. Findings of Fact

Claim 1, as read, requires that the process performed on the single syringe will result in encapsulation of the needle portion. Dr. Spinello testified he was unable to achieve this result with a single syringe, and Mr. Bricken did not testify that he had achieved such a result with a single syringe.

The last clause of claim number 1 of the 892 patent requires encapsulation of a syringe needle in a molten mass resulting from as few as one syringe being heated in the container by: "applying heat to the heat conductive container in an amount sufficient to melt the at least one syringe so that the plastic of the plastic portion can encapsulate the needle of the syringe to form a molten mass and render the molten mass sterile."

The necessity for encapsulation as an element of claim 1 is made even more clear by reference to the patent specification, the prosecution history, and the requirement to give meaning to the language of the claims.

The 892 patent specification states:

"The means for applying heat to heat conductive container may be any form of oven assembly, heating element or heater which meets the requirement of being capable of applying heat in an amount sufficient to melt the at least one syringe in the heat conductive container, 12"-that "12" designates the accompanying drawings-"to cause the melted plastic of the syringe, 14, to encapsulate the needle as a melted mass, 15, and render the melted mass, 15, sterile. To accomplish these results the means for applying heat should achieve a temperature of between about 380 degrees and 450 degrees Fahrenheit. At temperatures less than about 380 degrees Fahrenheit, the plastic of the syringes, 14, is not melted and the plastic does not encapsulate the needle.

**\*9** The clear import of this passage is that the "sufficient" amount of heat required in the last

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

clause of claim 1 causes the plastic portion to melt and encapsulate the needle, as recited in claim 1.

Even more importantly, the file history of the 892 patent makes clear that encapsulation was an essential requirement distinguishing it from the prior art. The argument for patentability made by the patentee, through its counsel, to the PTO during the prosecution of the 892 patent application is unequivocal:

"By providing a process for encapsulating the needle of the syringe in a molten mass of plastic from the plastic portion of the syringe, the dangers associated with stabbing oneself with the needle of a used syringe are eliminated."

That quote is from the information disclosure statement contained in the file history, Exhibit F at page 58.

Plaintiff made this argument to the PTO to distinguish the claimed invention over prior art.

At page 4 of the same information disclosure statement, the plaintiff further distinguished its claimed invention over the prior art by arguing that a prior art patent issued to Baker does not teach or suggest "that heat should be applied in an amount sufficient to melt the plastic of the syringe ... so that the plastic ... encapsulates the needle." That's in the same file wrapper, page 59, Exhibit F.

On page 4 and on pages 6 and 7 of the same exhibit, plaintiff again distinguishes the claimed invention from numerous other patents by repeating the limitation of encapsulation.

Finally, in response to the patent examiner's rejection of the claims, the plaintiff, at page 5 of its September 5, 1990 Request for Reconsideration, distinguishes the Baker patent by asserting that "the claimed inventive process melts the plastic portions of the syringes and causes the plastic from the syringes to encapsulate the needle of the syringe and form a molten mass." Exhibit F at page 75.

Thus, the plaintiff argued to the patent office that encapsulation is a necessary feature of the patented invention. For the court to find otherwise would mean that the below underlined phrase would render the last clause of claim 1 meaningless:

"Applying the heat to the heat conductive container in an amount sufficient to melt the at least one syringe SO THAT THE PLASTIC OF THE PLASTIC PORTION CAN ENCAPSULATE THE NEEDLE OF THE SYRINGE to form a molten mass and render the molten mass sterile."

It is clear from both the testimony of Mr. Bricken and the experiments to which Dr. Spinello testified to that encapsulation will not occur where one or possibly a few more syringes are used.

In his testimony, Mr. Bricken, the inventor of the 892 patent did not testify that he performed experiments demonstrating that a single syringe would encapsulate its needle when it melted.

In fact, the plaintiff admitted that the plastic portion of one syringe may not encapsulate the needle in a molten mass as is required by the process recited in claim 1.

**\*10** As a result, all the processes residing in the remaining claims of the 892 patent, which depend from claim 1 and, thus, include all of claims 1's limitations, similarly cannot encapsulate the needle. In other words, the claimed invention is inoperable because, as admitted by Mr. Bricken, the plastic portion of one syringe does not necessarily encapsulate the needle.

## UNENFORCEABILITY

Conclusions of Law

We now come to unenforceability.

The applicable law is that a patent is unenforceable if the applicant engaged in inequitable conduct during the prosecution of the patent. J.P. Stevens &

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

Co. Inc. v. Lex Tex Ltd. Inc. 747 F.2d 1553, 1560 (Fed.Cir.1984), cert. denied, 474 U.S. 822 (1985).

In order to establish inequitable conduct, clear and convincing evidence must demonstrate that the plaintiff or its agents failed to disclose material information or submitted false material information with an intent to deceive the PTO. Id.

In reaching a conclusion of inequitable conduct, the court undertakes a two-step analysis. The court must determine whether there are threshold showings of materiality and intent to mislead the PTO. Halliburton Co. v. Schlumberger Tech., 925 F.2d 1435, 1439 (Fed.Cir.1991). Then the court balances the threshold showing of materiality and intent. Id.

The degree of culpability required to establish intent varies with the degree of materiality of the false submission; the more material a reference or statement, the less culpable the conduct required. Id.

After the party asserting inequitable conduct has made a prima facie case of materiality and intent, the burden shifts to the opposing party to come forward with evidence that causes the court to reassess the validity of the defense. Paragon Podiatry Lab v. KLM Labs, 984 F.2d 1182, 1192 (Fed.Cir.1993).

A party may make a prima facie case of inequitable conduct by showing an unexplained violation of the duty of candor and good faith owed to the Patent and Trademark Office.

To establish threshold materiality the Federal Circuit maintains a preference for looking to the Patent and Trademark Office standard as a starting point. JP Stevens, supra.

Accordingly, PTO Rule 56 is the appropriate starting point for determining threshold materiality. American Hoist, supra.

Under this standard, information is material if it causes a "substantial likelihood that a reasonable examiner would consider it important in deciding

whether to allow the application to issue as a patent." Halliburton, 925 F.2d at 1435.

The intent-to-deceive element is met when the conduct involved, viewed in the light of all the evidence, including evidence of good faith, indicates sufficient culpability to require a finding of intent to deceive. Kingsdown Medical Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 876 (Fed.Cir.1988) (in banc.) cert. denied, 490 U.S. 1067, (1989).

It is not, however, required to show "direct proof of subjective wrongful intent on the part of persons acting for (the patentee)." RCA Corp. v. Data General Corp., 887 F.2d 1056, 1064 (Fed.Cir.1989).

**\*11** Intent need not, and rarely can, be proven by direct evidence. Intent is usually found as a matter of inference from circumstantial evidence. Hewlett-Packard Co. v. Bausch & Lomb Inc., 882 F.2d 1556, 1562 (Fed.Cir.1989).

A finding that a reference anticipates a claim satisfies the most stringent standard of materiality. Fox Indus. Inc. v. Structural Preservation Systems Inc., 922 F.2d 801, 804 (Fed.Cir.1991).

An undisclosed reference need not render a patent claim invalid. The issue is whether it would have been pertinent for consideration. Argus Chem. Corp. v. Fibre Glass-Evercoat Co., 759 F.2d 10, 14 (Fed.Cir.), cert. denied, 474 U.S. 903 (1985).

Under 37 Code of Federal Regulations section 1.59 and 1.99 in effect in 1990 and 1991, the plaintiff had a continuing duty to disclose material prior art to Examiner Yuen, the 892 patent examiner.

The official PTO interpretation of the rules of disclosure as set forth in the Manual of Patent Examining Procedure, MPEP, section 2,002.03(a) (1990) makes explicit the continuing duty to disclose material references identified from related U.S. applications until issuance.

"Updating of Information Disclosure Statement.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

"Section 1.99 provides that if at any time prior to issuance of a patent, an applicant, pursuant to his duty of disclosure under section 1.56, wishes to bring to the attention of the Office additional patents, publications or other information not previously submitted, the additional information should be submitted with reasonable promptness. For example, applicants have a duty of bringing to the attention of the office any material prior art or other information they become aware of from related United States applications, related foreign applications, related litigation (see section 2001.06(a), (b), and (c)), or which is otherwise brought to their attention."

That a continuing duty of disclosure exists during the period between payment of the issue fee and the issuance of the patent has been expressly recognized by the Federal Circuit. See *Kimberly Clark Corp. v. Proctor & Gamble Distributing Co.* 973 F.2d 911, 917-18 (Fed.Cir.1992).

Plaintiff's failure to bring the Knight patent to the attention of examiner Yuen of the 892 patent while its application was still pending is inexplicable, and intent to mislead is inferred. This Court draws the inference of an intent to deceive from the applicant's knowledge of the materiality of the undisclosed prior art as demonstrated by the findings of Examiner Snay. If an inference of intent is drawn, it becomes the applicant's burden to convince the fact finder that intent was lacking.

The Court takes notice of the similarity of the requirements of a Petition to Make Special, the method utilized by the plaintiff to obtain an expedited processing of his patent application as set forth in section 37 CFR 1.102 and in MPEP 708.02 VIII. Significantly, such a petition must include a statement that:

**\*12** "A pre-examination search was made, and specifying whether by the inventor, attorney, agent, professional searches, et cetera, and listing the field of search by class and subclass, publication ..." 708.02 VIII(c) (1990).

Furthermore, the petition must include "a detailed discussion of the references which discussion points out with the particularity required by 37 CFR 1.111(b) and (c), how the claimed subject matter is distinguishable over the references." Id.

Reliance on an inadequate pre-examination search is grounds for finding inequitable conduct. *General Electro,* 19 F.3d at 1409-10.

That the PTO relied on the plaintiff's declaration in granting the Petition to Make Special conclusively renders the representations material.

Conduct evidencing a "studied ignorance" of the facts and "reckless indifference" to the truth, combined with the absence of evidence of good faith gives rise to an inference of an intent to deceive. *Hewlett-Packard,* 882 F.2d at 1562.

Findings of Fact

The 892 patent is unenforceable due to three separate act of inequitable conduct without which the patent would not have issued.

1. The plaintiff and its agents did not disclose the Knight patent to the patent examiner, in blatant disregard of well-established rules of patent prosecution requiring disclosure of material prior art.

2. The plaintiff and its agents submitted false statements regarding encapsulation in order to distinguish over prior art references, as has been discussed previously.

3. The plaintiff submitted misleading information and an inadequate prior art search in connection with a Petition to Make Special the application leading to the 892 patent.

The Knight patent's materiality is clear given the determination by Patent Examiner Snay that the Knight patent anticipated process claims identical to those in the 892 patent, which he did in the copending PCT application, which application was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

thereafter abandoned.

This was not the first time that plaintiff was made aware of the Knight patent, because in its co-pending U.S. Application Number 07/364,019 ("the 019 application") from which the 892 process patent issued as a divisional of that application, claimed an apparatus for sterile disposable syringes, and was denied by Examiner Snay-partially on the basis of the Knight patent. The specifications contained in the 019 application contained an identical description of the process contained in the 892 patent.

Additionally, the rejected apparatus claims in the 892 process claims are identical in material terms, as is demonstrated in Demonstrative Exhibit T.

In office actions dated January 8, 1991 and July 30, 1991, Examiner Snay rejected the 019 application claims as either anticipated or rendered obvious based on the Knight patent. (Defendant's Exhibit H, pp. 145-150 and 158-163).

The plaintiff abandoned the 019 application following the examiner's rejection based on the Knight patent, just as the PCT application was abandoned after it was rejected in view of Knight.

**\*13** The January 8, 1991 office action shows unequivocally that around January 18, 1991 the plaintiff and its attorney were aware of the Knight patent and its relevance more than three months prior to the issuance of the 892 patent.

By letter dated February 12, 1991, D.O.C.C.'s attorney told Mr. Bricken of Snay's anticipation rejection based upon the Knight patent and forwarded a copy of the reference. Thus, Mr. Bricken and the plaintiff were aware of the Knight patent more than seven weeks prior to the issuance of the 892 patent.

Plaintiff knew that the Knight patent was material both to the process claim as well as the apparatus claim. In addition to the fact that the disclosure and material claim elements are identical for the process and apparatus, in its Petition to Make Special

the 019 application plaintiff expressly stated: "Claims 1 to 29 are pending in the application and are believed to be directed to a single invention."

Claims 1 to 29 of the 019 application as filed included both the apparatus and process claims. Accordingly, if the Knight patent were material to the apparatus claim as noted by examiner Snay in January 1991, plaintiff knew of the materiality regarding the process claim. Plaintiff's submission of identical search results in its Petition to Make Special both the apparatus and process applications is evidence that plaintiff thought the alleged inventions were the same.

Neither the plaintiff nor its attorney has provided a satisfactory reason for its failure after Examiner Snay's January 1991 rejection based on the Knight patent to apprise Examiner Yuen of that material patent.

In view of the disclosure requirements for a patent application, the plaintiff has offered nothing to rebut the inference of an attempt to mislead.

Additional grounds for finding inequitable conduct as based on the petition exists because the plaintiff knowingly submitted an inadequate preexamination search. The preexamination search for the plaintiff was performed not by an attorney, patent agent, or professional searcher, as suggested by the MPEP, or even by the inventor, but by Jonathan Matias, whose credentials are not noted in the petition. Mr. Matias' only credentials are a masters degree in biology, and I gather, as an instructor at a university.

As noted in his declaration supporting the apparatus application, Mr. Matias claimed to have discovered only 34 post-1971 patents containing the term "syringe" and "disposal," and furthermore claimed that no patents prior to 1980 were discovered.

The examination of the disclosures which were made to the PTO indicate that six of the seven prior patents relied on by the examiner were only submitted during the amendment process, which should

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

have alerted the plaintiff and its attorney to the like-lihood of an inadequate first search.

The same search to that allegedly run by Mr. Ma-tias, or a similar search, was run by Mr. Charles Rattner, a paralegal, using the Dialog Fulltext data-base, and that search uncovered 548 patents between 1971 and 1990 containing those two terms, that is, the terms "syringe" and "disposal."

**\*14** Additionally, Mr. Rattner's search uncovered 132 patents prior to 1980.

Finally, when Mr. Rattner's search was modified to include the plural of syringe 142 patents, including the Knight patent, were discovered prior to 1980.

The plaintiff has not shown that in its submission of and reliance on Mr. Matias's search it had reason-able grounds to believe that the search would be ad-equate.

Also the plaintiff has not offered any evidence to rebut the inference of inequitable conduct with re-spect to its Petition to Make Special.

Thus, in obtaining the 982 patent, plaintiff:

1. Failed to disclose prior art known to be material;

2. Falsely stated the alleged invention may be dis-tinguished from prior art based on encapsulation; and

3. Submitted a highly inadequate search result in connection with the petition to make special.

INFRINGEMENT.

Conclusions of Law

We now come to the issue of infringement.

The 892 patent claims are directed to a method for disposal of syringes. Accordingly, the claims can be infringed only by one who actually practices the claimed method. See *Moleculon Research Corp. v.*

*CBS Inc.,* 793 F.2d 1261, 1272 (Fed.Cir.1986), cert. denied, 479 US 1030 (1987).

There is no evidence that Spintech is a user of the TAPS product. Therefore the only infringement al-legation that would survive a facial challenge, is that of induced or contributory infringement under 35 USC Section 271(b) and (c).

35 USC 271(b) and (c) provides in pertinent part:

"271, Infringement of Patent.

"(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

"(c) Whoever sells a ... material or apparatus for use in practicing a patented process constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent and not a staple art-icle or commodity of commerce suitable for a sub-stantial noninfringing use, shall be liable as a con-tributory infringer."

It is fundamental that where there is no evidence of direct infringement of a patent, there can be no con-tributory infringement. *Aro Manufacturing Co. v. Convertible Top Replacement Co.* 365 U.S. 336 (1961). See also, *Met-Coil System Corp. v. Korners Unlimited Inc.,* 803 F.2d 684, 687 (Fed.Cir.1986); *Standard Oil Co. v. Nipon Shokubai Kogyo Co. Ltd.,* 754 F.2d 345, 348-49 (Fed.Cir.1985).

Thus, for purposes of 35 USC 271(b) and (c), Spintech cannot be liable where plaintiff fails to prove direct infringement.

Plaintiff bears the burden of proving infringement by a preponderance of the evidence.

Infringement analysis is a two-step process. First, the scope of the claims asserted must be assessed. Second, the accused process must be reviewed to see if it is covered by the claims as construed. *Palumbo v. Don-Joy Co.,* 762 F.2d 969 (Fed.Cir.1985). Resolution of the first issue is a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

legal question that depends on the claim language, the specification, the patent file history, the prior art, the nature of other claims, and expert testimony. The second issue is a factual question. See *SmithKline,* 859 F.2d at 882, 889.

**\*15** Because a claim must be interpreted and given the same meaning for both validity and infringement, plaintiff cannot argue that it has a valid patent by distinguishing its claim from the prior art, and later claim infringement over a process using a similar step.

To establish liability under 35 USC 271(c), D.O.C.C. must prove that Spintech sold the TAPS product, "knowing [it] to be especially made or especially adapted for use in an infringement" and that the TAPS product is not a "commodity of commerce suitable for substantial noninfringing use." 35 USC 271(c).

The knowledge requirement of section 271(c) is satisfied only if the party charged with contributory infringement knows of both the patent and infringement caused by a product. *Aro Manufacturing Co.,* supra. Accordingly, defendant can only be held liable as of April 26, 1993, the date it was made aware of the 892 patent. See *Trell v. Marlee Electric Corp.,* 912 F.2d 1443, 1447 (Fed.Cir.1990).

However, liability is avoided altogether if the TAPS device is designed for a substantial noninfringing use. See *C.R. Bard Inc. v. Advanced Cardiovascular Systems Inc.* 911 F.2d 670 (Fed.Cir.1990).

"When a charge of contributory infringement is predicated entirely on the sale of an article of commerce that is used by the purchaser to infringe a patent, the public interest and access to that article of commerce is necessarily implicated." *Sony Corp. v. Universal City Studios Inc.,* 464 US 417, 440 (1983). Contributory infringement liability is not meant for situations where noninfringing uses are common as opposed to farfetched, illusory, impractical or merely experimental. 4 Chisum Patents,

17.03[3], at 17-62 (1993).

35 USC 271(b) imposes liability where one actively induces infringement.

As under section 271(c), liability is contingent on showing infringement was actively induced knowing of both the patent and infringement. *Water Techs Corp. v. Calco Ltd.* 850 F.2d 660, 668 (Fed.Cir.), cert denied, 488 US 968 (1988).

B. Findings of Fact

Here, Spintech manufactures and sells medical waste disposal units under the name TAPS.

These patented products provide a unique means for disposal of medical wastes whereby resulting waste is rendered nonrecognizable, nonreusable and verifiably sterile as required by certain state medical waste disposal laws.

In the TAPS devices, a significant volume of temperature-calibrated plastic provided by the manufacturer is combined with medical waste. The plastic added is temperature-calibrated to melt at a temperature where all biological contamination is rendered sterile substantially on contact.

Further, the additional plastic fills the space containing the medical waste upon melting. Upon cooling, a sterile puck of plastic containing the medical waste may be disposed of in ordinary trash.

The use of the TAPS device differs significantly from the process claimed in the 892 patent in that: 1. additional plastic is used for encapsulation in TAPS, while the 892 patent relies on plastic from disposable syringes; 2. the plastic used in TAPS is temperature-calibrated to ensure sterilization upon melting while the 892 patent relies on plastic from syringes which may melt at lower temperatures and not result in sterilization; and 3. syringes with plastic portions (if syringes are processed at all) need not and often will not be processed in a TAPS device.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

**\*16** The 892 patent claims are directed solely to a method of disposal of syringes. TAPS is directed to a variety of medical waste.

Plaintiff alleges that the use of the TAPS product infringes the 892 claims.

There is no evidence Spintech is a user of the TAPS product.

Therefore in order for Spintech to be liable for infringement of the 892 patent's method claims, plaintiff must establish contributory or induced infringement under 35 USC Section 271(b) or (c).

Integral to the use of the Spintech product is the use of the temperature-calibrated plastic liner inserts to ensure sterilization and to permit encapsulation of medical waste.

The 892 patent file history estops plaintiff from proffering a claim construction that encompasses use of additional plastic. In a September 4, 1990 request for reconsideration filed in order to distinguish over U.S. Patent No. 4,662,516 to Baker, Sr., et al. (the "Baker patent"), the plaintiff distinguishes its claims in that no additional plastic need be used.

The Baker patent included the use of an additional plastic liner to seal the syringes. Plaintiff argued:

"In contrast, the claimed inventive process melts the plastic portion of the syringes and causes the plastic from the syringes to encapsulate the needle of the syringe and form a molten mass ... This process is not taught or suggested in the Baker, Sr., et al. patent." (Defendant's Exhibit F, p. 75).

Accordingly, D.O.O.C. made clear that to practice the 892 patent, the encapsulation and sterilization must be caused by the plastic from the syringes.

Also, the TAPS device is designed for use with a variety of medical waste, and plastic syringes need not be used.

Contrary to the 892 patent process the use of the TAPS device requires the use of an additional plastic liner to ensure encapsulation.

Thus, according to the file history quoted above, the TAPS device is in accordance with the prior art from which the plaintiff expressly distinguished itself.

Direct infringement of the 892 patent is lacking because the TAPS product often is used without disposable plastic syringes, and users of the TAPS product process waste such as glass vials, petri dishes, gauze, human teeth, and the like.

There can be no infringement from such users because the 892 patent only covers disposal of syringes having at least a plastic portion (See claim 1 of Exhibit D).

The plaintiff has offered no direct evidence of infringement by the TAPS users. Its only evidence of infringement is the Spintech TAPS brochure, which does demonstrate use of a syringe, but it is not clear whether it is a disposable plastic syringe. Accordingly, no direct proof has been offered by plaintiff of infringement.

Spintech is not liable for contributory or induced infringement because plaintiff has offered no proof of direct infringement by actual users, and the TAPS product can be used for substantial non-infringement purposes, specifically processing medical waste not including plastic syringes.

## PATENT MISMARKING.

### A. Conclusions of Law

**\*17** Now, the second cause of action is for patent mismarking in violation of 35 USC Section 292.

One basis for D.O.O.C.'s claim of patent mismarking is the TAPS product brochure accidentally listed Spintech's U.S. Patent No. 5,078,924 as number 5,078,928.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

Federal law makes patent mismarking a criminal offense where a party places a patent number on a product or advertisement "with the intent ... of deceiving the public and inducing them to believe that the thing was made or sold by or with the consent of the patentee." *Boyd v. Schildkraut Giftware Corp.,* 936 F.2d 76, 79 (2d Cir.), cert denied, 112 S.Ct. 378 (1991).

Due to its penal nature, section 292 carries a heavy scienter requirement and is narrowly construed. "Plaintiffs have the burden of proving that the defendants acted with the specific intent to deceive the public." *Sadler-Cisar, Inc. v. Commercial Sales Network, Inc,* 786 F.Supp. 1287, 1296 (N.D.Ohio 1991).

The Federal Circuit recently affirmed a summary judgment dismissal of a mismarking claim given a very similar factual pattern to the one presented here. *Arcadia Mach. & Tool Inc. v. Sturm, Ruger & Co.,* 786 F.2d 1124 (Fed.Cir.1986).

Where affidavits by defendants made clear that mislabeling was inadvertent as the result of oversight and no evidence of subjective intent to deceive was provided, summary disposition was appropriate. Id.

In the same case, the court also took favorable note that all products shipped under the labels at issue were in fact made in accordance with one or more of the defendant's patents.

Now, here, the facts relating to this part of the plaintiff's second claim are that Spintech does properly mark its products and its brochures with U.S. patent numbers 4,992,217 and 5,078,924.

It made a typographical error in connection with the latter patent and instead of the last digit 4, listed the last digit 8. It is asserted that such error was inadvertent and the past marking error has been corrected.

The plaintiff has offered no proof of deceptive intent. The mislabeled patent 5,078,928 is for a

"Coating Process for Manufacturing Enlarged Smooth Teeth Ends on a Comb." The plaintiff does not suggest and the court cannot ascertain any reasons why Spintech would wish the public to believe that such a patent existed for TAPS.

Accordingly, the Court finds that, indeed, such mismarking was inadvertent and not actionable.

Plaintiff also claims that the TAPS device improperly contains the listings of patent numbers 4,992,217 and 5,078,924, in that the device does not utilize compression in any way, whereas those patents indicate that compression is a part of the process.

Dr. Spinello testified as to how the TAPS product worked, and it was evident from his description of the weighted lid and the composition of the lid being of a higher heat resistant plastic that, indeed, the lid did serve the purpose of gravity compression and cause the plastic to be reduced in the chamber to a low level.

**\*18** Thus, the court does not find that there is any evidence that there is misuse of the patent designation of U.S. Patent Numbers 4,992,217 and 5,078,924.

ATTORNEY FEES

Next, the issue of attorney fees under 35 USC Section 285.

Section 285 reads in pertinent part:

"The court in exceptional cases may award reasonable attorney fees to the prevailing party."

The necessary predicate for the exercise of discretion by the trial court is a finding that the case is exceptional because of, 1. inequitable conduct during the prosecution of the patent, or 2. the filing and maintenance of a frivolous lawsuit. *Reactive Metals & Alloys Corp. v. ESM, Inc.,* 759 F.2d 1578, 1582 (Fed.Cir.1985); *Bayer Aktiengesellschaft v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

*Duphar International Research B.V.,* 738 F.2d 1237, 1242 (Fed.Cir.1984).

The Federal Circuit has approved an award for fees based upon the following standard:

"The filing and maintaining of an infringement suit which the patentee knows, or on reasonable investigation should know, is baseless, constitutes grounds for declaring a case exceptional under 35 USC Section 285 and awarding costs and attorney fees, and expenses to the accused infringer." *Eltech Systems Corp., v. PPG Indus. Inc.,* 903 F.2d 805, 810 (Fed.Cir.1990); *see also Mathis v. Spears,* 857 F.2d 749, 754 (Fed.Cir.1988) (The only deterrent to the improper bringing of clearly unwarranted suits on obviously invalid or unenforceable patents is Section 285).

A person suing qui tam recovers one-half of the $500 fine for each offense. A continuing advertisement over a period of time constitutes a single offense. See *Sadler-Cisar,* 786 F.Supp. at 1296.

As detailed above, the plaintiff engaged in inequitable conduct in the pursuit of the 892 patent consisting of: 1. non-disclosure of the Knight patent to the examiner of the 892 patent; 2. misrepresenting to the PTO that the claimed process is distinguished from the prior art because the plastic of the syringe encapsulates the needle of the syringe; and 3. submitting an inadequate search and misleading Information Disclosure Statement in connection with a Petition to Make Special.

Such inequitable conduct is an often cited basis upon which such a finding of an exceptional case may be based for awarding fees under section 285. See *Fox Industries,* 922 F.2d at 804; *Orthopedic Equipment Co. v. All Orthopedic Appliances,* 707 F.2d 1376 (Fed.Cir.1983).

When confronted with litigation brought in bad faith, the court's exercise of its inherent power to rectify, at least in part, the injustice done to the defendant serves to defend the court and the judicial

system against abuse. *Mathis,* supra, at 754.

It's unfortunate, the Court notes, that "no award under section 285 can fully compensate a defendant subjected to subjected to bad faith litigation, e.g, for the loss of executives' time and missed business opportunities." Id.

Findings of Fact

Here, the findings are that plaintiff filed and pursued the present lawsuit with full knowledge that the 892 patent could well be invalid.

**\*19** Similarly, the plaintiff pursued count 2 of the patent mismarking with absolutely no evidence of intent to mislead, and with no investigation of the validity of the compression claim made by the defendant for the lid of the heat conducive container.

As of January 17, 1991, the plaintiff was on notice of the Knight patent, Examiner Snay's decision that the apparatus claims co-pending with the 892 patent were anticipated by Knight.

Six months later, Examiner Snay made clear the 892 process claims were also invalidated by the Knight patent as evidenced by the preliminary examination report of a PCT application containing claims identical to those of the 892 patent.

In both instances the plaintiff acquiesced to the rejection and abandoned the U.S. apparatus application and the PCT application.

The plaintiff's only attempt to avoid the Knight patent as a reference was an argument that Knight did not anticipate because it required an afterburner, did not have a lid on the heat conducive container, and had temperature specifications of 400 to 600 Fahrenheit as opposed to plaintiff's no temperature or sufficient temperature to melt the plastic and encapsulate and render sterile the needle.

Examiner Snay pointed out the error in the plaintiff's argument. He noted the use of the open-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

ended word "comprising" in the D.O.C.C. independent claim, referring to the fact that a reference could disclose more than the invention claimed and still anticipate.

By its acquiescence to Examiner Snay's rejection based on the Knight patent, plaintiff provides corroboration for the fact that the present suit should have been known by it to be baseless.

The frivolous nature of this action is further illustrated by plaintiff's refusal to drop its patent mismarking claim despite its inability to produce any evidence of intent to mislead by Spintech as required by statute.

The harassing nature of the mismarking count was compounded by the minimal potential recovery should D.O.C.C. prevail, at best $250.

Spintech has been forced to endure the lasting effects of the present lawsuit, such as delays in obtaining financing, developing products, and getting to market.

Accordingly, the Court is going to award attorney fees to the defendant, reasonable attorney fees.

Application will be made on papers with a copy to the plaintiff.

The next issue is the liability of Mr. Bricken on the counterclaim, that is, for attorney fees, costs and expenses.

It has been held that corporate officers are personally liable for their role in the corporation's knowingly engaging in infringing activities, and these officers have been required to pay attorney fees.

Furthermore, it is well established that, where the infringement is caused by the active participation and encouragement of the corporate officer, personal liability may be found regardless of whether the corporation is the alter ego of the corporate officer. See *Orthokinetics, Inc. v. Safety Travel Chairs,* 806 F.2d 1565 (Fed.Cir.1986); *Franklin Electrical Pub-*

*lishers v. Unisonic Products Corp,* 763 F.Supp. 1, 3 (S.D.N.Y.1991).

**\*20** A corporate officer may be held personally liable for attorney fees under section 285 when the officer's active participation in tortious conduct results in a finding of patent unenforceability due to inequitable conduct and the filing or maintaining of a bad faith lawsuit. *Machinery Corp. of America v. Gullfiber AB,* 774 F.2d 467, 475 (Fed.Cir.1985); see also *Hughes v. Novi Am, Inc.,* 724 F.2d 122, 126 (Fed.Cir.1984).

"Officers of the corporation are personally liable for tortious conduct of the corporation if they personally took part in the commission of a tort." See *Orthokinetics,* 806 F.2d at 1579.

In determining whether an officer dominates the corporation so as to be considered its alter ego, the Second Circuit has looked to factors including, inter alia:

1. The absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., the keeping of corporate records. Mr. Bricken's testimony here is that such records exist but they were not produced during trial or during discovery.

2. Overlap in ownership, officers, directors and personnel. Here, the testimony is that Mr. Bricken was the president, chief executive officer, and major stockholder of plaintiff. It is also acknowledged he was the decision maker, after consultation with his partners, who were referred to thus in his testimony.

3. Common office space, address and telephone numbers. The Second Circuit cite is *William Passalacqua Builders, Inc. v. Resnick Developers, Inc.,* 933 F.2d 131, 139 (2d Cir.1991). The plaintiff corporation has no paid employees, and the only corporate address and phone numbers are those of Mr. Bricken's residential apartment on East 76 Street in Manhattan.

Under these circumstances, the Court finds that Mr.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

Bricken should be held liable along with the corporation for the payment of attorney fees, costs, and expenses for this litigation.

These are the findings of the Court and conclusions of law. I'm sorry it took so long, but the time here and the amount of work I am presently engaged in, if I did not do this orally it would be six months before you would get a decision. The only way I could do it is by dictating it into the record so my secretary can be doing other work in the office and the law clerks can be doing other work in the office.

I will edit this and have it reviewed, and if you all want to review it and make any suggestions or input, please do so within the next week.

MR. NEUNER: Thank you, your Honor.

### FINAL JUDGMENT

This patent infringement and patent mismarking action came on for trial before the Court, Honorable Robert P. Patterson, Jr., District Judge, presiding, and the issues having been duly tried and a decision having been duly rendered, as follows:

1. United States Letters Patent No. 5,003,892 to Jonathan Bricken has been proven invalid by clear and convincing evidence under 35 U.S.C. § 101 as inoperable.

2. United States Letters Patent No. 5,003,892 to Jonathan Bricken has been proven invalid by clear and convincing evidence under 35 U.S.C. § 102 as anticipated by the prior art.

*21 3. United States Letters Patent No. 5,003,892 to Jonathan Bricken has been proven invalid by clear and convincing evidence under 35 U.S.C. § 103 as obvious in view of the prior art.

4. United States Letters Patent No. 5,003,892 to Jonathan Bricken has been proven invalid by clear and convincing evidence under 35 U.S.C. § 112 as

nonenabling.

5. United States Letters Patent No. 5,003,892 to Jonathan Bricken has been proven unenforceable by clear and convincing evidence as a result of plaintiff D.O.C.C., Inc. and counterclaim defendant Jonathan Bricken's inequitable conduct.

6. Plaintiff D.O.C.C., Inc. has failed to prove under 35 U.S.C. § 271(a) by a preponderance of the evidence that Spintech, Inc. directly infringed United States Letters Patent No. 5,003,892 to Jonathan Bricken.

7. Plaintiff D.O.C.C., Inc. has failed to prove under 35 U.S.C. § 271(b) by a preponderance of the evidence that Spintech, Inc. induced others to infringe United States Letters Patent No. 5,003,892 to Jonathan Bricken.

8. Plaintiff D.O.C.C., Inc. has failed to prove under 35 U.S.C. § 271(c) by a preponderance of the evidence that Spintech, Inc. contributed to other persons' infringement of United States Letters Patent No. 5,003,892 to Jonathan Bricken.

9. Plaintiff D.O.C.C., Inc. has failed to prove under 35 U.S.C. § 292 by a preponderance of the evidence that Spintech, Inc. has mismarked its products with U.S. Letters Patent No. 4,992,217.

10. Plaintiff D.O.C.C., Inc. has failed to prove under 35 U.S.C. § 292 by a preponderance of the evidence that Spintech, Inc. has mismarked its products with U.S. Letters Patent No. 5,078,924.

11. Plaintiff D.O.C.C., Inc. has failed to prove under 35 U.S.C. § 292 by a preponderance of the evidence that Spintech, Inc. has mismarked its products with U.S. Letters Patent No. 5,078,928 with an intent to deceive the public.

12. Spintech, Inc. has proven under 35 U.S.C. § 285 that this case is exceptional in view of plaintiff D.O.C.C., Inc. and counterclaim defendant Jonathan Bricken's inequitable conduct and bad faith litigation.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145
**(Cite as: 1994 WL 872025 (S.D.N.Y.))**

13. Spintech, Inc. has proven that Mr. Bricken should be held liable along with D.O.C.C., Inc. for the payment of reasonable attorney fees, costs and expenses for this litigation.

IT IS ORDERED AND ADJUDGED

(i) that U.S. Letters Patent No. 5,003,892 is invalid;

(ii) that U.S. Letters Patent No. 5,003,892 is unenforceable;

(iii) that Spintech, Inc. has not directly infringed U.S. Letters Patent No. 5,003,892;

(iv) that Spintech, Inc. has not induced others to infringe U.S. Letters Patent No. 5,003,892;

(v) that Spintech, Inc. has not contributed to other persons' infringement of U.S. Letters Patent No. 5,003,892;

(vi) that Spintech, Inc. has not mismarked its products;

(vii) that Plaintiff D.O.C.C., Inc. and counterclaim defendant Jonathan Bricken are jointly and severally liable to Spintech Inc. and shall pay Spintech, Inc. the costs of this litigation and reasonable attorney fees expended by Spintech, Inc. in this litigation as found by the Court in a determination to be made after Plaintiff has filed objections to Defendants application for $257,199.10 which objections shall be filed by 8/26/94.

**\*22** (ix) that interest shall accrue upon receipt of this Final Judgment, at the one year treasury bill rate of 5.5% pursuant to 28 U.S.C. § 1961.

It is further ordered that, having reviewed plaintiffs' objections to attorney's fee application received on 8/12/94, plaintif's identify the entries in the time printout of defendant's attorneys to which they have specific objections by August 26, 1994, and file it with the Court.

So ordered

S.D.N.Y.,1994.
D.O.C.C. Inc. v. Spintech Inc.
Not Reported in F.Supp., 1994 WL 872025 (S.D.N.Y.), 36 U.S.P.Q.2d 1145

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3234629 (E.D.Pa.), 78 U.S.P.Q.2d 1927
**(Cite as: 2005 WL 3234629 (E.D.Pa.))**

H

United States District Court,
E.D. Pennsylvania.
Herman DOUGLAS, SR., Plaintiff,
v.
WAL-MART STORES, INC., Defendant.
**No. Civ.A. 05-152.**

Nov. 30, 2005.

Herman Douglas, Sr., Philadelphia, PA, pro se.

James D. Cashel, Montgomery McCracken Walker & Rhoads, LLP, Philadelphia, PA, for Defendant.

MEMORANDUM

ROBRENO, J.

**\*1** Plaintiff, Herman Douglas, Sr. ("Douglas"), has a patent on a u-shaped device that hooks on to an automobile operator's thigh, enabling the operator to steer the automobile with his or her thigh instead of, or in addition to, using his or her hands. He alleges that this patent encompasses the design for a neck support pillow, and that Wal-Mart Stores, Inc. ("Wal-Mart") is infringing his patent by selling a u-shaped neck pillow. On March 25, 2005, Douglas filed an amended complaint, adding claims for copyright infringement, false advertising, trade dress infringement, state and common law unfair competition, and trademark infringement to his claim for patent infringement.

Wal-Mart denies that its neck pillow infringes Douglas' patent and asserts that the additional claims have no merit. Wal-Mart has filed counterclaims seeking a declaratory judgment of non-infringement and invalidity of the patent, and a judgment of false-marking against Douglas pursuant to 35 U.S.C. § 292.

Both parties have filed motions for summary judg-

ment. Wal-Mart asks the Court to dismiss all counts of the amended complaint, to order that Wal-Mart's product does not infringe Douglas' patent, that Douglas' patent is invalid, and that Douglas has falsely marked promotional material in violation of 35 U.S.C. § 292. Wal-Mart requests Douglas be ordered to pay a fine pursuant to 35 U.S.C. § 292, and attorneys' fees and costs. Douglas seeks summary judgment on all of his claims, requests damages, attorneys' fees and costs, and asks that the Court enjoin Wal-Mart from further infringement of Wal-Mart's patent, copyright, and trademark.

For the reasons that follow, summary judgment will be granted to Wal-Mart on all of Douglas' claims. Wal-Mart's request for attorneys' fees and costs will be denied. Wal-Mart's first counterclaim will be dismissed as moot. Douglas' motion to dismiss Wal-Mart's second counterclaim will be granted.

I. BACKGROUND

On September 9, 1997, the United States Patent and Trademark Office issued a patent to Douglas (the "'272 patent"). The claims of the '272 patent are as follows: FN1

> FN1. A claim in a patent registration is "[a] formal statement describing the novel features of an invention and defining the scope of a patent's protection." Black's Law Dictionary 241 (7[th] Ed.1999).

1. A combined motor vehicle control pillow and tiltable steering wheel cover unit for straight highway driving comprising:

a fabric covered foam piece;

a hook and loop fastener strip mounted on one surface of said fabric covered foam piece; said hook and loop fastener strip being arranged to engage a steering wheel cover, said cover of said steering wheel being of a suitable material to be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2005 WL 3234629 (E.D.Pa.), 78 U.S.P.Q.2d 1927
**(Cite as: 2005 WL 3234629 (E.D.Pa.))**

gripped by said hook and loop fastener strip; and

a U-shaped plastic retainer secured to the opposite surface of said fabric covered foam piece, said U-shaped plastic retainer being adapted to fit on a thigh of a driver of a motor vehicle, whereby when said steering wheel is tilted toward the foam piece on the thigh of the driver a gripping contact is established between said hook and loop fastener strip and said steering wheel cover to maintain said steering wheel in a rotationless attitude.

**\*2** 2. The device of claim 1 wherein said fabric covered foam piece can be covered by plastic, silk, leather, cotton, and rayon or denim.

3. The pillow of claim 1 wherein said U-shaped retainer is mounted up beneath the said pillow and is supported by a funnel opening for easy assembly and cleaning.

Wal-Mart contends that Claims 2 and 3 are dependant on Claim 1, which is the only independent claim. The claims are accompanied by the specification and drawings of the "preferred embodiment of the invention." FN2 The specification includes the sentence: "This invention can also be used as a neck support pillow."

> FN2. The specification is "[a] patent applicant's written description of how an invention is constructed and used." Black's Law Dictionary 1406 (7 th Ed.1999).

On January 13, 2005, Douglas filed an action against Wal-Mart, alleging that Wal-Mart's "GÜEE MASSAGE0 NECK MASSAGE with Removable Massager" ("Güee Neck Massage") infringes the '272 patent. Wal-Mart states that the Güee Neck Massage is not a combined motor vehicle control pillow and tiltable steering wheel cover unit, does not contain a fabric covered foam piece, FN3 and does not contain a hook and loop fastener strip mounted on one surface of said fabric covered foam piece.

> FN3. Wal-Mart alleges the Güee Neck Massage is "stuffed with thousands of cushiony foam beads." (Def.'s Mot. Summ. J. 7.)

On March 22, 2005, Douglas registered Copyright TX 6-155-893, for advertising copy titled "Pleasurable Neck Pillow," or "neck support pillow." On March 25, 2005, Douglas filed an amended complaint, adding claims for copyright infringement, false advertising, trade dress infringement, state and common law unfair competition, and trademark infringement.

## II. LEGAL STANDARD

A court may grant summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" only if its existence or non-existence would affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" only when there is sufficient evidence from which a reasonable jury could find in favor of the non-moving party regarding the existence of that fact. *Id.* In determining whether there exist genuine issues of material fact, all inferences must be drawn, and all doubts must be resolved, in favor of the non-moving party. *Coregis Ins. Co. v. Baratta & Fenerty, Ltd.,* 264 F.3d 302, 305-06 (3d Cir.2001) (citing *Anderson,* 477 U.S. at 248).

Where the non-moving party is the plaintiff and, therefore, bears the burden of proof at trial, that party must present affirmative evidence sufficient to establish the existence of each element of his case. *Id.* at 306 (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Accordingly, a plaintiff cannot rely on unsupported assertions, speculation, or conclusory al-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3234629 (E.D.Pa.), 78 U.S.P.Q.2d 1927
**(Cite as: 2005 WL 3234629 (E.D.Pa.))**

legations to avoid the entry of summary judgment, *see Celotex,* 477 U.S. at 324, but rather, the plaintiff "must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.,* 214 F.3d 402, 407 (3d Cir.2000).

### III. ANALYSIS

#### A. *Patent Infringement*

**\*3** Wal-Mart argues that summary judgment should be granted in its favor on Douglas' claim of patent infringement for two reasons: (1) If the '272 patent covered all u-shaped neck pillows filled with beads it would be invalid under 35 U.S.C. § 102(b) because u-shaped neck pillows were on sale in the United States at least three years before Douglas received his patent; and (2) Douglas has not put forward evidence proving that the Güee Neck Massage infringes the '272 patent, either literally or under the doctrine of equivalents.

Douglas argues that the Güee Neck Massage infringes the '272 patent because the specification of the '272 patent states that the "invention can also be used as a neck support pillow." Douglas claims that his device and the Güee Neck Massage perform substantially the same function and Wal-Mart is therefore infringing the '272 patent under the doctrine of equivalents.

Douglas has not put forward sufficient evidence to show infringement under a traditional patent infringement analysis, and summary judgment will therefore be granted in favor of Wal-Mart on the patent infringement claim. It is not necessary to reach the issue of whether the '272 patent is valid.

"Determination of patent infringement requires a two-step analysis: (1) the scope of the claims must be construed; and (2) the allegedly infringing device must be compared to the construed claims." *Mars, Inc. v. H.J. Heinz Co., L.P.,* 377 F.3d 1369, 1373 (Fed.Cir.2004). It is the claims, not the specification, that define the scope of the patent and its

protections. *See, e.g., Johnson & Johnson Assoc. Inc. v. R.E. Service Co., Inc., et al.,* 285 F.3d 1046, 1052 (Fed.Cir.2002) (the claim requirement "presupposes that a patent applicant defines his invention in the claims, not in the specification ... the claims, not the specification, provide the measure of the patentee's right to exclude.").

#### 1. *Literal infringement*

Literal infringement of a patent exists when "each of the claim limitations 'reads on,' or in other words is found in, the accused device." *Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1345 (Fed.Cir.2002). Douglas does not put forward any evidence showing that the claim limitations of the '272 patent read on the Güee Neck Massage. Wal-Mart has put forward evidence showing that the Güee Neck Massage is not a combined motor vehicle control pillow and tiltable steering wheel cover unit, and does not contain a fabric covered foam piece, a hook and loop fastener strip, or a U-shaped plastic retainer, all of which are claim limitations of the '272 patent.

#### 2. *Doctrine of equivalents*

Although a finding of literal infringement is precluded if one or more of the claim limitations are not literally present in the allegedly infringing product, an accused device can still infringe a patent if it contains an equivalent of the claim limitation. A court will analyze an equivalent on a limitation-by-limitation basis, in order to be "specially vigilant against allowing the concept of equivalence to eliminate any claim limitations completely." *Allen Eng'g Corp.,* 299 F.3d at 1345. To prove equivalence, a party must show "that an element of an accused device does substantially the same thing in substantially the same way to get substantially the same result as the claim limitation." *Id.* (citation omitted).

**\*4** Wal-Mart argues that to find the Güee Neck Massage infringes the '272 patent under the doc-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3234629 (E.D.Pa.), 78 U.S.P.Q.2d 1927
**(Cite as: 2005 WL 3234629 (E.D.Pa.))**

Page 4

trine of equivalents would erase the limitation that the '272 patent is for a "combined motor vehicle control pillow and tiltable steering wheel cover unit for straight highway driving" comprised of a fabric covered foam piece, a hook and loop fastener strip, and a U-shaped plastic retainer.

Douglas argues that the doctrine of equivalents applies because the Güee Neck Massage "does perform substantially the same function in substantially the same way to obtain the same result." (Pl.'s Mot. Summ. J. 52.) However, the only evidence Douglas offers in support is information from the patent's specification, including the sentence, "[t]his invention can also be used as a neck support pillow," and a description of the shape of the pillow. (Pl.'s Mot. Summ. J. 46-49.) Again, it is the claims, not the specification, that define the scope of the patent's protection. Douglas also argues that because the Güee Neck Massage contains "thousands of cushiony foam beads," it is a fabric covered foam piece, because "if there would not be a fabric cover to Wal-Marts' pillow, there would not be anything to stuff the cushiony beads in." (Pl.'s Mot. Summ. J. 32.) With this assertion, the Douglas attempts to change the claim limitation of a "fabric-covered foam piece" into anything fabric covered. The doctrine of equivalents cannot be used to "erase meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement." *Johnson & Johnson,* 285 F.3d at 1054 (citing *Conopco, Inc. v. May Dep't Stores Co.,* 46 F.3d 1556, 1562 (Fed.Cir.1994)).

Douglas has failed to offer evidence showing that the Güee Neck Massage infringes the '272 patent, either literally or under the doctrine of equivalents. Accordingly, summary judgment in favor of Wal-Mart on the claim of patent infringement is appropriate.[FN4]

> FN4. As stated above, Wal-Mart also contends that Douglas' assertion that the Güee Neck Massage is identical to the device covered by the '272 patent invalidates the

patent, as such a device was sold in the United States more than three years before the patent issued. It is not necessary to reach this issue, however, as insufficient evidence has been offered to support a claim of patent infringement under a traditional patent infringement analysis.

B. *Copyright Infringement*

In his amended complaint, Douglas alleges Wal-Mart infringed his copyright for the text of an advertisement for a pleasurable neck pillow. In order to prove copyright infringement, a plaintiff must show: (1) proof of plaintiff's ownership of the copyright, and (2) copying by the defendant. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1990). Copying is proven by showing: (1) the defendant had access to the copyrighted work, and (2) there are substantial similarities between the two works. *Dam Things from Denmark, a/k/a Troll Co. ApS v. Russ Berrie & Co., Inc.,* 290 F.3d 548, 561 (3d Cir.2002).

Wal-Mart contends that Douglas has put forward no evidence showing that Wal-Mart copied his copyrighted work. Douglas argues that "Wal-Marts' commercial packaging is complete evidence of copying." (Pl.'s Mot. Summ. J. 10.) He points to the color scheme, and the fact that both his and Wal-Mart's advertisements use the words, "neck," "pillow," "stretchable," "squeezable," "fabric," "pocket," "zipper," "for," "foam," and "vibrator."

**\*5** Regarding ownership of the copyright, Douglas has put forward evidence of his copyright registration, Number TX 6-155-893. Wal-Mart has not challenged this registration beyond noting that the copyright is a "TX" registration, for a literary work, and therefore covers only the text of Douglas' advertising copy, not its visual aspects.[FN5]

> FN5. "Literary works" are defined by the Copyright Act as, "works, other than audi-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3234629 (E.D.Pa.), 78 U.S.P.Q.2d 1927
**(Cite as: 2005 WL 3234629 (E.D.Pa.))**

ovisual works, expressed in words, numbers, or other verbal or numerical symbols or indicia, regardless of the nature of the material objects, such as books, periodicals, manuscripts, phonorecords, film, tapes, disks, or cards, in which they are embodied." 17 U.S.C. § 101 (2005).

In order to prove copying of the protected work, a plaintiff may put forward direct evidence of copying, or circumstantial evidence of access and substantial similarity between the allegedly infringing and the protected work. *See, e.g., Franklin Mint Corp. v. National Wildlife Art Exch.,* 575 F.2d 62, 64 (3d Cir.1978). The indirect evidence necessary to show access must only show "there is a reasonable possibility of access." *Cottrill v. Spears,* 87 Fed. Appx. 803, 805 (3d Cir.2004) (citing *Gaste v. Kaiserman,* 863 F.2d 1061, 1066 (2d Cir.1988)). For example, a plaintiff may show there is a relationship between the alleged copier and an intermediary with access to the protected work. *Id.; see also Midway Mfg. Co. v. Bandai-America, Inc.,* 546 F.Supp. 125, 145-46 (D.N.J.1982) (wide publication of a work will suffice to show access). Additionally, the access shown must be meaningful, in that the plaintiff must show the defendant had an opportunity to view or copy the work before the allegedly infringing work was completed. *Id.*

In this case, Douglas has put forward no evidence that Wal-Mart had access to his copyrighted material. "Access must be more than a mere possibility and may not be inferred through speculation or conjecture." *Franklin Mint,* 575 F.2d at 806 (citing *Gaste,* 863 F.2d at 1066). The failure of Douglas to prove access, either directly or circumstantially, is sufficient reason for the Court to grant summary judgment to Wal-Mart on the copyright infringement claim.

In addition, Douglas has not sufficiently pointed to substantial similarity between the advertisement for the Güee Neck Massage and the advertisement for the Pleasurable Neck Pillow. An inquiry into substantial similarity considers two factors: (1) wheth-

er the defendant copied plaintiff's work; and (2) whether this copying, if proven, constituted an improper appropriation-or, in other words, whether the substantial similarity related to protectible material. *Kay Berry, Inc. v. Taylor Gifts, Inc.,* 421 F.3d 199, 207-08 (3d Cir.2005). The second factor is to be considered from the perspective of a lay person. *Id.*

Here, Douglas points to the Wal-Mart's use of the following words as evidence of copying: "neck," "pillow," "stretchable," "squeezable," "fabric," "pocket," "zipper," "for," "foam," and "vibrator." The Court finds that, from the perspective of a lay person, the use of these common words does not constitute illicit copying. On this basis, too, the Court finds it appropriate to grant summary judgment for Wal-Mart on the copyright infringement claim.[FN6]

> FN6. Douglas makes the argument that Wal-Mart has admitted its copyright infringement by alleging it is protected under the doctrine of "fair use." "Fair use" is indeed a defense used to counter a charge of infringement in the copyright context, and is asserted to excuse conduct that may otherwise amount to copying, *see, e.g., Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.,* 342 F.3d 191, 205 n. 13 (3d Cir.2003), but Wal-Mart does not assert such a defense here. Instead, Wal-Mart argues there has been no proof of infringement offered by Douglas, and the Court agrees.
>
> At oral argument on October 10, 2005, Wal-Mart stated that in response to Douglas' requests for admission, Wal-Mart had admitted that the outside of the box of the Güee Neck Massage contained the word, "squeezable." Wal-Mart then stated that if the Wal-Mart had trademark rights to enforce, such a use of the word "squeezable" would be fair use. (Tr. 26, Oct. 10, 2005.) In the trade-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3234629 (E.D.Pa.), 78 U.S.P.Q.2d 1927
**(Cite as: 2005 WL 3234629 (E.D.Pa.))**

mark context, nominative fair use can occur if the only practical way to refer to something is by using the trademarked term. *See, e.g., Century 21 Real Estate Corp. v. Lendingtree, Inc.,* 425 F.3d 211, 214 (3d Cir.2005). This may be the source of Douglas' contention that Wal-Mart had asserted a fair use defense. The Court will not reach the fair use doctrine in either the copyright nor the trademark contexts, as it finds there has been no infringement.

C. *Trade Dress Infringement*

**\*6** " 'Trade dress' refers to the design or packaging of a product which serves to identify the product's source." *Shire U.S. Inc. v. Barr Lab. Inc.,* 329 F.3d 348, 353 (3d Cir.2003). To establish infringement, a plaintiff must show: (1) the allegedly infringing feature is non-functional; (2) the feature is inherently distinctive or has acquired secondary meaning, and (3) consumers are likely to confuse the source of plaintiff's product with that of the allegedly infringing product. *Id.*

Wal-Mart asserts that Douglas has not offered sufficient evidence to prove the claim of trade dress infringement. Douglas argues that "Plaintiff's trade dress is found on Defendant's design of the product and its packaging and advertisement in violation of both the Lanham Act and Federal Trade Act." (Pl.'s Mot. Summ. J. 17.) This unsupported assertion is not sufficient to establish the elements of trade dress infringement and summary judgment will be granted in favor of Wal-Mart on this claim.

D. *False Advertising*

Douglas also alleges Wal-Mart has engaged in conduct amounting to false advertising under the Lanham Act, 15 U.S.C. § 1125(a). To establish such a claim, Douglas must show: (1) Wal-Mart made false or misleading statements about his own product (or another's); (2) there is actual deception

or a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff, e.g., declining sales and loss of good will. *Warner-Lambert Co. v. Breathasure, Inc.,* 204 F.3d 87, 92 (3d Cir.2000).

Wal-Mart asserts that Douglas has not offered sufficient evidence to show false advertising. Douglas states that the false advertising consists of Wal-Mart's use of his color and text. He also states that the products at issue have traveled in interstate commerce and that he has been and will continue to be irreparably harmed by Wal-Mart's false advertising.

Douglas has put forward no evidence that Wal-Mart made false or misleading statements regarding its product, on any intended deception, or on any likelihood of injury Douglas may suffer due to Wal-Mart's alleged conduct. Instead, he relies on conclusory allegations and unsupported assertions. Summary judgment will be granted for Wal-Mart on this claim.

E. *Unfair Competition; Trademark Infringement*

To establish a claim for unfair competition or trademark infringement, a plaintiff must show: "(1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark to identify goods and services is likely to create confusion concerning the origin of the goods or services." *Scott Fetzer Co. v. Gehring,* 288 F.Supp.2d 696, 703 (E.D.Pa.2003) (citation omitted).[FN7]

> FN7. The elements of unfair competition under Pennsylvania law and federal law are the same, except the federal claims require an effect on interstate commerce, and the elements necessary to establish a claim of unfair competition and one of trademark

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in F.Supp.2d, 2005 WL 3234629 (E.D.Pa.), 78 U.S.P.Q.2d 1927
**(Cite as: 2005 WL 3234629 (E.D.Pa.))**

infringement are the same. *Scott Fetzer Co.,* 288 F.Supp.2d at 703.

Wal-Mart argues that Douglas has not put forward evidence to establish any of the necessary elements for the claims of unfair competition and trademark infringement. Wal-Mart also contends the mark "Pleasurable Neck Pillow" is descriptive, and thus not entitled to trademark protection. (Def.'s Mot. Summ. J. 29-31.)

**\*7** Douglas states that his "first evidence is Defendants' fraudulent Güee Neck Massage0 Neck Massage with removable massager," and that Douglas is the first user of the trademark "Pleasurable Neck Pillow" in the state of Pennsylvania. Douglas also contends that Wal-Mart's use of the colors red, white, and blue on its commercial packaging infringes his trademark. (Pl.'s Mot. Summ. J. 17, 28.)

Although Douglas argues that color itself can be protected by trademark, Douglas has offered no evidence to supplement his own assertions that the mark is valid, legally protectable, and owned by Douglas. Summary judgment will be granted for Wal-Mart on the trademark infringement and unfair competition claims.

F. *Wal-Mart's Counterclaims*

1. *Declaratory judgement of non-infringement and invalidity of the '272 patent*

Wal-Mart seeks a declaratory judgment of non-infringement and invalidity of the '272 patent based on the assertion that u-shaped neck pillows were being sold in the United States more than three years prior to the registration of the '272 patent. This counterclaim will be dismissed as moot.

2. *False marking*

Wal-Mart seeks summary judgment on its counterclaim for false marking, alleging that Douglas has falsely marked his advertisements for the "3[rd]

Hand Auto Control Pillow," and the "Pleasurable Neck Pillow" with the '272 patent registration number, in violation of 35 U.S.C. § 292. Wal-Mart argues that neither of these devices falls within the claims of the '272 patent.

Douglas moves to dismiss Wal-Mart's counterclaim, contending that his patent encompasses many different materials and methods of assembling the device, and he has therefore properly labeled his devices with the '272 patent registration number.

Under federal law, patent mismarking is a criminal offense. 35 U.S.C. § 292; *Boyd v. Schildkraut Giftware Corp.,* 936 F.2d 76, 79 (2d Cir.1991). "The statute is enforceable by a *qui tam* remedy, enabling any person to sue for the statutory penalty and retain one-half of the recovery." *Boyd,* 936 F.2d at 79 . False marking is established when "an unpatented article is marked with the word 'patent' or any word or number that imports that the article is patented, and such marking is for the purpose of deceiving the public." *Clontech Laboratories, Inc. V. Invitrogen Corp.,* 406 F.3d 1347, 1351 (Fed.Cir.2005).

Intent to deceive the public must be established to find a violation of § 292. *See Boyd,* 936 F.2d at 79; *Mayview Corp. V. Rodstein,* 620 F.2d 1347, 1359 (9th Cir.1980); *FMC Corp. v. Control Solutions, Inc.,* 369 F.Supp.2d 539, 584 (E.D.Pa.2005) ("A claim for false marking fails absent evidence of an actual intent to deceive."). In its counterclaim complaint, Wal-Mart alleged that Douglas falsely marked an unpatented article with the intent to deceive the public. Douglas moved to dismiss this counterclaim, and Wal-Mart responded that Douglas' statement "in open Court that he is experienced in intellectual property litigation," (Def.'s Mot. Summ. J. 33.), shows his intent to deceive the public. Even viewed in the light most favorable to Wal-Mart, Wal-Mart's allegations are insufficient to state a claim for false marking, and this claim will be dismissed without prejudice. *See Clontech,* 406 F.3d at 1352-53 (liability under § 292 only ensues

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 3234629 (E.D.Pa.), 78 U.S.P.Q.2d 1927
**(Cite as: 2005 WL 3234629 (E.D.Pa.))**

if plaintiff can show defendant did not have a reasonable belief that the articles were properly marked).

## IV. ATTORNEYS' FEES AND COSTS

**\*8** Wal-Mart requests attorneys' fees and costs under the Patent Act, the Lanham Act, and the Copyright Act, due to the "objective unreasonableness of the claims that Douglas has asserted, and the bad faith litigation tactics he has employed." (Def.'s Mot. Summ. J. 35.) Douglas contests the allegations of bad faith and unreasonableness.

Although it is a close issue, given that the litigation is now at an end and Douglas was proceeding *pro se,* the request for attorneys' fees will be denied. FN8

> FN8. Douglas also requests attorneys' fees and costs, which will be denied.

## V. CONCLUSION

For the reasons set forth above, summary judgment will be granted to Wal-Mart on Douglas' claims for patent infringement, copyright infringement, false advertising, trade dress infringement, state and common law unfair competition, and trademark infringement.

Wal-Mart's counterclaim for a declaratory judgment of non-infringement and the invalidity of the '272 patent will be dismissed as moot. Wal-Mart's counterclaim for false marking will be dismissed without prejudice. Wal-Mart's request for attorneys' fees will be denied.

An appropriate order follows.

### *ORDER*

AND NOW, this 30th day of November 2005, upon consideration of Defendant's Motion for Summary Judgment (docs. no. 27, 28), Plaintiff's response

thereto, Plaintiff's Motions for Summary Judgment (docs. no. 19, 29), Defendant's response thereto, and after a hearing at which counsel for both parties participated, it is hereby ORDERED that Defendant's Motion for Summary Judgment (docs. no. 27, 28) is GRANTED in part and DENIED in part as follows:

> 1. Summary judgment will be GRANTED to Defendant on Plaintiff's claims for patent infringement, copyright infringement, false advertising, trade dress infringement, state and common law unfair competition, and trademark infringement;

> 2. Defendant's first counterclaim is DISMISSED as moot;

> 3. Defendant's second counterclaim is DENIED without prejudice; and

> 4. Defendant's request for attorneys' fees and costs is DENIED.

It is FURTHER ORDERED that Plaintiff's Motions for Summary Judgment (docs. no. 19, 29) are DENIED.

AND IT IS SO ORDERED.

E.D.Pa.,2005.
Douglas v. Wal-Mart Stores, Inc.
Not Reported in F.Supp.2d, 2005 WL 3234629 (E.D.Pa.), 78 U.S.P.Q.2d 1927

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2813015 (E.D.Pa.)
**(Cite as: 2010 WL 2813015 (E.D.Pa.))**

**C**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Bentley A. HOLLANDER, Plaintiff,
v.
ETYMOTIC RESEARCH, INC., Defendant.
**Civil Action No. 10-526.**

July 14, 2010.

**Background:** Qui tam relator brought action on behalf of United States against ear products manufacturer, alleging false marking of earphones and earplugs with expired patent numbers. Manufacturer moved for dismissal or transfer.

**Holdings:** The District Court, Tucker, J., held that:
(1) relator had standing to maintain action, and
(2) false marking claim was not pled with requisite particularity.

Motion granted in part.

West Headnotes

**[1] Patents 291 ☞0**

291 Patents
Article that is encompassed by claim of patent that has expired is "unpatented article" under false marking statute. 35 U.S.C.A. § 292.

**[2] Patents 291 ☞0**

291 Patents
Qui tam relator had standing to maintain action on behalf of United States against ear products manufacturer, alleging false marking of earphones and earplugs with expired patent numbers, since complaint expressly averred that manufacturer had injured sovereign interests of United States as well as public interest, and that manufacturer had discouraged or deterred honest competition and innovation

in competing products. 35 U.S.C.A. § 292(b).

**[3] Federal Civil Procedure 170A ☞0**

170A Federal Civil Procedure
Under federal rule requiring particularity in pleading fraud claims, intent or other conditions of person's mind may be alleged generally; however, pleadings must allege sufficient underlying facts from which court may reasonably infer that party acted with requisite state of mind. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ☞0**

170A Federal Civil Procedure
Federal rule requiring particularity in pleading fraud claims permits allegations based on "information and belief" when essential information lies uniquely within another party's control, but only if pleading sets forth specific facts upon which belief is reasonably based. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ☞0**

170A Federal Civil Procedure
Claim brought by qui tam relator on behalf of United States against manufacturer, alleging false marking of ear products with expired patent numbers, was not pled with requisite particularity under federal rules; complaint merely alleged, upon information and belief, that manufacturer had marked products with expired patents and had used expired patents in its advertising, without any specific averments regarding intent to deceive. 35 U.S.C.A. § 292; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[6] Venue 401 ☞0**

401 Venue
Private interest factors to be considered in request for transfer of venue include: (1) plaintiff's choice of forum; (2) defendant's choice of forum; (3) where claim arose; (4) convenience of parties as in-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

--- F.Supp.2d ----, 2010 WL 2813015 (E.D.Pa.)
**(Cite as: 2010 WL 2813015 (E.D.Pa.))**

dicated by their relative physical and financial conditions; (5) convenience of witnesses; and (6) location of relevant books and records insofar as these could not be reproduced in alternative forum. 28 U.S.C.A. § 1404(a).

**[7] Venue 401 ☞0**

401 Venue

Public interest factors to be considered in request for transfer of venue include: (1) enforceability of judgment; (2) practical considerations that could make trial easy, expeditious, or inexpensive; (3) relative administrative difficulty in two fora resulting from court congestion; (4) public policies of fora; and (5) judge's familiarity with applicable state law. 28 U.S.C.A. § 1404(a).

**[8] Venue 401 ☞0**

401 Venue

Plaintiff's choice of proper forum is paramount consideration in any determination of transfer request, and that choice should not be lightly disturbed. 28 U.S.C.A. § 1404(a).

**Patents 291 ☞328(2)**

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
        291k328 Patents Enumerated
            291k328(2) k. Original Utility. Most Cited Cases
4,677,679, 4,763,753, 4,852,683. Cited.

Ilan Rosenberg, Jacob C. Cohn, Cozen O'Connor, Philadelphia, PA, for Plaintiff.

Jonathan M. Rushman, Stephen F. Sherry, McAndrews Heid & Malloy Ltd., Chicago, IL, Lynn Bavaro Morreale, Stuart A. Schanbacher, Woodcock Washburn LLP, Philadelphia, PA, for Defendant.

*ORDER*

PETRESE B. TUCKER, District Judge.

**\*1 AND NOW,** this _____ day of July, 2010, upon consideration of Defendant Etymotic Research, Inc.'s Motion to Dismiss or Transfer (Doc. 13); Plaintiff Bentley Hollander's Response in Opposition thereto (Doc. 14); Defendant's Motion to File a Reply (Doc. 15); and Plaintiff's Response in Opposition thereto (Doc. 16), **IT IS HEREBYED and DECREED** that Defendant's Motion to Dismiss or Transfer is **GRANTED IN PART and DENIED IN PART** as follows:

  1. Defendant's Motion to Dismiss or Transfer is **GRANTED** to the extent that Plaintiff's Complaint is **DISMISSED** for failure to state with particularity the circumstances constituting Defendant's alleged false marking.

  2. Defendant's Motion to Dismiss or Transfer is otherwise **DENIED.**

  3. On or before **Monday, July 26, 2010,** Plaintiff may submit an amended complaint that complies with Fed.R.Civ.P. 9(b).

**IT IS FURTHER ORDERED** that Defendant's Motion for Leave to Reply is **DENIED.**

*MEMORANDUM OPINION*

Presently before the Court are Defendant Etymotic Research, Inc.'s Motion to Dismiss or Transfer (Doc. 13); Plaintiff Bentley Hollander's Response in Opposition thereto (Doc. 14); Defendant's Motion to File a Reply (Doc. 15); and Plaintiff's Response in Opposition thereto (Doc. 16). For the reasons set forth below, this Court will grant in part and deny in part Defendant's Motion to Dismiss or Transfer, and deny Defendant's Motion to File a Reply.

*BACKGROUND*

Plaintiff Bentley Hollander ("Plaintiff") has brought this *qui tam* action against Defendant Ety-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2813015 (E.D.Pa.)

**(Cite as: 2010 WL 2813015 (E.D.Pa.))**

motic Research, Inc. ("Defendant") for its alleged violation of the false marking statute, 35 U.S.C. § 292, in connection with its marking of certain earphones and earplugs with expired patent numbers. Specifically, Plaintiff claims that Defendant has violated 35 U.S.C. § 292(a) by, *inter alia*, falsely marking articles with expired patents and using those expired patents in its advertising of the articles for the purpose of deceiving the public into believing that the articles are covered by the expired patents. (Compl.¶ 2.)

Defendant Etymotic is a research, development, and manufacturing company that designs and manufactures in-ear products, such as earphones, hearing aids, and earplugs. (*See* Compl. ¶¶ 9-15.) Defendant's scientists, engineers, and audiologists have collaborated to generate over 100 patents. (*See* Compl. ¶ 16.) Plaintiff claims that, since 1984 and continuing to the present, Defendant has marked, or caused to be marked, products with one or more of the '679 Patent, the '753 Patent, and the '683 Patent. FN1 (Compl.¶¶ 16-17.) According to Plaintiff, the '679 Patent expired on July 5, 2004; the '753 Patent expired on October 4, 2005; and the '683 Patent expired on January 27, 2008. (Compl.¶¶ 20-22.) Defendant's alleged marking and sale of several products with those expired patents has given rise to the instant suit.

### STANDARD OF REVIEW

**\*2** On a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir.1994). A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. *See In re Warfarin Sodium Antitrust Litig.,* 214 F.3d 395, 397-98 (3d Cir.2000). The question is whether the claimant can prove any set of facts consistent with his or her allegations

that will entitle him or her to relief, not whether that person will ultimately prevail. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Semerenko v. Cendant Corp.,* 223 F.3d 165, 173 (3d Cir.2000). While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). On the contrary, "[t]he pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.' " *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993) (citation omitted).

On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1), dismissal is warranted where a court lacks subject matter jurisdiction over a case. Rule 12(b)(1) motions are either facial or factual challenges. *CNA v. United States,* 535 F.3d 132, 139 (3d Cir.2008). A facial attack concerns the sufficiency of the pleadings, whereas a factual attack is a dispute over the existence of certain jurisdictional facts alleged by the plaintiff. *Id.* (citing *United States ex rel. Atkinson v. Pa. Shipbuilding Co.,* 473 F.3d 506, 514 (3d Cir.2007)). "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs., Inc. v. United States,* 220 F.3d 169, 176 (3d Cir.2000). By contrast, when a defendant attacks subject matter jurisdiction "in fact," the court is "free to weigh the evidence and satisfy itself whether it has power to hear the case." *Carpet Group Int'l v. Oriental Rug Imps. Ass'n, Inc.,* 227 F.3d 62, 69 (3d Cir.2000) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977)). In reviewing a factual attack, the court is not confined to the allegations of the complaint. *Cestonaro v. United States,* 211 F.3d 749, 754 (3d Cir.2000). No presumption of truthfulness attaches to the plaintiff's allegations, "and the existence of disputed material facts will not pre-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2813015 (E.D.Pa.)
**(Cite as: 2010 WL 2813015 (E.D.Pa.))**

clude the trial court from evaluating for itself the merits of jurisdictional claims." *Carpet Group Int'l, 227 F.3d at 69* (citation omitted). The plaintiff bears the burden of persuasion regardless of whether the challenge is facial or factual. *Henderson v. Nationwide Mut. Ins. Co.,* 169 F.Supp.2d 365, 367-368 (E.D.Pa.2001).

### DISCUSSION

**\*3** Defendant has raised four arguments in support of dismissing this action or, in the alternative, transferring venue to the Northern District of Illinois. The Court will address each of those arguments in turn.

### I. *Marking After Patent Expiration*

[1] First, Defendant concedes that it has been marking and advertising expired patents, but argues that such activities do not constitute false marking. Specifically, Defendant contends that an article that is encompassed by a claim of a patent that has expired is not an "unpatented article" under the false marking statute, and therefore, the Complaint should be dismissed under Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction and/or Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted.

The false marking statute permits any person to sue a party who marks the word "patent" on an "unpatented article." 35 U.S.C. § 292. There is a dearth of case law in the Third Circuit addressing whether the continued use of a mark on a product after the expiration of a patent constitutes false marking. However, Defendant's argument that Section 292 does not reach the marking of articles with expired patents is not persuasive in light of Supreme Court and Federal Circuit precedent. *See generally* 7 Donald S. Chisum, *Chisum on Patents* § 20.03 (2010) ("[A] strong case can be made for finding culpable mismarking when a person intentionally continues to mark articles with the number of an expired patent.")

The Supreme Court has held that "[f]or purposes of federal law ... an item for which a patent has expired or been denied ... is unpatented and unpatentable." *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* 489 U.S. 141, 159, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989). Also, in a recent case, the Federal Circuit acknowledged that articles marked with expired patent numbers are falsely marked. *Pequignot v. Solo Cup Co.,* No.2009-1547, 2010 U.S.App. LEXIS 11820, at \*15, 2010 WL 2346649 (Fed. Cir. June 10, 2010). Specifically, the Federal Circuit held that an article covered by an expired patent is "unpatented" and "[a]n article that was once protected by a now-expired patent is no different [from] an article that has never received protection from a patent." 2010 U.S.App. LEXIS 11820, at \*12; 2010 WL 2346649 *see also Clontech Labs., Inc. v. Invitrogen Corp.,* 406 F.3d 1347, 1352 (Fed.Cir.2005) (noting that the false marking statute's reference to "unpatented article" means that "the article in question is not covered by at least one claim of each patent with which the article is marked").

Here, since the subject products are covered by expired patents, they are "unpatented." Therefore, the Court will not dismiss this action on the basis of Defendant's argument that marking an article after the expiration of a patent does not violate 35 U.S.C. § 292.

### II. *Standing*

Defendant also argues that Plaintiff lacks standing to pursue his claims. To satisfy the constitutional standing requirements of Article III, a plaintiff must show that: (1) he suffered an "injury in fact;" (2) the injury is traceable to the defendant's action; and (3) the injury is likely to be redressed by the court. *See, e .g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.,* 528 U.S. 167, 180-181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The plain language of 35 U.S.C. § 292(b) clearly provides that "[a]ny per-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2813015 (E.D.Pa.)

**(Cite as: 2010 WL 2813015 (E.D.Pa.))**

son" is permitted to sue for false marking.

**\*4** Moreover, courts have recognized that actions for falsely marking articles with expired patents state legally cognizable claims on behalf of the United States. *See, e.g., Woods v. Empire Health Choice, Inc.,* 574 F.3d 92, 97 (2d Cir.2009) ("Qui tam plaintiffs, even if not personally injured by a defendant's conduct, possess constitutional standing to assert claims on behalf of the Government as its effective assignees.") (citing *Vt. Agency of Natural Res. v. United States ex rel. Stevens,* 529 U.S. 765, 773-74, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000)); *Forest Group, Inc. v. Bon Tool Co.,* 590 3d 1295, 1302-03 (Fed.Cir.2009); *Simonian v. Cisco Sys.,* No. 10 C 1306, 2010 U.S. Dist. LEXIS 60752, at \*5, 2010 WL 2523211 (N.D.Ill. June 17, 2010) ("In the case of qui tam statutes, an injury to the United States is sufficient to confer standing upon a relator.") (citing *Vt. Agency,* 529 U.S. at 773-74); *Juniper Networks v. Shipley,* No. C 09-0696 SBA, 2010 U.S. Dist. LEXIS 24889, at \*16, 2010 WL 2091965 (N.D.Cal. Mar. 16, 2010) ("[I]n qui tam actions, the injury need not be suffered by the relator; injury in fact to the United States is sufficient.").

Indeed, "Congress intended the public to rely on marking as 'a ready means of discerning the status of intellectual property embodied in an article of manufacture or design.' " *Clontech Labs., Inc.,* 406 F.3d at 1356 (citing *Bonito Boats,* 498 U.S. at 162). Federal patent law "recogniz[es] an 'important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain.' " *Id.* at 1356 (citing *Lear, Inc. v. Adkins,* 395 U.S. 653, 670, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969)). False marking injures that interest because it "misleads the public into believing that a patentee controls the article in question (as well as like articles), externalizes the risk of error in the determination, placing it on the public rather than the manufacturer or seller of the article, and increases the cost to the public of ascertaining whether a patentee in fact controls the intellectual property embodied in an article." *Id.* at 1356-57;

*see also Forest Group, Inc.,* 590 F.3d at 1302 (explaining that false marking deters innovation and stifles competition in the marketplace).

[2] Here, Plaintiff expressly brings this suit on behalf of the United States, claiming that Defendant "has injured the sovereign interests of the United States of America as well as the public interest, and has discouraged or deterred honest competition and innovation in competing products." (Compl.¶ 32.) That is exactly the type of injury that confers standing upon an individual to bring a *qui tam* action under the false marking statute. Therefore, dismissal is not warranted on standing grounds.

### III. *Sufficiency of Pleadings*

Defendant further contends that Plaintiff did not properly plead "intent to deceive," and that such a showing is subject to the heightened pleading requirements applicable to claims of "fraud or mistake" under Fed.R.Civ.P. 9(b). Under Fed.R.Civ.P. 8(a), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The pleading standard is heightened under Fed.R.Civ.P. 9(b), which requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b).

**\*5** [3][4] The false marking statute requires that the marking be done with the "purpose of deceiving the public." 35 U.S.C. § 292. Under Rule 9(b), intent or other conditions of a person's mind may be alleged generally, however, "the pleadings must 'allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind.' " *Simonian,* 2010 U.S. Dist. LEXIS 60752, at \*8, 2010 WL 2523211 (citations omitted). Rule 9(b) permits allegations based on "information and belief" when "essential information lies uniquely within another party's control, but only if the pleading sets forth specific facts upon which the belief is reasonably based." *Id.; Exergen Corp. v. Wal-Mart Stores, Inc.,* 575 F.3d 1312, 1330

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2813015 (E.D.Pa.)
**(Cite as: 2010 WL 2813015 (E.D.Pa.))**

(Fed.Cir.2009). "[T]he fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent." *Clontech Labs., Inc.,* 406 F.3d at 1352.

Since deceptive purpose is an element of the claim, some courts have found that Rule 9(b) applies to false marking claims. *See, e .g., Advanced Cartridge Techs., LLC v. Lexmark Int'l, Inc.,* No: 8: 10-cv-486-T-23TGW, 2010 U.S. Dist. LEXIS 65047, at *3, 2010 WL 2640137(M.D. Fla. June 30, 2010) (holding that plaintiff's allegation that defendant "knows, or reasonably should know, that marking the Cartridge Products with patents that do not cover the Cartridge Products, or patents that are invalid or expired, will deceive the public" fails to satisfy Rule 9(b)); *Simonian,* 2010 U.S. Dist. LEXIS 60752, at *6-12, 2010 WL 2523211 ("Simonian cannot proceed with his claim absent any specific factual allegations indicating that Cisco had knowledge of the mismarking or an intent to deceive the public."); *Inventorprise, Inc. v. Target Corp.,* No. 09-CV-00380, 2009 U.S. Dist. LEXIS 102852, at *23 n. 16, 2009 WL 3644076 (N.D.N.Y. Nov. 2, 2009); *Juniper Networks,* 2009 U.S. Dist. LEXIS 40978, at *4 ("The false marking statute is a fraud-based claim, which is subject to the pleading requirements of Federal Rule of Civil Procedure 9(b) ."); *Cent. Admixture Pharm. Servs. v. Advanced Cardiac Solutions, P.C.,* No. CV-00-2430-VEH, 2006 U.S. Dist. LEXIS 95833, at *78 (N.D.Ala. Jan. 10, 2006) ("Both the language of Section 292 and the binding authority in this Circuit place on the defendants the burden to plead and produce facts demonstrating that the plaintiffs, in marking the solution with the '515 patent, had the specific intent to deceive the public into believing something that the plaintiffs knew to be false .")

However, other courts have been reluctant to expand the scope of Rule 9(b) to claims that do not sound in fraud or mistake. *See, e .g., Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (" Rule 8(a)'s simplified

pleading standard applies to all civil actions, with limited exceptions. Rule 9(b), for example, provides for greater particularity in all averments of fraud or mistake. This Court, however, has declined to extend such exceptions to other contexts."); *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (" Rule 9(b) ... impose [s] a particularity requirement in two specific instances ...'in all averments of fraud or mistake ...' "); *Astec Am., Inc. v. Power-One, Inc.,* No. 6:07-cv-464, 2008 U.S. Dist. LEXIS 30365, at *33, 2008 WL 1734833 (E.D.Tex. Apr. 11, 2008) ("[C]ourts have generally interpreted the scope of Rule 9(b) as limited to allegations of fraud and mistake."); *Third Party Verification, Inc. v. Signaturelink, Inc.,* 492 F.Supp.2d 1314, 1327 (M.D.Fla.2007) ("There is no case law that has required the Rule 9 level of pleading [for] claims for false marking."). Thus, the case law is still evolving, and there is no binding precedent on the issue of whether Rule 9(b) applies in the context of false marking claims.

**\*6** [5] Here, Plaintiff alleges "upon information and belief" that Defendant: (1) has marked and continues to mark Plaintiff's products with an expired patent; (2) and has used and continues to use the expired patent in its advertising; (3) for the purpose of deceiving the public into believing that its products are covered by the expired patents at issue. (Compl.¶¶ 30-31, 40-41, 50-51.) Plaintiff also alleges that Defendant "knows or reasonably should know that all patents, including the '679 Patent, the '753 Patent, and the '683 Patent, have a limited duration." (Compl.¶ 19.) In addition, Plaintiff alleges that Defendant "could not have had any reasonable belief" that the products were covered by the subject patents. (Compl.¶¶ 27, 37, 47.) Plaintiff further alleges "upon information and belief" that Defendant "knew or reasonably should have known" that the products were marked with expired patents. (Compl.¶¶ 28, 38, 48.)

Similar allegations were raised in *Brinkmeier v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2813015 (E.D.Pa.)
**(Cite as: 2010 WL 2813015 (E.D.Pa.))**

*Graco Children's Products,* 684 F.Supp.2d 548, 553 (D.Del.2010). In *Brinkmeier,* the court ultimately declined to rule on whether Rule 9(b) applies to false marking cases because the amended complaint failed to meet even the liberal pleading standards of Rule 8(a). The plaintiff in *Brinkmeier* alleged in Count I that "because the scopes of these patents do not cover the marked products, Defendant 'cannot have any reasonable belief that such products are protected by such patents' and that Defendant 'knows, or should know' that the products have been falsely marked." 684 F.Supp. at 553. The plaintiff also alleged " '[u]pon information and belief, [Defendant] marked products ... with expired patents for the purpose of deceiving the public into believing that something contained in or embodied in the products is covered by or protected by the expired patent [s].' " *Id.* The court concluded that "[those] allegations alone do not supply enough factual matter to suggest an intent to deceive, and amount to nothing more than the 'mere labels and conclusions' prohibited by *Twombley." Id.*

However, the court concluded that with respect to one of the patent markings, the plaintiff had sufficiently pleaded intent to deceive under Rule 8(a) and Rule 9(b). *Id.* Specifically, the plaintiff alleged that Defendant had sued two competitors for infringing the '437 patent and had revised its patent markings at least three times since the '437 patent expired. *Id.* On that basis, the plaintiff alleged that Defendant's marking of its products with the expired '437 patent was intentional. *Id.* Those pleadings were sufficient to suggest that Defendant had an intent to deceive with respect to the '437 patent marking. *Id.*

Construing the facts in the light most favorable to Plaintiff, Plaintiff's allegations might pass muster under Rule 8(a), but not under Rule 9(b). Clearly, Plaintiff has sufficiently pleaded "the fact of misrepresentation." Indeed, it is undisputed that Defendant marked its products with expired patents. However, specific facts showing Defendant's knowledge of falsity or intent to deceive are critically ab-

sent from the pleadings. Defendant has conceded only that its patents expired, not that it *knew* that those patents were expired when it marked its products. Although Plaintiff has alleged that Defendant knew or reasonably should have known that the products were marked with expired patents, Plaintiff attempts to support those allegations by averring merely that: (1) Defendant knows that patents have limited duration; (2) the patents at issue expired; and (3) Defendant continued to mark its products with those patents after expiration. Those allegations do not sufficiently articulate knowledge of falsity or intent to deceive because Defendant's knowledge of the limited duration of patents and the actual expiration of the patents do not create an inference that Defendant knew that the patents at issue actually expired. Moreover, Plaintiff's allegations based on information and belief are insufficient under Rule 9(b) where Plaintiff has failed to set forth specific facts upon which such belief is reasonably based. Therefore, Plaintiff's allegations do not meet Rule 9(b)'s heightened pleading standards.

**\*7** The Court is persuaded by the law of other district courts holding that false marking claims are fraud-based claims subject to Rule 9(b)'s heightened pleading standards. Moreover, although the Federal Circuit has yet to determine whether Rule 9(b) applies to false marking claims, it has recently held that inequitable conduct claims, which also require a showing of intent to deceive, are subject to Rule 9(b). *Exergen Corp.,* 575 F.3d at 1325-31. The two Supreme Court cases cited by Plaintiff, declining to extend Rule 9(b) in circumstances not constituting fraud or mistake, involve civil rights cases alleging municipal liability under § 1983 and, therefore, are inapposite. *See Leatherman,* 507 U.S. at 168; *Swierkiewicz,* 534 U.S. at 513. Accordingly, dismissal is warranted on the ground that Plaintiff has not adequately alleged intent to deceive under Rule 9(b).[FN2]

**IV.** *Transfer of Venue*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2813015 (E.D.Pa.)

**(Cite as: 2010 WL 2813015 (E.D.Pa.))**

[6][7] Finally, Defendant argues that this case should be transferred to the Northern District of Illinois. A district court may transfer any civil action to any other district court where it might have been brought "[f]or the convenience of parties and witnesses, [or] in the interest of justice." 28 U.S.C. § 1404(a). The Third Circuit has identified a series of public and private considerations to be balanced in evaluating requests for transfer. *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995). The private interest factors include: (1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) where the claim arose; (4) the convenience of the parties as indicated by their relative physical and financial conditions; (5) the convenience of the witnesses; and (6) the location of relevant books and records insofar as these could not be reproduced in the alternative forum. *Id.* The public interest factors include: (1) enforceability of judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the public policies of the fora; and (5) the judge's familiarity with the applicable state law. *Id.*

[8] Here, the private and public interest factors either weigh in favor of Plaintiff or are neutral as between the two parties. The law is well-settled that "a plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request, and that choice 'should not be lightly disturbed.' " *Shutte v. Armco Steel Corp.,* 431 F.2d 22, 25 (3d Cir.1970) (citation omitted). Thus, a transfer of venue is not warranted here.

### *CONCLUSION*

For the foregoing reasons, the Court grants in part Defendant's Motion to Dismiss or Transfer to the extent that Plaintiff's Complaint is dismissed for failure to state with particularity the circumstances constituting Defendant's alleged false marking. The Court denies Defendant's Motion to Dismiss in all other respects. The dismissal of this action is

without prejudice and the Court grants Plaintiff leave to submit an amended complaint. In addition, the Court denies Defendant's Motion for Leave to Reply.

**\*8** An appropriate order follows.

FN1. The three patents at issue are as follows: (1) U.S. Pat. No. 4,677,679, entitled "INSERT EARPHONES FOR AUDIOMETRY" (filed on July 5, 1984; issued on June 30, 1987) ("the '679 Patent"); (2) U.S. Pat. No. 4,763,753, entitled "INSERT EARPHONES FOR AUDIOMETRY" (filed on October 4, 1985; issued on August 16, 1988) ("the '753 Patent"); and (3) U.S. Pat. No. 4,852,683, entitled "EARPLUG WITH IMPROVED AUDIBILITY" (filed on January 27, 1988; issued on August 1, 1989) ("the '683 Patent").

FN2. Plaintiff cites *Hollander v. Timex Group USA, Inc.,* No. 10-429, currently pending in the United States District Court for the Eastern District of Pennsylvania, for the proposition that arguments similar to those raised by Defendant have been considered and rejected in this District. In that case, the court granted in part and denied in part the defendant's motion to dismiss. The defendant raised the following four arguments in its motion to dismiss: (1) marking after expiration does not constitute false marking; (2) the pleadings are insufficient to show that the defendant had actual knowledge of the patent expiration or intent to deceive; (3) the plaintiff failed to plead his fraud-based allegations with particularity pursuant to Rule 9(b); and (4) claims seeking recovery for violations occurring prior to January 29, 2005 are time-barred. The court granted the motion as to all alleged violations occurring prior to January 29, 2005, and denied it in all other respects. There is no accompanying memorandum opinion, so the basis for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 2813015 (E.D.Pa.)
**(Cite as: 2010 WL 2813015 (E.D.Pa.))**

the court's partial denial of the motion to
dismiss is not apparent.

E.D.Pa.,2010.
Hollander v. Etymotic Research, Inc.
--- F.Supp.2d ----, 2010 WL 2813015 (E.D.Pa.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3644076 (N.D.N.Y.)
**(Cite as: 2009 WL 3644076 (N.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
INVENTORPRISE, INC., Plaintiff,
v.
TARGET CORPORATION and Target Brands,
Inc., Defendants.
No. 09-CV-00380.

Nov. 2, 2009.

West KeySummary
**Patents 291 ☞222**

291 Patents
   291XI Regulation of Dealings in Patent Rights
and Patented Articles
      291k222 k. Marking Patented Articles. Most
Cited Cases

A marking on the back of an unpatented product's
packaging containing a false patent number for the
product did not constitute "advertising" within
meaning of false patent marking statute, which
barred the use of patent numbers in advertising in
connection with any unpatented article. Thus, a
consumer could not maintain a false patent marking
claim against a major retailer, which had no role in
the actual marking of the product. When the
product was hanging from a rod in the store, the
patent mark was not visible to the public and in
fact, the product had to be removed from the dis-
play rod and turned over to view the patent mark.
The false patent mark did not constitute a printed,
paid announcement, intending to call the public's
attention to the product. 35 U.S.C.A. § 292.

Heather V. Miller, Mark Edward Levy, Hinman,
Howard Law Firm, Binghamton, NY, for Plaintiff.

Richard N. Aswad, Aswad, Ingraham Law Firm,
Binghamton, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

*1 Plaintiff Inventorprise, Inc. commenced this ac-
tion against Target Corporation and Target Brands,
Inc. (referred to collectively in the Complaint as
"Target") asserting a claim of false patent marking
in violation of 35 U.S.C. § 292. Target has moved
to dismiss the action pursuant to Fed.R.Civ.P.
12(b)(1) and 12(b) (7). See Def. Mem. L. dkt. # 8.
Plaintiff has opposed the motion, see Pl. Opp.
Mem. L., dkt. # 11, and Defendant has filed a
Reply. See Def. Reply Mem. L., dkt. # 12. For the
reasons that follow, Defendant's motion is granted
and the action is dismissed.

**II. BACKGROUND**

Plaintiff commenced this action against Target in-
voking the Court's federal question and patent law
subject matter jurisdictional grants. (Compl. ¶ 8;
see 28 U.S.C. §§ 1331 & 1338(a)). Plaintiff alleges
that Target violated 35 U.S.C. § 292(a), the false
patent marking statute, because it marked the pack-
aging of the "Closet Cedar Storage Accessories
Set" ("the Product"), an un-patented item, with a
U.S. patent number and then sold the Product in its
retail stores. (See generally Comp.).

Target filed a motion to dismiss pursuant to
Fed.R.Civ.P. 12(b)(1) contending that the Court
lacks subject matter jurisdiction over the matter be-
cause there is no cognizable § 292(a) claim against
Target, and pursuant to Fed.R.Civ.P. 12(b)(7) con-
tending that Plaintiff failed to join a necessary party
to the action under Fed.R.Civ.P. 19.[FN1] (See dkt. #
11, Def. Mem. at 3-7). In the alternative, Target
seeks to substitute Cedar Fresh Home Products,
LLC ("Cedar Fresh"), the manufacturer of the
Product, as the sole defendant in this action. (Def.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3644076 (N.D.N.Y.)
**(Cite as: 2009 WL 3644076 (N.D.N.Y.))**

Mem. at 6-7). In support of its motion, Defendant offers the declaration of Kimberly S. Yearick, National Sales Manager for Cedar Fresh. Ms. Yearick attests that: (1) the Product is "made and delivered to Target by Cedar Fresh, who is a vendor to Target Corporation;" (2) the package containing the subject patent mark "is made under the direction and control of Cedar Fresh and Cedar Fresh is wholly responsible for the patent number appearing on the Product;" (3) the patent of the subject patent mark "is owned by Cedar Fresh, not Target;" and (4) "Target Corporation has had no role whatever in determining whether it is appropriate to mark the product with the patent number in question, nor has Target ever directed the patent number to be either placed on the package or not." (Yearick Decl. [dkt. # 8-2] ). Plaintiff has not contested the factual allegations set forth in this declaration, and Plaintiff concedes that, based upon these allegations, "it would appear that Cedar Fresh falls within the definition of 'necessary party' pursuant to Rule 19(a)." Pl. Opp. Mem. L. pp. 4-5.

> FN1. Although the parties use the pre-2007 amendment terms of "necessary" and "indispensable" party, Rule 19 no longer uses those terms. *See* Fed.R.Civ.P. 19 (addressing "required" parties). "However, the Second Circuit has stated that there is no 'substantive difference between the present rule and the rule as applied by the district court prior to the 2007 amendment.' " *Davidson Well Drilling, Ltd. v. Bristol-Myers Squibb Co.,* 2009 WL 2135396, at *2, n. 38 (S.D.N.Y. July 16, 2009) (quoting *CP Solutions PTE, Ltd. v. General Elec. Co.,* 553 F.3d 156, 159 n. 2 (2d Cir.2009) (citing *Republic of Phil. v. Pimentel,* 553 U.S. 851, 128 S.Ct. 2180, 2184, 171 L.Ed.2d 131 (2008) ("As the substance and operation of the Rule both pre- and post-2007 are unchanged, we will refer to the present, revised version."))).

## III. STANDARDS OF REVIEW

### a. *Fed.R.Civ.P. 12(b)(1)*

A case is to be dismissed for lack of subject matter jurisdiction pursuant to FED. R. CIV. P. 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate the matter. *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists. *See Luckett v. Bure,* 290 F.3d 493, 497 (2d Cir.2002); *see also Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir.1996).

**\*2** When a defendant moves to dismiss claims pursuant to Fed.R.Civ.P. 12(b)(1), "the movant is deemed to be challenging the factual basis for the court's subject matter jurisdiction." *Cedars-Sinai Medical Ctr. v. Watkins,* 11 F.3d 1573, 1583 (Fed.Cir.1993). For purposes of such a motion, "the allegations in the complaint are not controlling ... and only uncontroverted factual allegations are accepted as true." *Id.* Both the movant and the pleader are permitted to use affidavits and other pleading materials to support and oppose the motion to dismiss for lack of subject matter jurisdiction. *See Makarova,* 201 F.3d at 113; *Filetech S.A. v. France Telecom, S.A.,* 157 F.3d 922, 932 (2d Cir.1998); *Gunst v. Seaga,* 2007 WL 1032265, at *2 (S.D.N.Y. March 30, 2007).[FN2] "Furthermore, 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.' " *Gunst,* 2007 WL 1032265, at *2 (quoting *Shipping Financial Services Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998)). "Thus, the standard used to evaluate a Rule 12(b)(1) motion is similar to that used for summary judgment under Fed.R.Civ.P. 56." *Lopresti v. Merson,* 2001 WL 1132051, at *5 (S.D.N.Y. Sept.21, 2001).

> FN2. ("When resolving issues surrounding subject matter jurisdiction, a district court is not confined to the complaint and may refer to evidence outside the pleadings, such as affidavits.") (citing *Makarova,* 201 F.3d at 113).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Slip Copy, 2009 WL 3644076 (N.D.N.Y.)
**(Cite as: 2009 WL 3644076 (N.D.N.Y.))**

In the final analysis, the question on a Rule 12(b)(1) motion is whether the plaintiff has pleaded a "colorable claim" that invokes the Court's subject matter jurisdiction. *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 513, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006). "Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Steel Co. v. Citizens for a Better Environment,* 523 US 83, 89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). If any of the grounds for subject matter jurisdiction are lacking, dismissal is mandatory. *See United Food & Commercial Workers Union Local 919 v. Centermark Props. Meriden Square, Inc.,* 30 F.3d 298, 301 (2d Cir.1994).

**b. Fed.R.Civ.P. 12(b)(7) and 19**

"Rule 12(b)(7) allows a party to assert by motion the defense that the opposing party failed to join a party under Rule 19." *Davidson Well Drilling, Ltd. v. Bristol-Myers Squibb Co.,* 2009 WL 2135396, at *2 (S.D.N.Y. July 16, 2009). "Like a Rule 12(b)(1) motion, a court deciding a Rule 12(b)(7) motion may consider documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Id.* (citations and interior quotation marks omitted).

Rule 19 determines whether a party is required to be joined in the litigation. *See* Fed.R.Civ.P. 19.[FN3] "[T]he question of whether a case should be dismissed absent a required party arises only where joinder of that party is not feasible." *Boursoumian v. University at Buffalo,* 2009 WL 691297, at * 5, n. 3 (W.D.N.Y. March 11, 2009) (citing *Republic of the Philippines v. Pimentel,* 553 U.S. 851, 128 S.Ct. 2180, 2188, 171 L.Ed.2d 131 (2008)); *see also Viacom Int'l, Inc. v. Kearney,* 212 F.3d 721, 724 (2d Cir.2000),[FN4] *cert. denied,* 531 U.S. 1051, 121 S.Ct. 655, 148 L.Ed.2d 558 (2000). "The moving party 'has the burden of producing evidence show-

ing the nature of the interest possessed by an absent party and that the protection of that interest will be impaired by the absence.' " *William A. Gross Const. Associates, Inc. v. American Manufacturers Mut. Ins. Co.,* 2009 WL 427280, at *6 (S.D.N.Y. Feb.23, 2009) (quoting *Citizen Band Potawatomi Indian Tribe v. Collier,* 17 F.3d 1292, 1293 (10th Cir.1994)).

FN3. Rule 19 provides in pertinent part:

(a) **Persons Required to be Joined If Feasible.**

(1) **Required Party.** A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

\* \* \*

(b) **When Joinder Is Not Feasible.** If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed.

Fed.R.Civ.P. 19.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3644076 (N.D.N.Y.)
**(Cite as: 2009 WL 3644076 (N.D.N.Y.))**

FN4. ("If a party does not qualify as necessary under Rule 19(a), then the court need not decide whether its absence warrants dismissal under Rule 19(b).")

## IV. DISCUSSION

**\*3** A court should consider a 12(b)(1) motion before ruling on any other motions because dismissal of an action for lack of subject matter jurisdiction will render all other motions moot. *United States ex rel Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148, 1155-56 (2d Cir.1993), *cert. denied,* 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993). Federal district courts have original jurisdiction over civil actions arising under the laws of the United States, 28 U.S.C. § 1331, and "under any Act of Congress relating to patents ...." 28 U.S.C. § 1338(a). Plaintiff asserts that Target violated § 292(a) of the patent law, 35 U.S.C. § 292(a). The question that arises on the Rule 12(b)(1) motion is whether Plaintiff has pleaded a colorable § 292(a) claim against Target.

In the Complaint, Plaintiff alleges that Target violated § 292(a) because it marked, or caused another to mark, the Product with a U.S. Patent number that did not apply to the Product knowing, or having reasons to know, that the Product was un-patented. *See* Compl. ¶¶ 11-29. Section 292(a) provides, in relevant part:

Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word "patent" or any word or number importing that the same is patented for the purpose of deceiving the public

Shall be fined not more than $ 500 for every such offense.

35 U.S.C. § 292(a).

The purpose of 35 U.S.C. § 292(a) is to protect the patentee against fraudulent use of his name or device, and to prevent public deception by advert-

isements that claim that a product is patented or that an application for a patent is pending when that is not true. 1 Pat. L. Fundamentals § 2:27, 2d ed. (Thomson Reuters 2009) (citations omitted); *see* 7 Chisum, Patents, § 20.03 [7][c][vii] (2005); FN5 *Kalkowski v. Ronco, Inc.,* 424 F.Supp. 343, 353 (N.D.Ill.1976); FN6 *accord Forest Group, Inc. v. Bon Tool Co.,* 2008 U.S. Dist. LEXIS 57134, 2008 WL 2962206 (S.D.Tex.2008).FN7 "Intent to deceive the public is an essential element of an action based on 35 U.S.C. § 292." 1 Pat. L. Fundamentals § 2:27.

FN5. ("The purpose of the [false marking] statute is to protect the public.")

FN6. (The purpose of 35 U.S.C. § 292(a) is to protect patentees against fraudulent use of their name or device, and to prevent public deception by false marking.) (citing *Lase Co. v. W ein Products, Inc.,* 357 F.Supp. 210 (N.D.Ill.1973))

FN7. ("[o]ne purpose of the 'false marking' statute is to 'penalize those who would palm off upon the public unpatented articles, by falsely and fraudulently representing them to have been patented.' ") (citation omitted)

Section 292 is in the nature of a *qui tam* action because "[a]ny person may sue for the penalty, in which event one-half shall go to the person suing and the other to the use of the United States." 35 U.S.C. § 292(b); *see* 1 Pat. L. Fundamentals § 2:27 .FN8 Because "[t]he statute is 'penal in nature [it] must be construed strictly.' " *Max Impact, LLC v. Sherwood Group, Inc.,* 2009 U.S. Dist. LEXIS 71013, at\* 3 (S.D.N.Y. Aug. 10, 2009) (quoting *Proportion-Air, Inc. v. Buzmatics, Inc.,* 1995 U.S.App. LEXIS 25871, 1995 WL 360549, \*3 (Fed.Cir.1995)).

FN8. ("Causes of action brought by an informer under a statute which establishes a penalty for the commission or omission of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3644076 (N.D.N.Y.)
**(Cite as: 2009 WL 3644076 (N.D.N.Y.))**

a specified act and provides that such pen-
alty shall be recoverable in a civil action
with part of the penalty going to the person
bringing the action and the remainder go-
ing to the state are called *qui tam* ('who as
well') actions, because the private party
bringing the action declares that he sues
for the state as well as for himself.")

There is no dispute that Cedar Fresh, the owner of
the patent identified on the Product's package,
placed the patent number on the package and Target
"had no role whatever" in that action. Plaintiff con-
tends, however, that even if Target did not mark the
package, it violated § 292(a) because it used the im-
proper U.S. Patent number in advertising in connec-
tion with an unpatented article for the purpose of
deceiving the public.

**\*4** To state a claim under 35 U.S.C. § 292(a)
against a party that has had no role in the actual
marking of a product, a plaintiff must show that the
defendant (1) used the word "patent" (or any word
or number importing that the product is patented)
"in advertising in connection with any unpatented
article;" and (2) acted with the intent to deceive the
public. 35 U.S.C. § 292(a); *see Clontech Labs., Inc.
v. Invitrogen Corp.,* 406 F.3d 1347, 1352
(Fed.Cir.2005); [FN9] *Chamilia, LLC v. Pandora
Jewelry, LLC,* 2007 U.S. Dist. LEXIS 71246, \*29,
2007 WL 2781246 (S.D.N.Y. Sept. 24, 2007);
[FN10] *Max Impact, LLC.,* 2009 U.S. Dist. LEXIS
71013, at \*2-\*3; [FN11] *see also Juniper Works v.
Shipley,* 2009 U.S. Dist. LEXIS 40978, at \*7, 2009
WL 1381873 (N.D.Cal. May 14, 2009).[FN12]
Plaintiff cannot establish these elements against
Target.

     **FN9.** (A pleader may establish a *prima
     facie* case of false marking under the stat-
     ute by making three allegations: (1) an art-
     icle was falsely marked or advertised with
     the word "patent" or any word or number
     that imports that the article is patented, (2)
     the article so marked or advertised was an
     unpatented article, and (3) the marking or

advertisement was made with the intent to
deceive the public.)

     **FN10.** ("To state a cause of action for false
     patent marking, a plaintiff must show both:
     (1) advertising or use of the word
     "patented" in connection with a device that
     is not patented; and (2) intent to deceive.")

     **FN11.** ("To state a claim for false marking
     under 35 U.S.C. § 292, a plaintiff must al-
     lege that the defendant 'acted with the de-
     ceptive purpose necessary to trigger liabil-
     ity under the false marking statute.' ")
     (quoting *Kemin Foods, L.C. v. Pigmentos
     Vegetales Del Centro S.A. De C.V.,* 464
     F.3d 1339, 1355 (Fed.Cir.2006))

     **FN12.** ("To state a false marking claim, the
     plaintiff must allege the following: (1) a
     marking importing that an object is paten-
     ted; (2) falsely affixed to; (3) an unpaten-
     ted article; (4) with intent to deceive the
     public.") (citing *Clontech,* 406 F.3d at
     1351)

Turning first to the "use in advertising" element,
the express language of § 292(a) requires that there
"be a nexus between the defendant's marking, affix-
ing or using of a patent *and* the advertising of the
product." *Juniper Works,* 2009 U.S. Dist. LEXIS
40978, at \*9, 2009 WL 1381873 (emphasis in ori-
ginal). The term "advertising" implies an act soli-
citing the general public regarding the product. *See
id.*[FN13] Because "advertising" is not defined in the
statute, the plain meaning of the term provides
guidance as to its definition. " 'Advertising' is
defined as 'the action of calling something ... to the
attention of the public esp[ecially] by means of
printed or broadcast paid announcements.' "
*Chamilia,* 2007 U.S. Dist. LEXIS 71246, at \*29,
2007 WL 2781246 (quoting Webster's Third New
International Dictionary (1993)).

     **FN13.** ("Juniper cites no authority to sup-
     port the notion that a section 292(a) claim

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3644076 (N.D.N.Y.)
**(Cite as: 2009 WL 3644076 (N.D.N.Y.))**

can be stated simply by improperly marking, affixing or using a patent in relation to an unpatented article without any connection to advertising of the unpatented article. Nor would Jupiter's construction of section 292(a) be logical. The purpose of the statute is to protect the public from being misled as to whether a product is, in fact, subject to patent protection. To the extent that the public is not being solicited regarding the unpatented product, it is unclear how the alleged deception would harm the public, and thus, necessitate the protection of section 292(a).")

Case law interpreting a similar term under the Lanham Act provides further guidance as to the definition of "advertising." "In this circuit, to constitute 'commercial advertising or promotion' under the Lanham Act, a statement must be: (1) 'commercial speech,' (2) made 'for the purpose of influencing consumers to buy defendant's goods or services,' and (3) 'although representations less formal than those made as part of a classic advertising campaign may suffice, they must be disseminated sufficiently to the relevant purchasing public.' " *Gmurzynska v. Hutton,* 355 F.3d 206, 210 (2d Cir.2004) (quoting *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 56-58 (2d Cir.2002)). Promotion and advertising are distinct terms. "[A]dvertising is generally understood to consist of widespread communication through print or broadcast media," whereas promotion "may take other forms of publicity used in the relevant industry, such as displays at trade shows and sales presentations to buyers." *Fashion Boutique,* 314 F.3d at 57.

[U]nlike the Lanham Act, Section 292 applies only to "advertising;" it does not encompass "promotion." Thus, "the expression 'uses in advertising' cannot refer to any and all documents by which the word 'patent' is brought to the attention of the public; it can only refer to use of the word 'patent' in publications which are de-

signed to promote the allegedly unpatented product, namely, advertisements." [ *Accent Designs, Inc. v. Jan Jewelry Designs, Inc.,* 827 F.Supp. 957, 968-69 968 (S.D.N.Y.1993) ].

**\*5** *Chamilia,* 2007 U.S. Dist. LEXIS 71246, \*29-\*30, 2007 WL 2781246.

Here, the alleged "advertisement" of the false patent number appears on the back of the package that holds the "Closet Cedar Storage Accessories Set." *See* Pl. Resp., Ex. A [dkt. # 11-1]. There it is stated: "Protected by U.S. Patent # 5,419,935." Pl.Ex. A. It is evident from Plaintiff's Exhibit A that the package is designed to hang from a rod affixed to a wall or shelf so that the front of the package, which has a clear plastic sheet covering the pieces of the Product, is visible to the public as they walk in the aisle of Defendant's stores. It is also evident that the patent mark in issue (*i.e.* the statement that the Product is "Protected by U.S. Patent # 5,419,935") is on the backside of the packaging. Thus, when the package is hanging from the rod, the patent mark is not visible to the public. To view the patent mark, an individual must remove the package from the rod and turn it over.

This marking does not constitute "advertising" within the meaning of § 292(a). The printed words on the backside of the packaging do not constitute a "printed ... paid announcement" intended to call the public's attention of the Product. Further, there is no nexus between the marking and an act of solicitation of the general public to purchase the Product. *See Juniper Works,* 2009 U.S. Dist. LEXIS 40978, at \*9, 2009 WL 1381873.

There is also no merit to Plaintiff's contention that the mere act of offering a mis-marked product for sale in a retail store brings the matter within the purview of the "in advertising" provision of § 292(a). Congress has, in other patent statutes, imposed liability for the sale of items that infringe the patent law. *See e.g.* 35 U.S.C. § 271(a).[FN14] Clearly, Congress knows how to draft legislation imposing liability for the act of selling an in-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3644076 (N.D.N.Y.)
**(Cite as: 2009 WL 3644076 (N.D.N.Y.))**

fringing item. Under the age-old tenant of statutory construction *inclusio unius est exclusio alterius,* the inclusion of the term "advertising" and the exclusion of the terms "to sell" or "sells" leads to the conclusion that Congress intended the "use in advertising" provision of § 292(a) to address acts of broadcasting false patent information to the general public, not to impose liability on retailers who merely sell mis-marked products.

> FN14. ("Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.")

Further, Plaintiff has not alleged sufficient facts to satisfy the "intent to deceive" element of the claim. "Because Section 292 is, unlike the Lanham Act, a penal statute, it must be strictly construed, and, as such, an intent to deceive will not be inferred from statements that may have been the result of inadvertence or mistake." *Chamilia,* 2007 U.S. Dist. LEXIS 71246, *29, 2007 WL 2781246 (citing *Blank v. Pollack,* 916 F.Supp. 165, 173 (N.D.N.Y.1996)). Indeed, the Fifth Circuit has "adopted the formulation that an honest, though mistaken, mismarking of an article would not trigger liability under the statute." *Clontech,* 406 F.3d at 1352 (citing *Brose v. Sears, Roebuck and Co.,* 455 F.2d 763, 768-69 (5th Cir.1972)). The Federal Circuit has concluded:

**\*6** We see no reason to interpret the statute differently [from the Fifth Circuit] to render it a statute of strict liability for mismarking. Intent to deceive is a state of mind arising when a party acts with sufficient knowledge that what it is saying is not so and consequently that the recipient of its saying will be misled into thinking that the statement is true. *Seven Cases of Eckman's Alterative v. United States,* 239 U.S. 510, 517-18, 36 S.Ct. 190, 60 L.Ed. 411 (1916). Intent to deceive, while subjective in nature, is established in law

by objective criteria. *Id.* Thus, "objective standards" control and "the fact of misrepresentation coupled with proof that the party making it had knowledge of its falsity is enough to warrant drawing the inference that there was a fraudulent intent". *See Norton v. Curtiss,* 57 C.C.P.A. 1384, 433 F.2d 779, 795-96 (CCPA 1970). Thus, under such circumstances, the mere assertion by a party that it did not intend to deceive will not suffice to escape statutory liability. Such an assertion, standing alone, is worthless as proof of no intent to deceive where there is knowledge of falsehood. But in order to establish knowledge of falsity the plaintiff must show by a preponderance of the evidence that the party accused of false marking did not have a reasonable belief that the articles were properly marked (*i.e.,* covered by a patent). Absent such proof of lack of reasonable belief, no liability under the statute ensues.

*Clontech,* 406 F.3d at 1352

Plaintiff alleges that because the Product's package was marked with a number from a U.S. patent that (like all patents) contained a "printed title, specification, and claims describing the subject matter in the form originally issued," Compl. ¶ 25, and because Target is "a sophisticated company that has many decades of experience with applying for, obtaining, and litigating intellectual property including, but not limited to patents, and knows (itself or by its representatives), at least constructively, that patents describe the subject matter of the invention or product described therein," *id.* ¶ 26, Target knew or should have known that the patent number printed on the Product's package did not apply to "closet cedar storage accessories sets." *Id.* ¶ 27. Plaintiff also alleges, in conclusory fashion, that Target could not have reasonably believed that the Product was patented. *Id.* ¶ 28. From this, Plaintiff asserts that Defendant "has, upon information and belief, affirmatively and 'falsely marked' its closet cedar storage accessories sets, with the intent to deceive the public, in violation of 35 U.S.C. § 292(a) ." *Id.* ¶ 29. The Court finds these allegations insuf-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3644076 (N.D.N.Y.)
**(Cite as: 2009 WL 3644076 (N.D.N.Y.))**

ficient to sustain a § 292(a) claim against Target.

First, there is no allegation that Target used the false mark in advertising with the intent to deceive the public. Second, assuming *arguendo* that the mark was used in advertising, there are insufficient allegations that Target acted with the requisite intent to deceive the public. Unlike the cases where a party mis-marks an item and then claims mistake or inadvertence, here there is no dispute that Target played no role in the marking of the Product. It is mere supposition to conclude that, because Target is a sophisticated corporation, it knew that the Product was not patented and that the patent number printed on back of the package belonged to another item.FN15 It is even more speculative to conclude that, because Target supposedly had this knowledge, it offered the Product for sale in the packaging provided by Cedar Fresh with the specific intent to deceive the public.

> FN15. Although not argued by Target, it is not abundantly clear whether the patent number marked on the packaging applied to the packaging as opposed to the Product itself. The back of the packaging for the Product is marked with the following words: "Protected by U.S.Patent # 5,419,935." Pl. Opp. to Motion to Dismiss, Ex. A. U.S. Patent No. 5,419,935 ("the ' 935 patent"), entitled "PACKAGING FOR CEDAR PRODUCTS," is attached to the Complaint as Exhibit A. The Abstract for the '935 patent indicates that the patent is for
>
> > [a] container for cedar products having a transparent wall portion and an opaque wall portion. The transparent wall portion has high trasnmissivity in the visible light range and low transmissivity in the ultraviolet light range. The opaque wall portion contains a coating that prevents chemicals given off by cedar wood from diffusing into the opaque wall portion.

Because the Product consisted of cedar products, it is at least arguable that the patent mark applied to, or could be thought to apply to, the packaging on which it was printed. As the Federal Circuit stated in *Clontech,* "in order to establish knowledge of falsity [of the mark] the plaintiff must show by a preponderance of the evidence that the party accused of false marking did not have a reasonable belief that the articles were properly marked (*i.e.,* covered by a patent). Absent such proof of lack of reasonable belief, no liability under the statute ensues." 406 F.3d at 1352. Plaintiff does not offer evidence of a lack of a reasonable belief by Target that the package was properly marked.

**\*7** Even without applying the heightened pleading standard of Fed.R.Civ.P. 9(b), *see Juniper Works,* 2009 U.S. Dist. LEXIS 40978, at \*11, 2009 WL 1381873FN16 Plaintiff has failed to set forth sufficient facts to establish a plausible claim that, by selling the Product with a false patent number on the back of its package, Target acted with the intent to deceive the public. *See Max Impact, LLC.,* 2009 U.S. Dist. LEXIS 71013, at \*3-\*4.FN17

> FN16. ("The false marking statute is a fraud-based claim, which is subject to the pleading requirements of Federal Rule of Civil Procedure 9(b).")

> FN17. (Denying the defendant's motion to amend its complaint to add a § 292(a) claim because "[t]he intent to deceive cannot be presumed simply because there exists a genuine dispute as to whether [defendant'] product infringes upon the '774 patent.... The paucity of merit in [defendant's] proposed counterclaim is underscored by the conclusory progression of its allegations. Nothing in the allegations sufficiently suggests that [the plaintiff] acted with a deceptive purpose in marking its

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3644076 (N.D.N.Y.)
**(Cite as: 2009 WL 3644076 (N.D.N.Y.))**

[product] as patented.")

## V. CONCLUSION

The Court finds that, given the undisputed facts presented here, Plaintiff has not alleged a plausible § 292 claim against Target. Inasmuch as Target is the only defendant in this action and the § 292 claim is the only claim asserted, the action must be dismissed for lack of subject matter jurisdiction. Accordingly, that portion of Defendant's motion to dismiss [dkt. # 8] made pursuant to Fed.R.Civ.P. 12(b)(1) is **GRANTED,** and the action is **DIS-MISSED.** That portion of Defendant's motion made pursuant to Fed.R.Civ.P. 12(b)(7) is denied as moot.

**IT IS SO ORDERED**

N.D.N.Y.,2009.
Inventorprise, Inc. v. Target Corp.
Slip Copy, 2009 WL 3644076 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1381873 (N.D.Cal.)
**(Cite as: 2009 WL 1381873 (N.D.Cal.))**

Only the Westlaw citation is currently available.

United States District Court, N.D. California,
Oakland Division.
JUNIPER NETWORKS, a Delaware corporation,
Plaintiff,
v.
Peter M. SHIPLEY, an individual, Defendant.
**No. C 09-0696 SBA.**
**Docket No. 7.**

May 14, 2009.

West KeySummary
**Patents 291 ☞222**

291 Patents
    291XI Regulation of Dealings in Patent Rights
and Patented Articles
        291k222 k. Marking Patented Articles. Most
Cited Cases
A corporation failed to state a cause of action
against a computer hacker for the hacker's alleged
use of a mark for patents for a dynamic firewall on
his web site. The patents marked on the web site for
the dynamic firewall were not used in advertising in
connection with any unpatented article. There could
be no claim stated against the hacker for improperly
marking a patent in relation to an unpatented article
without any connection to advertising of the unpat-
ented article. 28 U.S.C.A. § 292(a).

Jonathan S. Kagan, Morgan Chu, Irell & Manella
LLP, Los Angeles, CA, David Craig McPhie, Re-
becca Lyn Clifford, Irell & Manella LLP, Newport
Beach, CA, for Plaintiff.

Andrew T. Oliver, Townsend and Townsend and
Crew, Palo Alto, CA, Brenda L. Joly, Cole M.
Fauver, Robins Kaplan Miller & Ciresi, LLP, Min-
neapolis, MN, for Defendant.

**ORDER GRANTING DEFENDANT'S MO-
TION TO DISMISS**

SAUNDRA BROWN ARMSTRONG, District
Judge.

**\*1** Plaintiff Juniper Networks, Inc. ("Juniper") filed
the instant action against Defendant Peter Shipley
("Shipley") alleging that he violated 28 U.S.C. §
292(a), which prohibits marking an item with the
word "patent" or a patent number for the purpose of
deceiving the public. The parties presently are be-
fore the Court on Defendant Shipley's Motion to
Dismiss for Failure to State a Claim Upon Which
Relief Can Be Granted Pursuant to Federal Rule of
Civil Procedure 12(b)(6) (Docket 7). Having read
and considered the papers filed in connection with
this matter, and being fully informed, the Court
hereby GRANTS the motion and dismisses the
Complaint, with leave to amend. FN1

    FN1. The Court, in its discretion, finds this
    matter suitable for resolution without oral
    argument. See Fed.R.Civ.P. 78(b).

**I. BACKGROUND**

**A. FACTUAL SUMMARY**

The following facts are taken from Juniper's Com-
plaint for False Marking (35 U.S.C. § 292) which,
for purposes of a motion to dismiss under Rule
12(b)(6), must be taken as true. Juniper is a design-
er, developer, manufacturer and seller of computer
networking products. (Docket 1, Compl. ¶ 8.) De-
fendant is an alleged computer "hacker" who pro-
motes his services and products on his website loc-
ated at http://dis.org ("the Website"), which he has
maintained since 1995. (*Id.* ¶¶ 9-10.) In an effort to
deter other "hackers" who have attacked his Web-
site in the past, Shipley developed a technology
known as Dynamic Firewall, which he claimed was
the subject of a series of pending patent applica-
tions. (*Id.* ¶¶ 11-12.) In Paragraph 14 of the Com-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Slip Copy, 2009 WL 1381873 (N.D.Cal.)
**(Cite as: 2009 WL 1381873 (N.D.Cal.))**

plaint, Shipley purportedly "marked" his website as follows:

> 14. On or before December 10, 1997, Mr. Shipley caused the following marking to be displayed on the Website with the Dynamic Firewall:

> **Dynamic Firewall** [*Dover, Cyber* ] * * * ***Patent Pending* * * ***

> "Shields holding captain ...".

> "D.IP.SHI.T" Dynamic IP SHield Technology A selfmodifying active firewall/packet filter designed to act as a LAN auto-defense and offense monitor/tool. This is an idea I came up with a few years ago.

> **Status:** basic log file monitoring function, now implementing core rulesets.

(Compl. ¶ 14 (emphasis added).) In 1999, Defendant experienced a hard drive crash on his computer at home, resulting in the complete destruction of the Dynamic Firewall. (*Id.* ¶ 15.) Although the technology was no longer operable, Juniper alleges that Shipley failed to remove the "Patent Pending" marking from his Website. (*Id.*)

On September 12, 2000, the U.S. Patent and Trademark Office ("PTO") issued Patent No. 6,119,236 ("'236 Patent") to Shipley. (*Id.* ¶ 17.) Thereafter, he modified the text on his Website on December 3, 2000 to read:

> **Dynamic Firewall** [*Dover* ] * * * ***Patent # 6,119,236* * * ***

> "Shields holding captain ...".

> "D.IP.SHI.T" Dynamic IP SHield Technology A selfmodifying active firewall/packet filter designed to act as a LAN auto-defense and offense monitor/tool. This is an idea I came up with a few years ago.

> **\*2 Status:** functioning ....

(*Id.* ¶ 18.)

On October 16, 2001, the PTO issued Patent No. 6,304,975 ("'975 Patent") to Shipley. (*Id.* ¶ 21.) On October 29, 2001, Shipley again modified his Website to read:

> **Dynamic Firewall** [*Dover* ] * * * ***Patent # 6,119,236 and 6,304,975* * * ***

> "Shields holding captain ...".

> "D.IP.SHI.T" Dynamic IP SHield Technology A selfmodifying active firewall/packet filter designed to act as a LAN auto-defense and offense monitor/tool. This is an idea I came up with a few years ago.

> **Status:** functioning ....

(*Id.* ¶ 22.) According to Juniper, Shipley's reference to the above-referenced patents constitutes a "false" marking in that it suggests that the patents were "functioning" on the Website when, in fact, they could not have been because Dynamic Firewall no longer was in existence. (*Id.* ¶¶ 20, 23.)

Although the alleged mismarking occurred in 2000 and 2001, Juniper claims that it first learned about Shipley's alleged conduct during the course of patent litigation currently pending in the Eastern District of Texas, which was filed by Enhanced Security Research LLC ("ESR"), a company in which Shipley is a manager and principal. *See Enhanced Security Research LLC v. Juniper Networks, Inc.,* E.D. Tex., Case No. 2-07CV-481-TJW-CE. During the course of discovery in that action, in October 2008 Juniper allegedly learned that Shipley had represented that Dynamic Firewall was running on his Website, and that he had associated two patent numbers with that technology. (Opp'n at 2.) However, Shipley purportedly admitted that he no longer possessed any operable copies of Dynamic Firewall as a result of a hard drive crash in 1999. Juniper subsequently filed the instant action in this Court on February 17, 2009, ostensibly based on that revelation.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1381873 (N.D.Cal.)
**(Cite as: 2009 WL 1381873 (N.D.Cal.))**

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a motion to dismiss for failure to state a claim, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what ... the claim is and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (internal quotation marks omitted); *Johnson v. Riverside Healthcare System, LP,* 534 F.3d 1116, 1122 (9th Cir.2008). "In general, the inquiry is limited to the allegations in the complaint, which are accepted as true and construed in the light most favorable to the plaintiff." *Lazy Y Ranch Ltd. v. Behrens,* 546 F.3d 580, 588 (9th Cir.2008).). However, a court need not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001). In the event dismissal is warranted, it is generally without prejudice, unless it is clear the complaint cannot be saved by any amendment. *See Sparling v. Daou,* 411 F.3d 1006, 1013 (9th Cir.2005); *Gompper v. VISX, Inc.,* 298 F.3d 893, 898 (9th Cir.2002).

## III. DISCUSSION

## A. APPLICABILITY OF 35 U.S.C. § 292

### 1. **Failure to Allege Conduct within the Scope of the Statute**

**\*3** The Patent Act prohibits marking an unpatented article with the word "patent" or any patent number for the purpose of deceiving the public. *See* 35 U.S.C. § 292(a); *Clontech Labs., Inc. v. Invitrogen Corp.,* 406 F.3d 1347, 1352 (Fed.Cir.2005). Section 292(a) provides, in relevant part, that, "Whoever

marks upon, or affixes to, or uses *in advertising in connection with any unpatented article,* the word "patent" or any word or number importing that the same is patented for the purpose of deceiving the public ... [s]hall be fined not more than $500 for every such offense." 35 U.S.C. § 292(a) (emphasis added). The false marking statute is enforceable by a qui tam remedy provided in section 292(b), which provides that "[a]ny person may sue for the penalty, in which event one-half shall go to the person suing and the other to the use of the United States." *See Boyd v. Schildkraut Giftware Corp.,* 936 F.2d 76, 79 (2d Cir.1991).

To state a false marking claim, the plaintiff must allege the following: (I) a marking importing that an object is patented; (2) falsely affixed to; (3) an unpatented article; (4) with intent to deceive the public. *See Clontech Labs., Inc.,* 406 F.3d at 1351. "The purpose of the [false marking] statute is to protect the public." 7 Chisum, *Patents,* § 20.03[7][c][vii] (2005); *accord Forest Group, Inc. v. Bon Tool Co.,* 2008 WL 2962206 (S.D.Tex.2008) ("[o]ne purpose of the 'false marking' statute is to 'penalize those who would palm off on the public unpatented articles, by falsely and fraudulently representing them to have been patented.' ") (citation omitted). Because of its penal nature, however, the statute is to be strictly construed. *Mayview Corp. v. Rodstein,* 620 F.2d 1347, 1359 (9th Cir.1980).

In his motion to dismiss, Shipley argues that Juniper's false marking claim fails on the ground that it does not allege that the "marking" (i.e., the references to the '236 and '975 Patents next to the word "Dynamic Firewall") was made in reference to a commercial purpose or advertising of an unpatented article. Rather, Shipley claims that the patents were mentioned solely for informational purposes as "an informal and humorous description of the inventions." (Opp'n at 5.) Juniper does not directly dispute this. Instead, Juniper asserts that there is no "commerce" requirement contained in section 292(a). Though acknowledging the statute's reference to "uses in advertising," Juniper contends that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Slip Copy, 2009 WL 1381873 (N.D.Cal.)
**(Cite as: 2009 WL 1381873 (N.D.Cal.))**

merely is one of three grounds for relief under section 292(a)-and that the statute also can be violated by the mere act of falsely "marking" or "affixing" a patent or patent number to a product, even if it is unrelated to advertising. (*Id.* at 6.)

Juniper's construction of section 292(a) is untenable. By its express terms, the statute provides that the patent must be marked upon, affixed or used *"in advertising in connection with any unpatented article."* 35 U.S.C. § 292(a) (emphasis added). In other words, there must be a nexus between the defendant's marking, affixing or using of a patent *and* the advertising of the product. Juniper cites no authority to support the notion that a section 292(a) claim can be stated simply by improperly marking, affixing or using a patent in relation to an unpatented article *without* any connection to advertising of the unpatented article. Nor would Jupiter's construction of section 292(a) be logical. The purpose of the statute is to protect the public from being misled as to whether a product is, in fact, subject to patent protection. To the extent that the public is not being solicited regarding the unpatented product, it is unclear how the alleged deception would harm the public, and thus, necessitate the protection of section 292(a).[FN2]

> **FN2**. Alternatively, Juniper argues that it has, in fact, alleged that Shipley marked his Website in order to "promote[ ] his 'hacking abilities and related products and products." (Opp'n at 8 (citing Compl. ¶ 9). Even accepting this allegation as true, there are insufficient facts to establish any link between Shipley's reference to the '236 and '975 Patents and his alleged promotion of his "hacking abilities."

**2. Failure to Allege Intent to Deceive with Particularity**

**\*4** Even if Juniper had properly alleged that Shipley engaged in conduct within the purview of section 292(a), it has not sufficiently alleged facts that

the mismarking was done with the requisite intent to deceive the public. Juniper alleges the following regarding Shipley's alleged intent:

> 19. Mr. Shipley's altered marking falsely indicated that the Dynamic Firewall allegedly covered by U.S. Pat. No. 6,119,236 was still 'functioning' on the Website.

> 20. On information and belief, at the time Mr. Shipley made this alteration to the Website language, *he knew that language to be false,* and that no Dynamic Firewall allegedly covered by U.S. Pat. No. 6,119,236 was in fact 'functioning' on the Website.

> \* \* \*

> 23. Mr. Shipley's altered marking falsely indicated that the Dynamic Firewall allegedly covered by U.S. Pat. Nos. 6,119,236 and 6,304,975 was still 'functioning' on the Website.

> 24. On information and belief, at the time Mr. Shipley made this alteration to the Website language, *he knew that language to be false,* and that no Dynamic Firewall allegedly covered by U.S. Pat. No. 6,119,236 was in fact 'functioning' on the Website.

(Compl. ¶¶ 19-20, 23-24 (emphasis added).)

Juniper contends that it need only allege that Shipley knew that Dynamic Firewall was non17 operational when he associated the patents with that technology. (Opp'n at 9.) The Court disagrees. The false marking statute is a fraud-based claim, which is subject to the pleading requirements of Federal Rule of Civil Procedure 9(b), *See Berson v. Applied Signal Technology, Inc.,* 527 F.3d 982, 987 (9th Cir.2008) ("[p]laintiffs must 'state with particularity facts giving rise to a strong inference' that defendants acted with the *intent to deceive* ....") (emphasis added); *see also Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1103-04 (9th Cir.2003) (claims that are "grounded in fraud" or that "sound in fraud" are subject to Rule 9(b)); *c.f., Eisai Co.,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1381873 (N.D.Cal.)
**(Cite as: 2009 WL 1381873 (N.D.Cal.))**

*Ltd. v. Teva Pharmaceuticals USA, Inc.,* 557 F.Supp.2d 490, 493 (D.N.J.2008) (claim for inequitable conduct, which requires an intent to deceive the Patent and Trademark Office, is subject to heightened pleading standard under Rule 9(b).) Juniper's conclusory allegations that Shipley "knew" his reference to the patents was "false" are thus insufficient to plead an intent to deceive under section 292(a).[FN3]

> FN3. Juniper cites *Astec Am., Inc. v. Power-One, Inc.,* 2008 WL 1734833 (W.D.Tex.2008) where the district court appears to suggest that Rule 9(b) does not apply to a false marking claim. (Opp'n at 9 .) Setting aside the *Astec* court's failure to cite any compelling authority or provide analysis to support that conclusion, the Court notes, as discussed above, that in this Circuit fraud-based claims are subject to Rule 9(b).

**B. STATUTE OF LIMITATIONS**

**1. Equitable Estoppel/Tolling**

As an independent ground for dismissal, Shipley contents that Juniper's false marking claim is time-barred. False marking claims under section 292(a) are subject to a five-year statute of limitations. *Arcadia Mach. & Tool Inc. v. Sturm, Ruger & Co., Inc. .,* 786 F.2d 1124, 1125 (Fed.Cir.1986) (citing 28 U.S.C. § 2462, which governs civil fines). In this case, the Complaint alleges that Shipley falsely "marked" his Website on September 12, 2000 with respect to the '236 Patent and on October 21, 2001, by adding the reference to the ' 975 Patent. (Compl.¶¶ 17, 22.) Given the five-year limitations period, Juniper had until *October 21, 2006* to file a claim under section 292(a). *See London v. Everett H. Dunbar Corp.,* 179 F. 506, 508 (1st Cir.1910) (false marking must take place within limitations period). However, Juniper did not file its Complaint until February 17, 2009, well beyond five years after the last act of "marking."

*5 In attempt to avoid the statute of limitations bar, Juniper maintains that its Complaint is timely under the doctrine of equitable tolling. (Opp'n at 11.) The Court notes, as a threshold matter, there are two separate but related equitable doctrines that may toll a limitations period: (1) equitable tolling and (2) equitable estoppel. *Lukovsky v. City and County of San Francisco,* 535 F.3d 1044, 1051 (9th Cir.2008). " 'Equitable tolling' focuses on 'whether there was excusable delay by the plaintiff: If a reasonable plaintiff would not have known of the existence of a possible claim within the limitations period, then equitable tolling will serve to extend the statute of limitations for filing suit until the plaintiff can gather what information he needs.' " *Id.* (quoting *Johnson v. Henderson,* 314 F.3d 409, 414 (9th Cir.2002)). "Equitable estoppel, on the other hand, focuses primarily on actions taken by the defendant to prevent a plaintiff from filing suit, sometimes referred to as 'fraudulent concealment.' " *Id.* Here, Juniper predicates its equitable tolling argument on the premise that Shipley "improperly concealed his violations of the mismarking statute." (Opp'n at 10.) As such, Juniper's argument is more appropriately framed as equitable estoppel, as opposed to equitable tolling. Either way, Juniper's tolling argument fails as pleaded.

The gravamen of Juniper's argument is that Shipley concealed that "the markings on his Website were false by continuing to represent that a 'Dynamic Firewall' was 'functioning' on the Website in accordance with the identified patents, despite his knowledge that this statement was untrue." (Opp'n at 11; Compl. ¶¶ 16, 18, 19, 22, 23.) These allegations are too vague to comply with the particularity requirements of Rule 9(b). *See Wasco Prods., Inc. v. Southwall Techs., Inc.,* 435 F.3d 989, 991 (9th Cir.2006) (tolling of statute of limitations based on fraudulent concealment must be pleaded with particularity). That aside, the Complaint is devoid of facts demonstrating that Shipley actively concealed that Dynamic Firewall was not functional when he modified his Website in 2000 and 2001 to specifically reference the '236 and ' 975 Patents. Rather, Ju-

Slip Copy, 2009 WL 1381873 (N.D.Cal.)
**(Cite as: 2009 WL 1381873 (N.D.Cal.))**

niper has done nothing more than restate his false marking claim, which is insufficient as a matter of law, to invoke the doctrine of equitable estoppel. *See Lukovsky,* 535 F.3d at 1052 ("The primary problem with plaintiffs' argument is that their alleged basis for equitable estoppel is the same as their cause of action. As we have previously explained, the plaintiff must point to some fraudulent concealment, some active conduct by the defendant 'above and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from suing in time.' ") (citation omitted); *Santa Maria v. Pacific Bell,* 202 F.3d 1170, 1177 (9th Cir.2000) (same).

Junipers argument fares no better when viewed through the lens of equitable tolling. "To establish that equitable tolling applies, a plaintiff must prove the following elements: [1] fraudulent conduct by the defendant resulting in concealment of the operative facts, [2] failure of the plaintiff to discover the operative facts that are the basis of its cause of action within the limitations period, and [3] due diligence by the plaintiff until discovery of those facts." *Federal Election Com'n v. Williams,* 104 F.3d 237, 240-41 (9th Cir.1996). As discussed, Juniper has failed to allege facts with sufficient particularity to establish fraudulent concealment by Shipley. But even if it had, the Complaint fails to allege facts demonstrating that a reasonable plaintiff exercising due diligence would not have known of its claim during the limitations period. *Lukovsky,* 535 F.3d at 1051; *Williams,* 104 F.3d at 241.

**\*6** The Court concludes that Juniper has failed to allege facts sufficient to invoke the doctrine of equitable tolling or equitable estoppel. Since Juniper may be able to allege facts sufficient to invoke either or both doctrines, the Court will grant leave to amend to cure the deficiencies noted above. *See Cervantes v. City of San Diego,* 5 F.3d 1273, 1276-77 (9th Cir.1993) (noting dismissal on statute of limitations grounds is disfavored where equitable tolling may apply).

**2. Continuing Violations**

Equally without merit is Juniper's ancillary contention that Shipley engaged in mismarking *within* five years of the date the Complaint was filed on February 17, 2009. (Opp'n at 11-13.) Although no specific marking violations are alleged to have occurred since October 16, 2001, Juniper relies on its general allegation that "the false marking has been published multiple times every day since 1999." (Opp'n at 12 (quoting Compl. ¶ 33).) According to Juniper, "there easily have been thousands of mismarking 'offenses' that have occurred within the five years immediately prior to the filing of the Complaint." (*Id.* at 12.)

Juniper's argument misconstrues the scope of section 292(a). Under the express terms of the statute, the impermissible act is *the marking* of the unpatented article, not the *publication* of the false mark. *See London v. Everett H. Dunbar Corp.,* 179 F. 506, 507 (1st Cir.1910) (holding that the "[false marking] statute does not prescribe a distinct penalty for each individual article marked, but merely a penalty for the offense of marking...."); *Forest Group, Inc. v. Bon Tool Co.,* 2008 WL 2962206 at *6 (S.D.Tex.2008) (ruling that mismarking is a "separate, distinct decision" and rejecting plaintiff's request to impose a penalty of $500 for each product sold with the false marking); *Sadler-Cisar, Inc. v. Commercial Sales Network, Inc.,* 786 F.Supp. 1287, 1296 (N.D.Ohio 1991) ("continuous markings over a given time constitute a single offense.").

Juniper contends that *London* and *Forest Group* are distinguishable on the ground that they each involved the marking of a product at "one time," as contrasted with this case where "Shipley continues to publish his false markings to this date, and has published his false markings *multiple times over an extended period,* resulting in multiple offenses." (Opp'n at 13.) As discussed, however, nothing in section 292(a) prohibits the "publication" of an improper mark. Rather, as the above authorities establish, it is *the act of marking the product* that consti-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 1381873 (N.D.Cal.)
**(Cite as: 2009 WL 1381873 (N.D.Cal.))**

tutes the violation, irrespective of how many products are mismarked. And even if "publication" could be analogized to "marking," the allegedly continuous posting on the Website concerning the patents constitutes a discrete act. *C.f., Oja v. U .S. Army Corps of Engineers,* 440 F.3d 1122, 1132 (9th Cir.2006) (improper posting of statements on website was "a single, discrete act," even though the information was "continuously hosted on a server computer"). Under Juniper's analysis, the statute of limitations would never run so long as the invalid marking continues to appear on the Website. Tellingly, Juniper cites no authority, nor has the Court located any, to support such an expansive construction of the false marking statute.

## IV. CONCLUSION

**\*7** IT IS HEREBY ORDERED THAT Defendant Shipley's Motion to Dismiss (Docket 7) is GRANTED. Plaintiff Juniper is granted leave to amend to correct the deficiencies discussed above. Juniper shall have ten (10) days from the date this Order is filed to file its amended complaint. Failure to do so will result in the dismissal of this action, with prejudice.

IS IT SO ORDERED.

N.D.Cal.,2009.
Juniper Networks v. Shipley
Slip Copy, 2009 WL 1381873 (N.D.Cal.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2448108 (S.D.N.Y.)
**(Cite as: 2009 WL 2448108 (S.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
MAX IMPACT, LLC, Plaintiff,
v.
SHERWOOD GROUP, INC., Defendant.
**No. 09 Civ. 0902(LMM).**

Aug. 10, 2009.

*MEMORANDUM AND ORDER*

McKENNA, District Judge.

**\*1** Sherwood Group, Inc. ("Sherwood" or "Counterclaim Plaintiff") seeks leave to amend its Counterclaim to add a count for patent false marking under 35 U.S.C. § 292 against Max Impact, LLC ("Max Impact" or "Counterclaim Defendant"). For the following reasons, Counterclaim Plaintiff's motion is DENIED.[FN1]

> **FN1.** The Court notes Max Impact's objection that Sherwood's motion is procedurally defective, as Sherwood failed to file a notice of motion. The Court accepts the parties' letter briefing.

***1.***

To amend its counterclaim to add a new count for patent false marking, Sherwood would need to be granted leave of the Court. Under Federal Rule of Civil Procedure 15(a)(2), leave should be freely granted if it serves the ends of justice. Fed.R.Civ.P. 15(a)(2). However, leave to amend should be denied if, *inter alia,* such amendment would be futile. Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Amendment would be futile if, for instance, the amended pleading would be unable to withstand a 12(b)(6) motion to dis-

miss. *See Lucente v. IBM,* 310 F.3d 243, 258 (2d Cir.2002).

***2.***

Sherwood alleges that Max Impact has falsely indicated that its Rollbana product is patented under U.S. Patent No. 5,176,774 ("the '774 patent"), when, in fact, Max Impact has knowledge that the Rollbana is not made according to the methods claimed in the '774 patent. Sherwood asserts that Max Impact is thereby in violation of 35 U.S.C. § 292 and seeks half of any penalty assessed, pursuant to § 292(b), and attorneys fees.

In relevant part, § 292 provides that "[w]hoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word 'patent' or any word or number importing that the same is patented, for the purpose of deceiving the public ... [s]hall be fined not more than $ 500 for every such offense." 35 U .S.C. § 292.

To state a claim for false marking under 35 U.S.C. § 292, a plaintiff must allege that the defendant "acted with the deceptive purpose necessary to trigger liability under the false marking statute." *Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. De C.V.,* 464 F.3d 1339, 1355 (Fed.Cir.2006). The statute is "penal in nature and therefore must be construed strictly." *Proportion-Air, Inc. v. Buzmatics, Inc.,* 1995 WL360549, *3 (Fed.Cir.1995).

Plaintiff fails to meet this standard. Sherwood's proposed false marking allegation is simply a restatement of Sherwood's defense to Max Impact's infringement claim, which is, in essence, that Max Impact cannot prove that its banner is made in accordance with the methods of the '774 patent. This is an insufficient allegation of intent to deceive to sustain a motion to dismiss on the proposed false marking claim.

The intent to deceive cannot be presumed simply

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2448108 (S.D.N.Y.)
**(Cite as: 2009 WL 2448108 (S.D.N.Y.))**

because there exists a genuine dispute as to whether Sherwood's product infringes upon the '774 patent. First, Sherwood recounts only the favorable testimony of Huican Li ("Li"), the manufacturer of both Plaintiff and Defendant's banners. Sherwood posits that Max Impact has "failed to submit any evidence in this case or the prior case as to how Max Impact's banners are manufactured." (Defendant's Answer, Affirmative Defenses and Amended Counterclaims to Plaintiff's Complaint ¶ 33.) Then, in the very next paragraph, Sherwood lodges the allegation that "[a]ccordingly, Max Impact knows from the evidence of Mr. Li and Dr. Koberstein that Max Impact's 'Rollabana' product is not made according to the specific steps claimed in the '774 patent." (*Id.* at ¶ 34.) The paucity of merit in Sherwood's proposed counterclaim is underscored by the conclusory progression of its allegations. Nothing in the allegations sufficiently suggests that Max Impact acted with a deceptive purpose in marking its Rollabana as patented.

**\*2** To be clear, though when Max Impact sought injunctive relief, the Court determined it had failed to meet its burden to persuade the Court that it could prevail on its infringement claim, *see Max Impact, LLC v. Sherwood Group, Inc.,* 2009 WL 1448983 (S.D.N.Y., May 20, 2009); *Max Impact, LLC v. Sherwood Group, Inc.,* 2009 WL 415611 (S.D.N.Y., February 13, 2009), the Court has never indicated, as Sherwood seems to suggest, that Max Impact's claim that the Rollabana and Expand-A-Banner are made according to the '774 patent is untenable. In fact, despite any prior failure of proof, Max Impact's legal basis for alleging infringement, in conjunction with the lack of sufficient allegations of deceptive intent, is sufficiently colorable as to preclude a finding of the intent to deceive required under a false marking claim. *See Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. De C.V.,* 464 F.3d 1339, 1355 (Fed.Cir.2006).

For the foregoing reasons, the Counterclaim Plaintiff's motion to amend its Counterclaim is DENIED.

SO ORDERED.

S.D.N.Y.,2009.
Max Impact, LLC v. Sherwood Group, Inc.
Slip Copy, 2009 WL 2448108 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2523211 (N.D.Ill.)
**(Cite as: 2010 WL 2523211 (N.D.Ill.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
Thomas SIMONIAN, Plaintiff,
v.
CISCO SYSTEMS, INC., Defendant.
**No. 10 C 1306.**

June 17, 2010.

David P. Germaine, Joseph Michael Vanek, John Paul Bjork, Vanek, Vickers & Masini, P.C., Bruce S. Sperling, Robert David Cheifetz, Sperling & Slater, Jessica Elyse Rissman, Martin Goering, Law Offices of Eugene M. Cummings, P.C., Chicago, IL, for Plaintiff.

David Aaron Nelson, Michael Francis Harte, Quinn Emanuel Unquhart Oliver & Hedges LLP, Chicago, IL, for Defendant.

### *MEMORANDUM OPINION*

SAMUEL DER-YEGHIAYAN, District Judge.

**\*1** This matter is before the court on Defendant Cisco Systems, Inc.'s (Cisco) motion to dismiss. For the reasons stated below, we grant the motion to dismiss.

### BACKGROUND

Plaintiff Thomas Simonian (Simonian), who is a relator for the purposes of this *qui tam* action, alleges that Cisco has marked its products with expired patents, and provides Internet Protocol Set Top Box Model No. IPN330HD as an example. The Internet Protocol Set Top Box Model No. IPN330HD shown in the complaint was allegedly manufactured in October 2009. Seven of the patents marked on the In-

ternet Protocol Set Top Box Model No. IPN330HD were allegedly expired at the time of the product's manufacture. According to Simonian, Cisco is a sophisticated company, with "decades of experience applying for, obtaining, and/or litigating patents." (Compl.Par.17). Simonian contends that Cisco has knowledge that its products are marked with expired patents. Simonian also claims that Cisco "intentionally marked its products with the expired patents ... to prevent competitors from entering the market and for the purpose of deceiving the public." (Compl.Par.20). Simonian has brought a *qui tam* action against Cisco for false patent marking pursuant to 35 U.S.C. § 292. Cisco has moved to dismiss Simonian's claim.

### LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) (Rule 12(b)(1)) requires a court to dismiss an action when it lacks subject matter jurisdiction. *United Phosphorus, Ltd. v. Angus Chemical Co.,* 322 F.3d 942, 946 (7th Cir.2003). If the concern of the court or party challenging subject matter jurisdiction is that "subject matter jurisdiction is not evident on the face of the complaint, the motion to dismiss pursuant to Rule 12(b)(1) would be analyzed as any other motion to dismiss, by assuming for purposes of the motion that the allegations in the complaint are true." *Id.; see also Ezekiel v. Michel,* 66 F.3d 894, 897 (7th Cir.1995) (stating that when reviewing a motion to dismiss brought under Rule 12(b)(1), this court "must accept as true all well-pleaded factual allegations, and draw reasonable inferences in favor of the plaintiff"). For the purpose of determining subject matter jurisdiction, this court "may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Ezekiel,* 66 F.3d at 897 (quoting *Capitol Leasing Co. v. Federal Deposit Insurance Corp.,* 999 F.2d 188, 191 (7th Cir.1993)). The burden of proof in a Rule 12(b)(1)

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2523211 (N.D.Ill.)
**(Cite as: 2010 WL 2523211 (N.D.Ill.))**

motion is "on the party asserting jurisdiction." *United Phosphorus, Ltd.,* 322 F.3d at 946.

In ruling on a motion to dismiss brought pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) ( Rule 12(b)(6)), a court must "take all of the factual allegations in the complaint as true" and make reasonable inferences in favor of the plaintiff. *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (stating that the tenet is "inapplicable to legal conclusions"); *Thompson v. Ill. Dep't of Prof'l Regulation,* 300 F.3d 750, 753 (7th Cir.2002). To defeat a motion to dismiss brought pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal,* 129 S.Ct. at 1949 (internal quotations omitted) (emphasis in original) (quoting in part *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

### DISCUSSION

*2 Cisco argues that Simonian's complaint should be dismissed because Simonian lacks standing to pursue his claim and because Simonian has not met the pleading requirements of Federal Rule of Civil Procedure 8(a) (Rule 8(a)) or Federal Rule of Civil Procedure 9(b) (Rule 9(b)).

*I. Standing*

Cisco argues that Simonian lacks standing to pursue a claim under 35 U.S.C. § 292 because he has not alleged that he is a competitor or a purchaser of the product. Generally, to meet the requirements of constitutional standing under Article III, a plaintiff must establish that he (1) suffered "an injury in fact," (2) that the injury is "fairly traceable to the challenged action of the defendant," and (3) that the injury is likely to be redressed by the court. *Lujan v. Defender's of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (citations omitted) (internal quotations omitted). However, in this case, the plain language of 35 U.S.C. § 292(b)

provides that "[a]ny person" is permitted to sue for false marking. 35 U.S.C. § 292(b). In addition, 35 U.S.C. § 292 is a *qui tam* statute. *See Forest Group, Inc.,* 590 F.3d 1295, 1303 (Fed.Cir.2009) (stating that "Congress' interest in preventing false marking was so great that it enacted a statute which sought to encourage third parties to bring *qui tam* suits to enforce the statute" and that "the false marking statute explicitly permits *qui tam* actions"). In the case of *qui tam* statutes, an injury to the United States is sufficient to confer standing upon a relator. *See Vermont Agency of Natural Resources v. U.S. ex rel. Stevens,* 529 U.S. 765, 773-74, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (stating that "the assignee of a claim has standing to assert the injury in fact suffered by the assignor" and that therefore a *qui tam* statute "can reasonably be regarded as effecting a partial assignment of the Government's damages claim"). The United States is injured when the laws it enacts to protect the public are violated. *See Id.* at 771 (discussing injury to the sovereignty of the United States); *Forest,* 590 F.3d at 1302-03 (discussing the important public policy reasons for enforcing the false marking statute). Since the United States suffers an injury when the false marking statute is violated, Simonian has standing to assert a claim against Cisco under 35 U.S.C. § 292.

*II. Sufficiency of the Complaint*

Cisco argues that Simonian has not alleged sufficient facts to support his claims under either Rule 8(a) or Rule 9(b), and that therefore, Simonian's claim should be dismissed. To prevail on a claim for false marking, a plaintiff must show that a defendant marked "an unpatented article" with the "intent to deceive the public." *Forest,* 590 F.3d at 1300.

*A. Applicability of Rule 9(b)*

Since "intent to deceive" is an element of the claim, some courts have found that Rule 9(b) applies to false marking claims. *See., e.g., Juniper Networks*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2523211 (N.D.Ill.)
**(Cite as: 2010 WL 2523211 (N.D.Ill.))**

*v. Shipley,* 2009 WL 1381873, at *4 (N.D.Cal.2009) (stating that "[t]he false marking statute is a fraud-based claim, which is subject to the pleading requirements of Federal Rule of Civil Procedure 9(b)"). However, the case law is still developing, and at this time, there is no binding precedent on this issue. Although in its reply, Cisco represents that Simonion has conceded that Rule 9(b) applies to false marking claims (*see* Reply 8 n. 3), Simonian actually indicated that he need not argue whether Rule 9(b) applies because his complaint meets both pleading standards (*see* Response 11 n. 4).

**\*3** False marking is only actionable where there is an "an intent to deceive." *Forest,* 590 F.3d at 1300. Therefore, a claim brought under 35 U.S.C. § 292 "is a fraud-based claim." *Juniper,* 2009 WL 1381873, at *4. Fraud-based claims are subject to the heightened pleading requirements of Rule 9(b). *See, e.g., United States ex rel. Gross v. AIDS Research Alliance-Chicago,* 415 F.3d 601 at 604 (7th Cir.2005) (stating that "[t]he [False Claims Act] is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure"); *see also Exergen Corporation v. Wal-Mart Stores, Inc.,* 575 F.3d 1312, 1326-30 (Fed.Cir.2009) (applying Rule 9(b) pleading to an inequitable conduct claim, which requires an individual to have a "specific intent to deceive"). Accordingly, the Rule 9(b) pleading standard applies to Simonian's false marking claim.

*B. Analysis of the Complaint under Rule 9(b)*

Under Rule 9(b), a party "must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). The term "circumstances" refers to the specific "who, what, where, when, and how" surrounding the misrepresentation. *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.2009) (citation omitted). In the instant action, Simonian has specifically identified the product Cisco allegedly mismarked and the patents on the product

that are allegedly expired. In addition, Simonian has alleged the dates such patents expired and the date that the product was manufactured. Thus, Simonian has adequately alleged the circumstances surrounding the alleged false marking.

With respect to the "intent to deceive" element of the claim, Rule 9(b) allows intent or "other conditions of a person's mind" to be alleged generally. Fed.R.Civ.P. 9(b). However, the pleadings must "allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind." *Exergen,* 575 F.3d at 1327; *see also Robin v. Arthur Young & Co.,* 915 F.2d 1120, 1127 (7th Cir.1990) (stating that "while the defendant's mental state need not be pleaded with particularity, 'the complaint must still afford a basis for believing that plaintiffs could prove scienter' ") (citation omitted). Allegations based on "information and belief [are] permitted under Rule 9(b) when essential information lies uniquely within another party's control, *but only if the pleading sets forth specific facts upon which the belief is reasonably based." Id.* at 1330 (emphasis added).

Where a party making a misrepresentation has knowledge of the misrepresentation, intent to deceive can be inferred. *Clontech Lab, Inc. v. Invitrogen Corp.,* 406 F.3d 1347, 1352 (Fed.Cir.2005). Simonian has alleged that "upon information and belief" Cisco is "a sophisticated company and has many decades of experience applying for, obtaining, and/or litigating patents." (Compl.Par.17). Simonian has not alleged any specific facts upon which he bases this allegation. In addition, all of Simonian's other allegations related to Cisco's knowledge and "intent to deceive" not only flow from there, but are also based upon information and belief unsupported by specific facts. (Compl.Par.18-20). Thus, Simonian has failed to plead specific facts showing Cisco's knowledge of the mismarking or its intent to deceive the public.

**\*4** Simonian has cited to *Lusby v. Rolls-Royce Corporation,* 570 F.3d 849 (7th Cir.2009), to support his argument that his complaint satisfies the partic-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 2523211 (N.D.Ill.)
**(Cite as: 2010 WL 2523211 (N.D.Ill.))**

ularity requirements of Rule 9(b). In *Lusby,* the Seventh Circuit stated that a pleading need not "exclude all possibility of honesty in order to show the particulars of fraud" and that "[i]t is enough to show, in detail, the nature of the charge, so that vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy." 570 F.3d at 854-55. Applying those standards, the Seventh Circuit found that the plaintiff's complaint in *Lusby* satisfied Rule 9(b). However, the complaint in *Lusby* included specific factual allegations to support the inference of fraudulent intent. *Id.* at 853-54. For example, the plaintiff in *Lusby* alleged that the defendant company had knowledge of the misrepresentation at issue because the plaintiff informed supervisors of the relevant facts and because the company's audits confirmed the information conveyed by the plaintiff to the company. *Id.* In contrast, there are no specific factual allegations to support an inference of fraudulent intent in Simonian's complaint.

Simonian has also cited a recent Supreme Court decision, *Merck & Co., Inc. v. Reynolds,* --- U.S. ----, 130 S.Ct. 1784, --- L.Ed.2d ---- (2010), which Simonian cites for the proposition that certain statements, when shown as false, show scienter as well. *Id.* at 1796-97 (stating that "it is unlikely ... that someone would falsely say 'I am married' without being aware of the fact that his statement is false"). However, *Merck* was an action for securities fraud brought under § 10(b) of the Securities Exchange Act of 1934. *Id.* In addition, the Supreme Court held in *Merck* that "[w]here § 10(b) is at issue, the relation of factual falsity and state of mind is more context specific" and that "[a]n incorrect prediction about a firm's future earning, by itself, does not automatically tell us whether the speaker deliberately lied or just made an innocent (and therefore nonactionable) error." *Id.* at 1979. Similarly, the mere fact of mismarking a product does not necessarily show knowledge or intent. Thus, Simonian cannot proceed with his claim absent any specific factual allegations indicating that Cisco had knowledge of the mismarking or an intent to deceive the public. Based upon the above, we find that Simonian's complaint does not meet the heightened pleading requirements of Rule 9(b), and therefore we grant Cisco's motion to dismiss the complaint.

If Simonian can cure the deficiency in his complaint, Simonian may file a motion for leave to file an amended complaint by July 1, 2010. If Simonian files a motion for leave to file an amended complaint by July 1, 2010, Cisco will be given until July 8, 2010, to file a response. If Simonian fails to file a motion for leave to file an amended complaint by July 1, 2010, or if Simonian fails to file a motion for leave to file an amended complaint by July 1, 2010, with sufficient detail to withstand a subsequent motion to dismiss, the instant action will be dismissed. *See, e.g., Crestview Village Apartments v. U.S. Dept. of Housing and Urban Development,* 383 F.3d 552, 558 (7th Cir.2004) (explaining that "a 'court may deny leave to amend if the proposed amendment fails to cure the deficiencies in the original pleading, or could not survive a second motion to dismiss' ") ( *Perkins v. Silverstein,* 939 F.2d 463, 471-72 (7th Cir.1991)).

## CONCLUSION

**\*5** Based on the foregoing analysis, we grant Cisco's motion to dismiss.

N.D.Ill.,2010.
Simonian v. Cisco Systems, Inc.
Slip Copy, 2010 WL 2523211 (N.D.Ill.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 1912650 (N.D.Ill.)
**(Cite as: 2010 WL 1912650 (N.D.Ill.))**

**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois,
Eastern Division.
ZOJO SOLUTIONS, INC., Plaintiff,
v.
The STANLEY WORKS, Defendant.
**No. 10 C 1175.**

May 12, 2010.

**Background:** Patentee moved to dismiss quit tam suit alleging false patent marking.

**Holdings:** The District Court, Milton I. Shadur, Senior District Judge, held that:

(1) prohibition on false marking of any "unpatented" article applied to patentee's alleged marking of articles with expired patent designation, and

(2) private plaintiff possessed standing to bring action.

Motion denied.

West Headnotes

**[1] Patents 291 ⊱222**

291 Patents
    291XI Regulation of Dealings in Patent Rights and Patented Articles
        291k222 k. Marking Patented Articles. Most Cited Cases

Prohibition on false marking of any "unpatented" article applied not only to articles that were never patented, but also to patentee's alleged marking of articles with expired patent designation; in qui tam action alleging false patent marking; use of patent designation on article after patent expired and entered public domain deterred innovation and stifled competition in marketplace, just as falsely marking article which was never patented did. 35

U.S.C.A. § 292(a).

**[2] Patents 291 ⊱224**

291 Patents
    291XI Regulation of Dealings in Patent Rights and Patented Articles
        291k224 k. Penalties for Violations of Regulations. Most Cited Cases

Private plaintiff had standing to bring qui tam false patent marking action, under provision of patent statute explicitly allowing members of the public to sue on behalf of the government, to help control false patent marking, despite contention that suit was an action to enforce a penal law that was not subject to oversight or control by executive branch, in violation of "Take Care Clause" of federal constitution. U.S.C.A. Const. Art. 2, § 3; 35 U.S.C.A. § 292.

Matthew S. Miller, Law Offices of Matthew S. Miller, Michael Thomas Layden, John C. Ellis, Richard J. Prendergast, Richard J. Prendergast, Ltd., Chicago, IL, for Plaintiff.

David C. Van Dyke, Trisha K. Tesmer, Cassiday Schade LLP, Chicago, IL, Bryan P. Collins, Sarah R. Greene, Pillsbury Winthrop Shaw Pittman LLP, McLean, VA, for Defendant.

*MEMORANDUM ORDER*

MILTON I. SHADUR, Senior District Judge.

**\*1** Stanley Black & Decker, Inc. ("Stanley") FN1 has noticed up for presentment on May 14 a motion to dismiss this action brought against it by Zojo Solutions, Inc. ("Zojo")-an action among the very large number of lawsuits around the country that claim false patent marking in violation of 35 U.S.C. § 292(a) ("Section 292(a)"). This and all such other actions, which dot the greensward of patent litigation like an infestation of dandelions, have been prompted by the Federal Circuit's decision in

--- F.Supp.2d ----, 2010 WL 1912650 (N.D.Ill.)
**(Cite as: 2010 WL 1912650 (N.D.Ill.))**

*Forest Group, Inc. v. Bon Tool Co.,* 590 F.3d 1295 (Fed.Cir.2009), which has created the prospect of extraordinarily large damage awards in qui tam suits brought to enforce Section 292(a).

[1] Although the defendants in other like actions on this Court's calendar and those of its colleagues have launched different attacks on the complaints in those cases, here Stanley has pointed to two claimed problems with Zojo's lawsuit:

> 1. Fed.R.Civ.P. ("Rule") 12(b)(6) assertedly calls for dismissal because Section 292(a) outlaws the false marking of "any unpatented article," while Stanley contends that its challenged articles are not "unpatented" because they practice a once-existing, but now-expired, patent.

> 2. Even if that assertion fails, Rule 12(b)(1) assertedly calls for dismissal for lack of subject matter jurisdiction because Zojo is said to lack standing to bring the lawsuit. Stanley says the "Take Care Clause" of U.S. Const. art. II, § 3 is violated by Section 292(a) because that statute "vest[s] the authority to enforce a penal law in a private plaintiff with absolutely no oversight or control by the Executive Branch of the U.S. government" (Stanley Mem. 2).

Because this Court is bound to follow the teaching of the Federal Circuit in this action under the patent laws, and because *Forest Group* effectively answers-and rejects-both of those contentions, this Court need not await Zojo's response to the motion to dismiss. Instead it will simply quote the relevant portions of the *Forest Group* opinion.

As for Stanley's Rule 12(b)(6) contention, here is what *Forest Group,* 590 F.3d at 1302-03 (citations and internal quotation marks omitted) says:

> The marking and false marking statutes exist to give the public notice of patent rights. Congress intended the public to rely on marking as a ready means of discerning the status of intellectual property embodied in an article of manufacture or

design. Acts of false marking deter innovation and stifle competition in the marketplace. If an article that is within the public domain is falsely marked, potential competitors may be dissuaded from entering the same market. False marks may also deter scientific research when an inventor sees a mark and decides to forego [sic] continued research to avoid possible infringement. False marking can also cause unnecessary investment in design around or costs incurred to analyze the validity or enforceability of a patent whose number has been marked upon a product with which a competitor would like to compete. In each instance where it is represented that an article is patented, a member of the public desiring to participate in the market for the marked article must incur the cost of determining whether the involved patents are valid and enforceable.

**\*2** All of those perceived evils are present when a patentee continues to affix the "patent" designation to an article even after it has entered the public domain by reason of the patent's expiration.[FN2]

[2] And as for Stanley's Rule 12(b)(1) motion, *Forest Group* has confronted-and here too has rejected-the notion that private plaintiffs such as Zojo were not intended to be granted authority to bring this type of action. Here is *Forest Group,* 590 F.3d at 1303-04 (citations to articles omitted):

> Congress' interest in preventing false marking was so great that it enacted a statute which sought to encourage third parties to bring qui tam suits to enforce the statute.

> Forest argues that interpreting the fine of § 292 to apply on a per article basis would encourage "a new cottage industry" of false marking litigation by plaintiffs who have not suffered any direct harm. This, however, is what the clear language of the statute allows. Section 292(b) provides that "[a]ny person may sue for the penalty, in which event one-half shall go to the person suing and the other to the use of the United States." 35 U.S.C. § 292(b). As noted by Forest, an *amicus*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 1912650 (N.D.Ill.)
**(Cite as: 2010 WL 1912650 (N.D.Ill.))**

brief was filed in this case by an individual who created a holding company to bring *qui* tam actions in false marking cases. Commentators have discussed a surge of such actions in recent years, noting the possible rise of "marking trolls" who bring litigation purely for personal gain.

Rather than discourage such activities, the false marking statute explicitly permits *qui* tam actions. By permitting members of the public to sue on behalf of the government, Congress allowed individuals to help control false marking.

To be sure, that treatment does not extend to the constitutional argument advanced by Stanley, but it must be remembered that if the Federal Circuit had perceived that the statute posed a subject matter jurisdictional problem, it would have been obligated to raise and address that issue sua sponte. In a sense, then, that court's failure to speak of any potential problem of unconstitutionality could be viewed as confirming the validity of the statute. In any event, this Court will leave that task to the Federal Circuit if this action gives rise to an appeal.

Accordingly Stanley's motion is denied, and counsel for the litigants will not be required to appear at the designated presentment date. This denial also calls for vacating the schedule previously set by this Court except for the 9 a.m. May 28 status hearing date, which is retained. In the meantime Stanley is ordered to answer the Complaint on or before May 26, 2010.

FN1. According to Stanley's filings in this case, it was formerly known as "The Stanley Works," the appellation employed in the Complaint and hence in the case caption here.

FN2. It is also worth noting that in part Section 292(a) refers to a marking that contains "the word 'patent' or any word or number importing that the same *is* patented" (emphasis added). That use of the present tense "is" appears to undercut

Stanley's argument as to an article that once was protected by a patent but no longer is.

N.D.Ill.,2010.
Zojo Solutions, Inc. v. Stanley Works
--- F.Supp.2d ----, 2010 WL 1912650 (N.D.Ill.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.